**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JIMMY LYONS and JACQUELINE LYONS, individually and on behalf of all others similarly situated, | Civil Action No. 13-CV-0513 |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT ECF CASE** |
| LITTON LOAN SERVICING LP, GOLDMAN SACHS GROUP, INC., and OCWEN FINANCIAL CORPORATION, | JURY TRIAL DEMANDED |
| Defendants. | |

## <u>INTRODUCTION</u>

1.      This is a proposed class action brought by Plaintiffs Jimmy Lyons and Jacqueline Lyons ("Plaintiffs"), on behalf of themselves and all other persons who have or had a residential mortgage loan owned, originated and/or serviced by Defendants Litton Loan Servicing LP ("Litton"), Goldman Sachs Group, Inc. ("Goldman Sachs"), and/or Ocwen Financial Corporation ("Ocwen") as successor in interest to Litton, and, in connection therewith, were required to pay for "force-placed" insurance on the secured property.  Plaintiffs allege that Defendants derived improper financial benefits by imposing force-placed insurance policies on properties, some of which are already covered by homeowners insurance policies purchased by the homeowner.  In addition, Defendants improperly charged residential borrowers for Defendants' "cost" of procuring force-placed insurance from its contracted insurance agents, but a portion of such "cost" is returned, transferred or paid to Litton and/or its related entities.  Plaintiffs seek to recover damages equal to the amount of the improper and inequitable financial benefit received by Defendants and/or their affiliates as a result of this anti-consumer practice, and to rescind

and/or enjoin the future collection of amounts charged against the mortgage accounts of residential borrowers but not yet collected.

2.     Lenders require borrowers to purchase and agree to maintain hazard insurance coverage on the secured property as a condition to funding home loans.  Plaintiffs were required to obtain and maintain hazard insurance as a condition of their mortgage.

3.     In the event that borrowers' hazard insurance policies lapse, rather than attempt to maintain borrowers' existing policies, mortgage loan servicers such as Litton choose to replace borrowers' insurance policies with more expensive ones, known as "force-placed insurance" or "lender-placed insurance" ("FPI" or "LPI") policies.  Such policies provide substantially less coverage and are substantially more costly than the borrowers' original policies, while providing lucrative financial benefits to the loan servicers and/or their affiliates.  Further, such policies often provide unnecessary or duplicative coverage, in that they are improperly backdated to collect premiums for time periods during which the mortgagor has absolutely no risk of loss or are placed on properties where there is no lapse in coverage.

4.     Defendants exploited Litton's contractual authority to force-place insurance to reap additional and unjustified profits in the form of fees, commissions, discounted tracking services, and other forms of consideration at the expense of borrowers whose insurance was force-placed.  These improper fees and charges were not legitimately related to the cost of the force-placed insurance or the purposes for which force-placed insurance is purchased – to protect the lender's interest in the property.

5.     The insurance premiums paid by and/or assessed to Plaintiffs and Class members also included amounts not attributable to the cost of providing force-placed insurance but, instead, constituted expenses associated with servicing the loans.  The small percentage of

borrowers who were force to pay for LPI were therefore shouldering the costs of monitoring Litton's entire loan portfolio – effectively providing kickbacks to Defendants in the form of subsidies paid by borrowers whose insurance was force-placed.  *See* Testimony of Birny Birnbaum on Behalf of the Center for Economic Justice before the Florida Office of Insurance Regulation (July 3, 2012), attached hereto as Exhibit 1 ("Birnbaum Florida Testimony").

6.      Defendants' scheme funneled profits to Defendants that were generated through their collusive activities with their insurance agents.  As one journalist observed:

> In the pantheon of modern-day mortgage abuses, force-placed insurance hasn't attracted much attention.  But it generates hundreds of millions of dollars a year in fees and commissions for insurance companies, banks and other financial institutions. Policies are sometimes backdated to cover periods that have already passed.
>
> In essence, critics say, high-priced insurance policies cover a time when no events happened.  And often, the mortgage company and the force-placed-insurance company are affiliated, with the mortgage company receiving a "service fee" in return for the business.  But homeowners don't know that."

*See* Dave Lieber, Everyone Profits Off Force-Placed Insurance, Except Homeowner, Star-Telegram (Oct. 1, 2011), attached hereto as Exhibit 2.

7.      Recently, the force-placed insurance practices of lenders, servicers and insurance companies have come under increased scrutiny by regulatory authorities.  In October 2011, a number of mortgage servicers and insurers received subpoenas from the New York Department of Financial Services ("NYDFS") with respect to lender-placed insurance activities dating back to September 2005.  In connection with its investigation of the force-placed insurance practices of lenders and insurers, the NYDFS sent formal document requests to a number of insurers that engage in the business of force-placed insurance, including American Modern Home, the insurance agent that force-placed Plaintiffs' insurance as set forth below.  *See* Press Release,

N.Y. Dep't of Fin. Servs., Department of Financial Services Expands Probe into Force-Placed Insurance, Demanding Explanation for High Rates; Will Hold Public Hearings (Apr. 5, 2012), *available at* http://www.dfs.ny.gov/about/press/pr1204051.htm, attached hereto as Exhibit 3.[1]

8.      In addition, on September 1, 2011, the NYDFS entered into an agreement with Defendants Goldman Sachs, Litton, and Ocwen regarding these entities' adherence to certain mortgage servicing practices.  *See* Press Release, N.Y. Dep't of Fin. Servs., Superintendent Lawsky Announces Agreement with Goldman Sachs, Ocwen, Litton on Groundbreaking New Mortgage            Practices         (Sept.         1,         2011),         *available*            *at* http://www.dfs.ny.gov/about/press/pr110901.htm (hereinafter N.Y. Dept. of Fin. Servs., Sept. 1, 2011 Press Release), attached hereto as Exhibit 5.  Included in this agreement is the requirement that the loan servicers "ensure that any force-placed insurance be reasonably priced in relation to claims incurred" and a prohibition against "force-placing insurance with an affiliated insurer." *Id.*; *see also* N.Y. Dep't of Fin. Servs. Banking Dep't, Agreement on Mortgage Servicing Practices (Sept. 1, 2011), *available at* http://www.dfs.ny.gov/about/press/clocwen.pdf, attached hereto as Exhibit 6.  The agreement was entered into as a condition of the NYDFS's approval of

---

[1] American Modern Insurance Group, Inc. ("AMIG") is a subsidiary of Munich Re Group, a German corporation headquartered in Munich, with its U.S. corporate office located in Amelia, Ohio.  AMIG is a provider of insurance products including "lender-placed" hazard insurance. *See*    *About*    *American*    *Modern*,    American    Modern    Insurance    Group, http://fid.amig.com/about.html (last accessed Jan. 22, 2013).  AMIG "writes insurance policies mostly through three companies," American Modern Home Insurance Company, American Family Home Insurance Company, and American Modern Select Insurance Company.  *See About Us*, American Modern Insurance Group, http://www.amig.com/aboutus.html (last accessed Jan. 22, 2013).  Upon information and belief, American Modern Home Insurance Company ("American Modern Home") is a subsidiary of AMIG that underwrites force-placed insurance policies.  *See* Exhibit 4 (Evidence of Insurance (listing American Modern Home as company underwriting force-placed insurance policy)).

Ocwen's acquisition of Litton and did not preclude any future investigations of past practices or release any future claims or actions.  *See* N.Y. Dept. of Fin. Servs., Sept. 1, 2011 Press Release.

9.      The NYDFS also convened hearings on May 17, 18 and 21, 2012, to investigate the force-placed insurance industry.   On the opening day of these hearings, NYDFS Superintendent Benjamin Lawsky noted that his department's initial inquiry uncovered "serious concerns and red flags" which included:  (a) exponentially higher premiums for force-placed insurance than regular homeowners insurance; (b) extraordinarily low loss ratios; (c) harm to distressed borrowers; (d) lack of competition in the market; (e) increased reliance on force-placed insurance as a major profit center for both banks and insurers; and (f) "tight relationships between banks, their subsidiaries and insurers."   *See* Opening Statement of Benjamin M. Lawsky, Superintendent of Financial Services (May 17, 2012), attached hereto as Exhibit 7.  As Superintendent Lawsky summarized, the net result of these practices:

> Take[] the form of large commissions being paid by insurers to the banks for what appears to be very little.  In other cases, banks have set up reinsurance subsidiaries who take over the risk from the insurance companies.  Thus, the banks pay high premiums for coverage that is highly profitable and then those profits revert right back to the banks through reinsurance agreements.

> *          *          *          *

> In sum, when you combine [the] close and intricate web of relationships between banks and insurance companies on the one hand, with high premiums, low loss ratios and lack of competition on the other hand, it raises serious issues and questions….

*Id.*

10.     In addition, the National Association of Insurance Commissioners ("NAIC") – the lead national insurance regulatory organization created and governed by the chief insurance regulators from all 50 states that is charged with establishing standards and best practices, conducts peer review, and coordinates regulatory oversight – recently began investigating force-

placed insurance practices and held public hearings on August 9, 2012 to look into the force-placed insurance practices of banks and their partners.  *See* Mark E. Ruquet, *NAIC Promises Greater Focus on Force-Placed Insurance as CFPB Proposes Rules*, PropertyCasualty360.Com (Aug. 10, 2012), *available at* http://www.propertycasualty360.com/2012/08/10/naic-promises-greater-focus-on-force-placed-insura, attached hereto as Exhibit 8.

11.     In this action, Plaintiffs challenge, among other things as further described herein, Defendants' decision to purchase force-placed insurance from their insurance agents pursuant to agreements that returned an improper financial benefit to Defendants and/or their subsidiaries/affiliates that is unrelated to any contractual or other *bona fide* interest in protecting the lender's interest in the loan, and which resulted in the force-placement of unnecessary insurance and unauthorized, unjustified and unfairly inflated costs to the borrower for force-placed insurance in violation of law.

12.     Upon information and belief, during the Class Period, Defendants entered into agreements with their insurance agents pursuant to which Defendants and/or their subsidiaries/affiliates:  (a) received a portion of the premiums for each force-placed insurance policy purchased for a borrower; (b) assumed a portion of the force-placed insurance policies originally written by force-placed insurance providers without any real or commensurate transfer of risk; and/or (c) received services in kind, including discounted insurance tracking services.

13.     Throughout the Class Period, Defendants engaged in unlawful, abusive and unfair practices with respect to force-placed insurance, including, as described in further detail below: (a) force-placing insurance according to pre-arranged agreements at a substantially higher cost to the borrower, to unjustly generate profits for themselves; (b) charging Class members unreasonably high amounts for FPI, inflated by unreasonable expenses unrelated to the provision

of FPI and which result from collusion among affiliates involved in the process; (c) receiving improper fees, payments, commissions and/or other things of value from providers of force-placed insurance; (d) forcing borrowers to pay for duplicative and/or backdated insurance coverage; (e) improperly exploiting the ability to manage and gain access to escrow funds in breach of fiduciary obligations to increase profits to lenders, servicers and insurance providers; and (f) misrepresenting that Defendants were force-placing insurance on Plaintiffs' and Class members' properties to secure their interests and omitting to inform Plaintiffs and Class members that they were force-placing insurance on their homes to not only protect the lender's interest, as contemplated by the mortgage contracts, but in such a manner as to generate an unreasonable and unwarranted profit for Defendants as the servicer of the loans.

14.    In this action, Plaintiffs do not challenge the rates of their force-placed insurance as excessive.  Rather, Plaintiffs challenge, among other things as set forth herein, Defendants' *decision to purchase* force-placed insurance from insurers that provide an improper financial benefit to Defendants and/or their affiliates and at rates that far exceed borrower-purchased insurance (while providing substantially less coverage), and seek statutory and compensatory damages, as well as restitution/disgorgement of Defendants' unjust enrichment.

## JURISDICTION AND VENUE

15.    This Court has diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"), given that minimal diversity exists among Plaintiffs and Defendants, there are more than 100 members in the Class, and the amount in controversy in this action exceeds $5,000,000.

16.    Venue is proper in this District under 28 U.S.C. § 1391(b) because one or more Defendants maintain a principal place of business in this District, regularly conduct business in

this District, and/or a substantial part of the events giving rise to the claims occurred in this District.

**PARTIES**

**Plaintiffs**

17.     Plaintiffs Jimmy Lyons and Jacqueline Lyons, husband and wife, are residents of Palm Bay, Florida.

18.     On or about October 26, 2006, Mr. and Mrs. Lyons refinanced their home mortgage loan with Fremont Investment and Loan (the "Lyons Mortgage").  The loan was secured by property located at 1007 SW La Belle Avenue, Palm Bay, Florida 32908 (the "Lyons Property").  The amount of the refinanced loan was $196,350.00.  *See* Lyons Mortgage, attached as Exhibit 9 hereto.

19.     The Lyons Mortgage is a standardized single family residential security instrument, "FLORIDA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS Form 3010 1/01." *Id.*

20.     Pursuant to the Lyons Mortgage, and as a condition of their loan's closing, Plaintiffs were required to insure the property which serves as collateral for the loan. *Id.* § 5.  In the event that coverage of the property is not maintained, "Lender may obtain insurance coverage, at Lender's option and Borrower's expense." *Id.*  As detailed in Section 5 under "UNIFORM COVENANTS" of the security deed:

> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance

8

coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

*Id.*[2]

**Defendants**

21.     Defendant Goldman Sachs Group, Inc. ("Goldman Sachs") is a Delaware corporation with its principal place of business located in New York, New York.  During a portion of the Class Period, Goldman Sachs was the corporate parent of Defendant Litton. According to the consent order between Goldman Sachs and the Board of Governors of the Federal Reserve System, "by virtue of its indirect ownership of Litton, Goldman Sachs was the 23rd largest servicer of residential mortgages in the United States," and Goldman Sachs, through Litton, serviced residential mortgages held by various investors, including the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, and other government-

---

[2] A standard mortgage clause or lender's loss payable endorsement typically continues coverage for the lender even after the insured has failed to pay premiums.  *See* Patrick A. Randolph, Jr., A Mortgagee's Interest in Casualty Loss Proceeds: Evolving Rules and Risks, 32 REAL PROP. PROB. & TR. J. 1, 2-3, 18-23 (1997).

sponsored entities.  *See In re* Goldman Sachs Grp., Inc., Consent Order (Sept. 1, 2011), *available at*  http://www.federalreserve.gov/newsevents/press/enforcement/enf20110901f1.pdf,   attached hereto as Exhibit 10.

22.     Defendant Ocwen Financial Corporation ("Ocwen") is a Florida corporation with its principal place of business located in Atlanta, Georgia.  On September 1, 2011, Ocwen acquired Litton from Goldman Sachs.  *See* Ocwen Financial Corporation 2011 Form 10-K, filed February 29, 2012, Exhibit 11.[3]  As part of the Litton acquisition, Ocwen and Goldman Sachs agreed to certain indemnification provisions, pursuant to which the two entities agreed to share certain losses resulting from third-party claims arising out of Litton's pre-closing servicing acitivites.  *Id.*     Upon information and belief, Litton's force-placed insurance practices complained of herein fall within the scope of these indemnification provisions.

## FACTUAL ALLEGATIONS

### A.     Defendants' Force-Placed Insurance Operations

23.     Each loan owned or serviced by Litton is secured by a mortgage or deed of trust on the underlying property.

24.     In order to protect the mortgagee's interest in the secured property, mortgage loan contracts typically allow the lender or third party servicer to "force-place" insurance when the borrower fails to maintain the requisite insurance.  Plaintiffs' and the Class members' mortgage loan contracts contain such provisions affording Litton the authority to force-place their insurance in the event of a lapse.  The failure of a borrower to maintain hazard insurance is

---

[3] Plaintiffs reserve all rights to add additional defendants at a later time should discovery reveal it to be appropriate.

clearly contemplated by the mortgage contract and such a failure by the borrower does not result in a material failure to perform under the mortgage contract.

25.     Defendants' discretion to force-place insurance, however, is limited by the bounds of reasonable conduct and by the express terms of the mortgage contract itself.  Defendants have routinely exceeded the bounds of reasonableness and the spirit, intent and letter of the mortgage contract by force-placing insurance in a manner and in amounts that are not required to protect the lender's interest in the property, in an effort to reap profits from the borrower which are neither required nor contemplated by the mortgage contract and through other conduct described herein with respect to the force-placement of insurance.

26.     The typical mortgage contract does not disclose that the lender or loan servicer will receive a financial benefit in connection with the force-placed insurance policy.  Instead, the contract misrepresents to borrowers that the cost passed on to them is necessary to protect the lender's interest in the secured property.

27.     Force-placed insurance policies are almost always more expensive than standard insurance coverage.  Reportedly, such policies cost up to ten times more than standard policies. While the FPI policy is for the benefit of the lender, the cost is passed on to the borrower.  *See* Jeff Horowitz, Ties to Insurers Could Land Mortgage Servicers in More Trouble, American Banker (November 10, 2010) (hereinafter Ties to Insurers), *available at* http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html, attached hereto as Exhibit 12.

28.     Once a lender and/or servicer receives evidence that a borrower has obtained his/her own insurance policy, the forced-placed coverage should be fully or partially canceled.

**B.     Loan Servicers Commonly Have Undisclosed Lucrative Pre-Arranged Agreements To Refer Borrowers To Certain Force-Placed Insurance Providers**

29.     The force-placement of insurance policies is a very lucrative business for loan servicers.   Commonly, the loan servicer selects the force-placed insurance provider in accordance with a pre-arranged agreement and force-places the policy in such a way as to receive substantial financial benefits from the provider.  The loan servicer benefits by placing the force-placed insurance policy either: (a) with an affiliate; or (b) with a third party provider who has already agreed to share revenue with the loan servicer in the form of a direct or indirect commission payment or through a "captive reinsurance agreement" whereby "reinsurance" premiums are ceded to a subsidiary of the lender and/or servicer.

30.     Under the commission arrangement, the provider of the force-placed insurance policy pays a commission either directly to the loan servicer or to an affiliate posing as an insurance "agent."  Typically, under such an arrangement, commissions are paid to a "licensed insurance agency" that is simply an affiliate or subsidiary of the loan servicer and exists only to collect the kickbacks/commissions collected from the force-placed insurance provider.

31.     Under the captive reinsurance arrangement, the provider of the force-placed insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer" of the loan servicer.  In return for the subsidiary purportedly agreeing to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums received on account of the policy.

32.     Illustrative of the typical kickback arrangements is the following graphic from American Banker:

# Sharing in the Profits

How servicers make money arranging force-placed coverage

## Commissions

To replace lapsed homeowners coverage, the servicer, working through a subsidiary, buys policy from insurer

Servicer advances premiums to insurer



Insurer pays portion of premium back to subsidiary as a commission

Servicer bills borrower for the policy



If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale



## Reinsurance

To replace lapsed coverage, servicer buys policy on home from insurer

Servicer advances premiums to insurer

Subsidiary of servicer reinsures part of the policy, gets a cut of premiums

If necessary, subsidiary buys letter of credit from another party

Servicer bills borrower for the policy

If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale

33.     J. Robert Hunter of the Consumer Federation recently described these practices in his testimony before the New York Financial Services Department in connection with the Department's inquiry into force-placed insurance practices:

> In some instances, lenders use [force-placed] insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or broker[s] or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using "fronting" primary insurers to direct the coverage to lender-affiliated captive reinsurers. Lenders often receive free or below cost service from affiliated service providers.

*See* J. Robert Hunter, Consumer Federation of America, Testimony Before NYDFS on Force-Placed Insurance 1 (May 17, 2012), Exhibit 13.

13

34.     Indeed, as Birny Birnbaum of the Center for Economic Justice, another experienced and noted expert in the area of force-placed insurance stated:

> Servicers have financial incentives to force-place the insurance because the premiums include commissions and other considerations for the servicer.  With some servicers, the insurance is reinsured through captive reinsurer of the servicer, resulting in additional revenue to the servicer from the force-placement coverage.

*See* Birny Birnbaum, Center for Economic Justice, Testimony Before NYDFS on Force-Placed Insurance 15 (May 21, 2012), Exhibit 14.

35.     Borrowers have no say or input into the carrier or terms of the force-placed insurance policies.  The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the loan servicer and the insurer, rather than negotiated between the borrower and the insurer.  *Id.*; *see also* Hunter NYDFS Testimony at 10, Exhibit 13.

36.     For their part, the loan servicers have no incentive to comparison shop for the best rate.  Rather, the loan servicers are financially motivated to refer borrowers to the provider that will provide the best financial benefit to the servicer in terms of commissions, ceded reinsurance premiums and/or other benefits such as discounted insurance tracking services that are established as part of the secret arrangements and profit-making scheme established by providers and affiliates.  Further, because the servicer's "commission" and/or reinsurance premium is usually related to the size of the policy, the servicer actually has an incentive to purchase the highest price insurance, an interest diametrically opposed to that of the borrower.  *See, e.g.,* Hunter NYDFS Testimony at 1, Exhibit 13.

37.     Commonly, a loan servicer enters into an agreement with a provider, pursuant to which it refers borrowers exclusively to the provider for force-placed insurance.

**C.**     **The Incentives And Opportunities For Abuse In The Administration Of Force-Placed Insurance Are Routinely Mined By Cooperating Participants in the Industry**

38.     Force-placed insurance policies are not underwritten on an individual policy basis.  Rather, loan servicers' contracts with force-placed insurance providers require or permit the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

39.     As J. Robert Hunter in his recent testimony before the New York Financial Services Department testified, "lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance."  *See* Hunter NYFSD Testimony at 5, Exhibit 13.  The lack of individual underwriting does not result in lower prices for consumers; quite to the contrary, actually.  Instead, as a result of the schemes described herein between the banks and servicers, consumers are gouged.

40.     Thus, for example, loan servicers often go so far as to actually outsource their insurance tracking and processing to the force-placed insurance provider.  The provider then continuously monitors the servicer's mortgage portfolio and verifies the existence of (or lack of) insurance on each mortgaged property.  In the event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an insurance certificate on the property on behalf of and for the benefit of the lender and/or servicer.  Thus, where these servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral.  *See* Ties to Insurers, Exhibit 12.

41.     Upon information and belief, Litton did not monitor its own loan portfolio to track insurance coverage but rather outsourced this function to its force-placed insurance providers.  AMIG, for example, provides insurance tracking services for its lender clients.  *See Insurance*

*Services*, American Modern Insurance Group, http://fid.amig.com/homeowners-insurance-tracking.html (last accessed Jan. 22, 2013).

42.     Indeed, during his recent testimony before the Property and Casualty Insurance and the Market Regulation and Consumer Affairs Committees at the 2012 NAIC Summer National Meeting on August 9, 2012, Joseph Markowicz of PRP Claims – an organization that proclaims to have been "Bridging the Lending and Insurance Communities, since 1992" – recognized that LPI premiums include not just the risk incurred but also "administrative costs undertaken by the LPI carrier on the lenders behalf, that are bundled into the costs of the premium" which in turn are passed on to "the general public." *See* Exhibit 15, Joseph Markowicz, PRP Claims, NAIC Testimony (Aug. 9, 2012). Thus, in return for purchasing higher-priced FPI, insurers provide kickbacks to loan servicers in the form of services in kind, the cost of which is ultimately borne by the borrowers.

43.     Force-placed insurer subsidiaries are highly profitable businesses. Further, "[t]he incentives and potential for abuse in the administration of LPI [lender placed insurance] are great. Consumers do not request the insurance, but are forced to pay for it. The cost of LPI is much higher than a policy the borrower would purchase on his or her own. Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases, the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the lender from the force-placement of the coverage." *See* Exhibit 16, Birny Birnbaum, Executive Director of the Center for Economic Justice, Testimony of Before the U.S. House of Representatives Subcommittee on Insurance, Housing and Community Opportunity Committee on Financial Services (July 28, 2011).

44.     In addition, "[t]he prices for residential property LPI are significantly excessive. In 2009, insurers paid only 16% of net premium in claims and in 2010 the ratio was 17%. Incredibly, lenders get a commission—totaling hundreds of millions of dollars—out of these premiums, despite the fact that the insurance is placed to protect the lenders' collateral.  The premiums also include the costs of tracking all the loans in the lenders' portfolios to identify those loans without insurance—so the lenders' cost of tracking all loans is passed only to those consumers paying for force-place [sic] insurance."  *Id.*

45.     While lenders and/or servicers such as Defendants profit from the force-placed insurance scheme, as part and parcel of their effort to maintain a shroud of secrecy over the scheme, servicers do not separately report their income from payments received from providers of force-placed insurance.  However, according to a recent article published by *American Banker*, "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars every year."  *See* Exhibit 12, Ties to Insurers (noting that servicers demand generous commissions and other payments in return for their referrals).

46.     Servicers commonly attempt to justify the high price of force-placed insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting. However, as *American Banker* noted:

> Though part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry—even after accounting for the generous commissions and other payments that servicers demand.

*Id.*

47.     Force-placed insurance providers have tools to assess risk and minimize unexpected risk of loss.  As stated succinctly in January 2007 by industry insider John Meadows, "Leveraging technologies and data elements that are available in most servicer's systems, an

innovative lender-placed carrier can offer products that take into account relevant property-specific risk characteristics to determine premium rates." *See* John Meadows, "*Evaluate Processes and Controls to Ensure Insurance Efficiencies*," Servicing Management, January 2007, attached hereto as Exhibit 17.

48.    Loan servicers also attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property. However, according to the Center for Economic Justice, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting. *See* Exhibit 14.

49.    As Birny Birnbaum of the Center for Economic Justice testified, servicer explanations for the high cost of force-placed insurance are "unsupported by any evidence." *See* Birnbaum NYDFS Testimony at 1, Exhibit 14. A central indicator of the level of risk incurred in a line of insurance is a "loss ratio." Simply put, a loss ratio is a comparison to the amount of money taken in premiums compared to the amount of money paid out on claims. Loss ratios for FPI have historically been very low, especially compared to traditional homeowner policies.

50.    In his testimony before the NYDFS, Birny Birnbaum presented statistics collected by the NAIC reflecting nationwide loss ratios for LPI hazard insurance during the 2004-2011 period as being, on average, *more than thirty-five points higher* than the ratios for commercially available homeowners' policies. *Id.* When confined to the period from 2007-2011, the disparity between LPI and hazard insurance loss ratios and those of commercially available homeowners' policies *was nearly 42 points*. *Id.*

51.    Moreover, because the policies are not individually underwritten, the force-placed insurer is spared the costs associated with individual underwriting. *Id.* at 26.

**D.**      **Defendants Charge Borrowers For Redundant And Unnecessary Insurance**

52.      Unnecessary or inappropriately priced force-placed insurance arises when a loan servicer forces borrowers to purchase and maintain such insurance for their property that is unnecessary, duplicative and/or in amounts greater than required by law or their mortgage agreements.

53.      Motivated by the lucrative financial incentive associated with force-placing insurance, upon information and belief, Defendants have required borrowers to pay for unnecessary insurance coverage.   Such examples include, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the mortgagee's interest in the secured property; (b) backdating force-placed insurance policies so that they cover time periods already passed when the policy is placed, thus requiring borrowers to pay for retroactive coverage for by-gone periods of time for which no risk of loss exists; and (c) requiring borrowers to pay for force-placed insurance policies covering periods of time following a lapse of previous insurance despite the fact that the lender's interest in the property was covered for such time pursuant to a "standard mortgage clause,"[4] in prior policies which extend coverage for a period of time beyond the cancellation date.

54.      Simply put, consumers should not be charged for retrospective insurance.   The NAIC has indicated that insurance is "prospective in nature."   *See, e.g.,* Exhibit 12, Ties to Insurers (quoting the NAIC as stating that insurance policies "should not be back-dated to collect premiums for a time period that has already passed").   Requiring borrowers to pay for backdated insurance coverage to cover time periods during which there is no risk of loss is improper and

---

[4] *See* Patrick A. Randolph, Jr., A Mortgagee's Interest in Casualty Loss Proceeds: Evolving Rules and Risks, 32 REAL PROP. PROB. & TR. J. 1, 31-42 (1997).

unlawful, and is also anticompetitive in that borrowers cannot purchase backdated insurance in the private market.

55.     Another reason that charging borrowers for backdated insurance is improper is that the overwhelming majority of mortgages contain a requirement that the borrower purchase property insurance containing a "standard mortgage clause."[5]   In addition, many hazard insurance policies contain a "Lender's Loss Payable Endorsement," which provides coverage for the lender even after the insured has failed to pay premiums and/or the policy reaches the expiration date.   Accordingly, force-placing insurance policies effective immediately following the termination of the borrower's policy and charging borrowers expensive premiums for such insurance is unlawful and unfair because borrowers are charged for needless and duplicative insurance coverage. The force-placed policies issued by Defendants pursuant to and in accordance with the scheme described herein thus generate improper windfalls to Defendants and the insurance providers at the expense of the borrowers.

**E.     Defendants Charged Plaintiffs For Redundant Or Otherwise Unnecessary Insurance Pursuant to Lucrative Pre-Arranged Agreements**

56.     The Lyons Mortgage was serviced by Litton.

57.     In January 2010, Plaintiffs entered into a Home Affordable Modification Agreement with Litton ("Modification Agreement").   Pursuant to the Modification Agreement, Litton established an escrow account for Plaintiffs, and insurance premiums and property taxes were thereafter to be paid out of Plaintiffs' escrow account.

---

[5] *See* Fannie Mae standard contracts for all fifty states, *available at* https://www.efanniemae.com/sf/formsdocs/documents/secinstruments/ (last accessed Sept. 7, 2012).

58.     Before entering into the Modification Agreement, Plaintiffs did not have an escrow account, however, in accordance with the requirements of their mortgage, Plaintiffs maintained hazard insurance on their property.   Immediately prior to the Modification Agreement, Plaintiffs had a hazard insurance policy with HomeWise Preferred Insurance Company, with a policy period of December 3, 2008 through December 3, 2009 and an annual premium of $1,299.00.   *See* HomeWise Insurance Declaration Page, Exhibit 21.   This homeowners' policy covered the structure of Plaintiffs' residence as well as personal property and loss of use. *Id.*

59.     On or about December 10, 2009, Litton sent Plaintiffs a letter[6] informing them "that the insurance policy on [their] property has been canceled or is no longer in effect" and that they "are currently insured under a temporary binder (effective 12/03/2009)."   The letter demanded proof of coverage within 60 days from the date of the letter.   Upon receipt of this letter, Plaintiffs, believing that Litton was now responsible for making the premium payments out of Plaintiffs' escrow account, contacted Litton and asked why Litton had not paid the premium.   A Litton representative assured Plaintiffs that Litton would make the payment.

60.     On or about January 5, 2010, HomeWise sent Plaintiffs a Cancellation Acknowledgement informing them that their hazard insurance policy had been cancelled for nonpayment, effective December 3, 2009.   *See* HomeWise Cancellation Acknowledgement, Exhibit 22.   Upon receipt of this notice, Plaintiffs again contacted Litton about making the insurance payment.   A Litton representative again assured Plaintiffs that Litton would make the

---

[6] The date printed on this letter is December 10, 2010; however, this appears to be a mistake. The letter clearly stated that the temporary insurance binder was "effective 12/03/2009."

payment.  Plaintiffs also contacted HomeWise to inform them that Litton would be paying the premium.

61.     On or about February 11, 2010, Litton sent Plaintiffs a letter informing them that Litton had received proof of insurance.  *See* Proof of Insurance Received, Exhibit 23.The letter stated:  "[w]e have received proof of insurance for the above referenced account and our records have been updated to reflect your policy information.  There has been no additional charge to your account."  *Id.*  Relying on this letter, Plaintiffs thought Litton had paid the insurance premium and that their insurance was current.

62.     On or about January 27, 2011, Litton sent Plaintiffs a letter indicating that Plaintiffs' "insurance coverage lapsed from 12/03/2010 to 01/03/2011" and that Litton had purchased fire insurance for this period and "charged [Plaintiffs'] escrow account $371.52 to pay for the premium."  *See* January 27, 2011 Letter and EOI, Exhibit 24.  The letter was accompanied by an "Evidence of Insurance," which shows that the force-placed policy was purchased from American Modern Home Insurance Company.  *Id.*  The agency that procured the policy was listed as Southwest Business Corporation.  *Id.*

63.     Litton force-placed hazard insurance on Plaintiffs even though Plaintiffs had an escrow account and Litton was responsible for making premium payments out of that account.

64.     Plaintiffs' "Escrow Account Disclosure Statement," dated April 18, 2011, lists three insurance payments that were made out of Plaintiff's escrow account.  *See* Escrow Account Disclosure Statement, Exhibit 25.  All three payments were made in January 2011.  *Id.*  The first payment, for $1,975.42, *id.*, was for a preferred homeowner's (hazard) insurance policy for the period of January 3, 2011 through January 3, 2012, *see* Universal Property 2011 Declaration Page, Exhibit 26.  The second payment, for $4,374.75, was described as "LPLACED FIRE."  *See*

Exhibit 25.  The third payment, for $371.52, was also described as "LPLACED FIRE."  *Id.*  The $371.52 payment was for the force-placed hazard policy covering the one-month period from December 3, 2010 through January 3, 2011.  *See* Exhibit 24.

65.    Plaintiffs do not recall receiving any letters or notices from Litton indicating that Litton had force-placed them with a $4,374.75 hazard insurance policy.  Plaintiffs do not recall receiving an "Evidence of Insurance" for a policy with a premium of $4,374.75.

66.    Plaintiffs contacted Litton to request documentation related to the $4,374.75 payment that was made from Plaintiffs' escrow account; however, Litton refused to provide any documentation.

67.    To date, Plaintiffs do not know which force-placed hazard policy was obtained with the $4,374.75 payment.  However, Plaintiffs believe that the $4,374.75 charge was for a force-placed policy covering the year 2010.  Plaintiffs had maintained preferred hazard insurance on their property from the time of their refinance in October 2006 until at least December 3, 2009.  Plaintiffs also have proof of preferred hazard insurance from January 2011 through January 2013.  Thus, the only period unaccounted for is for the period from December 3, 2009 through January 2011.

68.    In December 2009 and again in January 2010, Litton represented to Plaintiffs that it would make the requisite insurance payments to their preferred insurer, thereby keeping their preferred insurance current.  Litton sent Plaintiffs a letter, dated February 11, 2010, representing that Litton had received proof of insurance for their account.  *See* Exhibit 23.   Plaintiffs reasonably relied on Litton's representations in assuming that the insurance on their property was current.

69.     However, in January 2011, Litton charged $4,374.75 to Plaintiffs' escrow account for a force-placed policy that was, on information and belief, backdated to cover the year 2010. *See* Exhibit 25.  The policy was backdated despite the fact that there was no damage to the property and/or claims arising out of damage to the property during 2010 – a fact that Litton could have easily known or discovered.

70.     Although the force-placed policy was more than twice as costly as Plaintiffs' preferred 2011 policy and more than three times as costly as Plaintiffs' preferred 2009 policy, the force-placed policy provided less coverage, in that it did not cover Plaintiffs' personal property.

**F.      Government Response**

71.     As referenced above, force-placed insurance practices of mortgage lenders and servicers, insurance providers and insurance producers are currently the subject of a number of pending government investigations.

72.     Thus, state attorneys general have taken action concerning loan servicers' abusive practices concerning force-placed insurance.  Recently, a coalition of forty-nine (49) state attorneys general entered into an historic joint state-federal settlement agreement with the country's five largest loan servicers ("National Mortgage Settlement") to address numerous problems that have surfaced during the foreclosure crisis.  *See* www.nationalmortgagesettlement.com/ (last accessed Sept. 7, 2012), the official website established by the government relating to the settlement.  *See also* Jeff Horwitz, Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies, American Banker (Mar. 10, 2011, 12:25 PM), *available at* http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-1034213-1.html, attached hereto as Exhibit 18.

73.     Among other terms, the proposed settlement would essentially prohibit servicers from profiting from force-placed insurance.  Specifically, under the proposed settlement,

mortgage servicers: (a) shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has not paid for property insurance; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on the secured property; (c) must work with the borrower to continue or reestablish the existing homeowner's policy; (d) shall continue to make payments if there is a lapse in payment and the payments are escrowed regardless of homeowner payment; and (e) must purchase the force-placed insurance for a commercially reasonable price.  *Id.*; *see also* Consent Judgment, *United States of America v. Bank of America Corp.*, Civ. No. 1:12-cv-00361-RMC (D.D.C. Apr. 14, 2012) (ECF No. 14 Section VII).

74.     Notably, by analogy, state insurance commissioners and federal regulators have also investigated and condemned captive reinsurance arrangements in the title insurance industry – which also had a relatively low level of losses – as nothing more than sham transactions designed to funnel unlawful kickbacks for business referrals.  *See, e.g.* Broderick Perkins, Title Insurance Industry in Hot Water with Regulators Again, San Jose Business Journal (May 22, 2005), available at  http://www.bizjournals.com/sanjose/stories/2005/05/23/story4.html?page=all (last accessed Sept. 7, 2012).

75.     Indeed, while announcing a $37.8 million settlement with nine title insurers, California Insurance Commissioner John Garamendi stated that "[t]his reinsurance scheme appears to be nothing more than a form of commercial bribery."  *See* Exhibit 19, Dale Kasler, *3 Title Insurers to Pay Refunds:  Companies Settle State Case Accusing Them of Paying Kickbacks In Return For Referrals*, Sacramento Bee (July 21, 2005).  As a result, a number of providers have abandoned such arrangements altogether.

76.     Fannie Mae has also changed its policies to curb loan servicers' improper practices.  On March 14, 2012, Fannie Mae issued a Service Guide Announcement "amending

and clarifying its policies regarding the use, coverage, requirements, deductibles, carrier eligibility requirements and allowable expenses for lender-placed insurance" for servicers of the loans it holds.   *See* Fannie Mae Servicing Guide Announcement SVC-2012-04, attached as Exhibit 20.  The Fannie Mae guidelines seek to eliminate the abuses prevalent in the force-placed insurance industry including requiring that the cost of force-placed insurance be "competitively priced" and "commercially reasonable" and must exclude:

- any lender-placed insurance commission earned on that policy by the servicer or any related entity;

- costs associated with insurance tracking or administration, or;

- any other costs beyond the actual cost of the lender-placed insurance policy premium.

*Id*. at 4.

77.     The New York State Department of Financial Services' recent hearings on force-placed insurance practices have further resulted in government action and findings that borrowers were overcharged for force-placed insurance.  On June 12, 2012, Governor Cuomo's official website announced, "DFS Investigation Indicates Insurance Companies Overcharged for Force-Placed Insurance."   Available at  http://www.governor.ny.gov/press/06122012DFS  (last accessed Sept. 7, 2012).  It stated:

> The evidence of higher than necessary insurance premiums was made clear at a recent DFS hearing.  Also, the DFS discovered that the force-placed insurance market lacks the sort of competition that would keep premiums down.  In New York, two companies have 90% of the market.  In addition, the hearings made clear that force placed insurance costs are having a terrible impact on homeowners, while banks and insurers are profiting off the payments.

*Id.*

78.     Birny Birnbuam, in his testimony before the NYDFS presented statistics collected by the NAIC reflecting nationwide loss ratios for LPI hazard insurance during the 2004-2011 period as being, on average, more than thirty-five points higher than the ratios for commercially available homeowners policies.  *Id.* at 9.  When confined to the period from 2007-2011, the disparity between LPI hazard insurance loss ratios and those of commercially available homeowners polices was nearly 42 points.  *Id.*

79.     As *American Banker* observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and writing policies, payments to them are simply a cost of doing force-placed business."  *See* Exhibit 12.

80.     Moreover, the premiums that Defendants chose to impose upon borrowers were inflated because they included tracking servicing costs and expenses on top of the cost of the force-placed insurance itself, including loan tracking and servicing activities, which resulted in kickbacks to Defendants in the form of services in kind.  *Id.*

81.     Defendants' practices of referring force-placed insurance business to affiliates or otherwise profiting from the force-placement of insurance policies tended to keep premiums for force-placed insurance artificially inflated over time because a percentage of borrowers' premiums were not actually being paid to cover actual risk, but were simply funding illegal kickbacks.  Amounts paid to servicers as commissions have become a part of the cost of doing business for force-placed insurance providers.  As a result, force-placed insurance premiums incorporate the payment of such kickbacks – to the detriment of consumers.

82.     Further, Defendants' conduct threatens and, indeed, stifles competition.  As the NAIC recently opined when asked whether pricing in the area of force-placed insurance industry

is competitive, servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects the bank's interests or one where they are provided with an incentive or inducement to enter into the transaction." *See* Exhibit 12.  This suppression of competition and subsequent harm to borrowers is a direct result of the scheme alleged herein.

## CLASS ACTION ALLEGATIONS

83.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following class:

> All persons and entities in the United States, who, within the applicable statute of limitations, have or had a residential mortgage loan owned, originated and/or serviced by Litton Loan Servicing LP, Goldman Sachs Group, Inc., and/or Ocwen Financial Corporation as successor in interest to Litton and, in connection therewith, were required to pay for force-placed insurance on the secured property (the "Class").

Plaintiffs also bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following subclass:

> All persons and entities in the State of Florida who, within the applicable statute of limitations, have or had a residential mortgage loan owned, originated and/or serviced by Litton Loan Servicing LP, Goldman Sachs Group, Inc., and/or Ocwen Financial Corporation as successor in interest to Litton and, in connection therewith, were required to pay for force-placed insurance on the secured property (the "Florida Subclass").

84.     The Class and Florida Subclass are collectively referred to as the "Classes."

85.     The Classes exclude Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

86.     The membership in each of the proposed Classes is so numerous that joinder of all members is impracticable.

87.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

88.     Plaintiffs' claims are typical of the claims of the members of the Classes.

89.     There are questions of law and fact common to the Classes, which will generate common answers central to the resolution of the case.  These include, without limitation:

(a)     The nature, scope and implementation of Defendants' unlawful, improper and fraudulent acts;

(b)     Whether Defendants misrepresented the reason for the high cost of force-placed insurance;

(c)     Whether Defendants misrepresented that Plaintiffs' and Class Members' mortgage contracts authorized them to force-place insurance in the manner they did;

(d)     Whether Defendants maintained a policy of referring force-placed insurance business to insurers pursuant to pre-arranged agreements;

(e)     Whether Defendants maintained a policy of referring force-placed insurance business to affiliates;

(f)     Whether Defendants breached the terms of Plaintiffs' and Class Members' mortgages or loan contracts;

(g)     Whether Defendants breached their fiduciary duties to Plaintiffs and members of the Classes;

(h)     Whether Defendants and/or their affiliates received commission payments from force-placed insurance providers;

(i)    Whether Defendants and/or their affiliates received unauthorized and illicit payments in connection with force-placed insurance that were unrelated to any *bona fide* service in connection with the force-placed insurance and its purpose;

(j)    Whether Defendants wrongfully backdated force-placed insurance policies;

(k)    Whether Defendants violated their implied covenant of good faith and fair dealing;

(l)    Whether Defendants intentionally or negligently made material misrepresentations and omissions to Plaintiffs and the Classes regarding its procurement of FPI policies;

(m)    With respect to the Florida Subclass, whether Defendants' conduct constituted an unfair, unlawful or fraudulent business practice in violation of Florida's deceptive and unfair trade practice laws;

(n)    Whether Defendants received financial benefits from the force-placed insurance provider in the form of insurance monitoring, tracking and processing services;

(o)    Whether the provision in Litton's standard residential mortgage agreements authorizing Litton to charge borrowers for the "cost" of obtaining FPI is procedurally and substantively unconscionable because it does not authorize or contemplate that Litton and/or its related entities would derive a hidden financial benefit by procuring FPI, and where a portion of the amounts charged to residential borrowers' accounts are returned, transferred or paid to Litton and/or related entities;

(p)    Whether Defendants or their affiliates have been unjustly enriched by their conduct as alleged herein;

(q)     Whether Defendants or their affiliates participated in arrangements that involved kickbacks; and

(r)     Whether Defendants are liable to Plaintiffs and the Classes for damages and, if so, the measure of such damages.

90.     These and other questions of law and/or fact are common to the Classes and predominate over any questions affecting only individual Members of the Classes.

91.     Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Classes.  Plaintiffs have no claims antagonistic to those of the Classes.  Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation.  Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Classes.

92.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants.

93.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Classes would create a risk of adjudications with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

94.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making

appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

95.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT ONE
### BREACH OF CONTRACT
### INCLUDING IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

96.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

97.    Defendants have serviced loans evidenced by substantially similar standard form notes and mortgage contracts.

98.    Every contract contains an implied covenant of good faith and fair dealing.

99.    In all of their actions described herein, Defendants acted on their own behalf and as duly authorized agents of the owner or assignee of the mortgage agreements of Plaintiffs and the members of the Classes.  Defendants were contractually obligated to service the loans of Plaintiffs and the members of the Classes pursuant to the terms of their mortgage agreements.

100.    The mortgage contracts of Plaintiffs and the members of the Classes contained an implied covenant of good faith and fair dealing, pursuant to which Defendants were bound to exercise the discretion afforded them under the mortgage contract in good faith and to deal fairly with Plaintiffs and the members of the Classes in that regard.  Defendants were not allowed to

evade the spirit of the mortgage contract by exercising discretion afforded them under the mortgage to force-place insurance in a manner abusive to borrowers.

101.    Any discretionary authority granted to Defendants under the terms of Plaintiffs' and the Class Members' mortgage contracts was subject to Defendants' implied duty of good faith and fair dealing.  Accordingly, to the extent that the mortgage contracts of Plaintiffs and members of the Classes permitted Defendants to unilaterally force-place insurance, Defendants were obligated not to exercise their discretion to do so in bad faith for their own financial gain for the purpose of maximizing their profits at borrowers' expense.

102.    Defendants breached their duties of good faith and fair dealing in at least the following respects, among others:

(a)    Failing to make any effort whatsoever to maintain borrowers' existing insurance policies and, instead—for the sole purpose of maximizing their own profits—forcing borrowers to pay for insurance policies from providers of Defendants' choice.  These policies needlessly came with substantially greater premiums and less coverage than borrowers' existing policies, while providing an improper financial benefit to Defendants and/or their affiliates;

(b)    Using their discretion to choose a force-placed insurance policy in bad faith and in contravention of the parties' reasonable expectations by purposefully forcing borrowers to pay for more than the cost of protecting the lender's interest in the secured property;

(c)    Failing to seek competitively priced insurance on the open market and instead selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies were continually purchased through the same companies;

(d)     Assessing excessive, unreasonable, and unnecessary insurance policy premiums against Plaintiffs and the members of the Classes and misrepresenting the reason for the cost of the policies;

(e)     Backdating force-placed insurance policies to cover time periods which already passed and for which there was absolutely no risk of loss;

(f)     Misrepresenting in their force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time and/or the lender's coverage under a "standard mortgage clause" and/or a Lender's Loss Payable Endorsement;

(g)     Procuring force-placed insurance policies to cover time periods during the mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement; and

(h)     Failing to provide borrowers with any opportunity whatsoever to opt out of having their force-placed insurance policies provided by an insurer with whom Defendants had a secret arrangement to benefit Defendants and maximize their profits.

103.    Further, to the extent that the mortgage contracts of Plaintiffs and the Classes permitted Defendants to unilaterally force-place insurance, Defendants were contractually permitted to do so only to the extent required to reasonably protect the mortgagee's interest in the secured property.

104.    Nonetheless, Defendants have imposed or collected amounts that exceeded the amounts required to protect the mortgagee's interest in the policy.  Such practices have included, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the mortgagee's interest in the secured property; (b) backdating force-placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite

the fact that the time has lapsed and no loss occurred during the lapsed period; and (c) requiring borrowers to pay for force-placed insurance policies despite the existence of a Lender's Loss Payable Endorsement or standard mortgage clause that already protects the lender's interest in the property.

105.    By force-placing insurance that goes well beyond the pale of what is required to protect their interests, Defendants have breached express contractual obligations owed to Plaintiffs and the members of the Classes.

106.    As a direct, proximate and legal result of the aforementioned breaches of the covenant of good faith and fair dealing and the express terms of the mortgage contracts, Plaintiffs and the members of the Classes have suffered damages and are entitled to the relief sought herein for such breaches of contract.

**COUNT TWO**
**BREACH OF FIDUCIARY DUTY/MISAPPROPRIATION OF FUNDS HELD IN TRUST**

107.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

108.    Defendants held and/or controlled funds in escrow; controlled the establishment, funding requirements and maintenance of escrow accounts for the purposes of paying taxes, assessments, insurance premiums and other items set forth in borrowers' mortgages; and was obligated under their mortgages to return any excess funds in accordance with the terms of the mortgages.

109.    Defendants, as servicer of Plaintiffs' mortgage, required payment of and/or accepted monies from Plaintiffs for Escrow Items identified in their Mortgage on a monthly basis and held them in Plaintiffs' escrow account. Similarly, Defendants, as the servicer of Plaintiffs'

mortgage, force-placed hazard insurance, required payment therefore, and deducted and/or charged the cost of the premiums to Plaintiffs' escrow account.

110.    Defendants were obliged to hold, manage and control these escrow funds in trust, and owed Plaintiffs and members of the Classes the highest fiduciary duty with respect to the handling of such funds.

111.    Defendants breached their fiduciary duty to Plaintiffs and the members of the Classes by, *inter alia*: (a) unilaterally using escrow funds to purchase force-placed insurance at a cost and in amounts that were inflated solely in order to generate additional profits for Defendants; (b) profiting from unnecessary and excessive force-placed insurance policies that were purchased from escrow funds at the expense of Plaintiffs and members of the Classes; (c) unilaterally utilizing the escrow funds to pay for unnecessary, backdated and duplicative insurance for the purpose of increasing Defendants' profits; and (d) improperly depleting the escrow funds for unnecessary, unauthorized, backdated and duplicative hazard insurance resulting in additional costs and injury to Plaintiffs and members of the Classes.

112.    These actions were undertaken by Defendants in bad faith solely for the benefit of Defendants and were not intended to benefit Plaintiffs or other borrowers.

113.    As a direct result of Defendants' actions and subversion of Plaintiffs' interests to Defendants' own interests in reaping additional, extravagant and unauthorized fees and profits, Plaintiffs and the Classes have suffered injuries in the form of unnecessary and excessive escrow charges, unnecessary and improper depletion of escrow funds intended for and properly allocated to other Escrow Items, a loss of funds from their escrow accounts and/or loss of equity in the property due to increases in the amounts due under the mortgage to cover escrow shortfalls.

114.    Plaintiffs and the Classes are entitled to all damages resulting from Defendants' breach of their fiduciary obligations and misappropriation of escrow funds.  In addition, Plaintiffs and the Classes are entitled to punitive damages because Defendants acted in bad faith in deliberate and/or reckless disregard of their rights and Defendants' obligation to hold the escrow funds in trust

**COUNT THREE**
**CONVERSION**

115.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

116.    Defendants had and continue to have a duty to maintain and preserve their borrowers' mortgage escrow accounts, and to prevent their diminishment or alteration through their own wrongful acts.

117.    Defendants wrongfully and intentionally collected force-placed insurance premiums from their borrowers' mortgage escrow accounts.

118.    Defendants collected these force-placed insurance premiums by wrongfully and intentionally taking specific and readily identifiable funds from their mortgage customers' escrow accounts.

119.    Defendants have assumed and exercised the right of ownership over these funds without authorization to do so and in hostility to the rights of Plaintiffs and the Classes without legal justification.

120.    Defendants have retained these funds unlawfully without the consent of Plaintiffs and the members of the Classes and have deprived them from exercising control over the funds.

121.    Defendants intend to permanently deprive Plaintiffs and the members of the Classes of these funds.

122.    Plaintiffs and members of the Classes properly own these funds, not Defendants, who now claim that they are entitled to their ownership contrary to the rights of Plaintiffs and the members of the Classes.

123.    Plaintiffs and the members of the Classes are entitled to the immediate possession of these funds.

124.    Defendants have wrongfully converted these specific and readily identifiable funds.

125.    Defendants' wrongful conduct is of a continuing nature.

126.    As a direct and proximate result of Defendants' wrongful conversion, Plaintiffs and the Classes have suffered and continue to suffer actual damages.  Plaintiffs and the members of the Classes are entitled to recover from Defendants all damages and costs permitted by law, including all amounts that Defendants have wrongfully converted, which are specific and readily identifiable.

**COUNT FOUR**
**UNJUST ENRICHMENT**

127.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

128.    Plaintiffs and Members of the Classes have conferred a substantial benefit upon Defendants derived from the force-placed insurance premiums paid by Plaintiffs and Members of the Classes.

129.    By force-placing Plaintiffs and Class Members with unnecessary, exorbitantly priced, and at times backdated FPI policies, Defendants were able to earn commissions, kickbacks, and/or other compensation from force-placed insurers, such as American Modern.  Thus, Defendants benefitted from Plaintiffs' and Class Members' payment of premiums for

38

unnecessary, overpriced, and, in the case of backdated policies, unusable hazard insurance coverage.

130.     Because the forced placement of such unnecessary, overpriced, and backdated policies was unjustifiable, unfair, and/or unlawful, these commissions, kickbacks, and/or other forms of compensation were received and retained by Defendants under circumstances that make it inequitable for Defendants to retain the benefit without payment to Plaintiffs and Class Members.

131.     Defendants were therefore unjustly enriched by the force-placed insurance practices alleged above.

132.     As a result of Defendants' unjust enrichment, Plaintiffs and Class members have sustained damages in an amount to be determined at trial and see full disgorgement and restitution of the benefits received by Defendants.

**COUNT FIVE**
**DECLARATORY AND INJUNCTIVE RELIEF**

133.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

134.     On each cause of action stated herein, Plaintiffs and the Classes will be irreparably injured in the future by the Defendants' continuing misconduct.

135.     Plaintiffs, on behalf of themselves and all members of the Classes, seek a judgment declaring that Defendants must cease the activities described herein, provide the Classes with adequate remedies, including, without limitation, refunds and/or credits of all unfair, unlawful or otherwise improper force-placed insurance charges and provide for adequate procedures and policies to ensure that Defendants' unlawful conduct does not continue. Such policies and procedures should include, without limitation, that Defendants: (a) are prohibited

from force-placing insurance when the servicer knows or has reason to know that the borrower has a policy in effect that meets the minimum requirement of the loan documents; (b) cannot force-place insurance that is in excess of the lender's interest in the mortgaged property; (c) cannot force-placed backdated insurance; (d) are prohibited from purchasing the force-placed insurance from a subsidiary, affiliate, or any entity in which they have a direct or indirect financial interest; (e) must make reasonable efforts to continue or reestablish the borrower's existing insurance policy if there is a lapse in payment; and (f) must purchase any force-placed insurance for a commercially *bona fide* and reasonable price.

136.    Plaintiffs and the Classes do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Complaint, and will suffer irreparable injury as a result of the Defendants' misconduct unless injunctive and declaratory relief is granted.

137.    By reason of the foregoing, Plaintiffs and the Classes are entitled to declaratory and injunctive relief as set forth herein.

**COUNT SIX**
**VIOLATION OF THE FLORIDA DECEPTIVE AND**
**UNFAIR TRADE PRACTICES ACT**
**(on behalf of the Florida Subclass only)**

138.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

139.    Florida's Deceptive and Unfair Trade Practices Act, Section 501.201, *et seq*. ("FDUTPA") prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.201, Fla.

140.    Plaintiffs and the Florida Subclass are "consumers" as defined in Section 501.203(7) of FDUTPA.

141.    Defendants have engaged in unconscionable acts or practices and used unfair or deceptive acts in the conduct of their trade and/or commerce in the State of Florida, as described herein.

142.    The policies, acts and practices alleged herein were intended to result and did result in the payment of inflated insurance premiums for force-placed insurance by Plaintiffs and the Florida Subclass and which, in turn, were intended to generate unlawful kickbacks and profits for Defendants.

143.    Specifically, Litton had relationships with its force-placed insurance vendors whereby they would pay unreasonable and inflated premiums for force-placed insurance policies, charge that amount to Plaintiffs and the Florida Subclass, and would then receive kickbacks or commissions based on a percentage of the insurance policy's premium.

144.    Defendants conduct of charging inflated and excessive premiums for force-placed insurance as alleged herein, including to Plaintiffs and members of the Classes violates the FDUPTA.

145.    Litton is not a bank or savings and loan association regulated by the Florida Office of Financial Regulation of the Financial Services Commissions.  Litton is not a bank or savings and loan association regulated by federal agencies.

146.    Plaintiffs and the Florida Subclass sustained damages as a direct and proximate result of Defendants' unfair and unconscionable practices.  Section 501.211(2), Florida Statutes, provides Plaintiffs and the Florida Subclass a private right of action against Defendants and entitles them to recover their actual damages, plus attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Classes, pray for relief as follows:

A.      That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs be appointed as representatives of the proposed Classes, and that Plaintiffs' counsel be appointed as counsel for the proposed Classes;

B.      That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.      That Plaintiffs and the proposed Classes recover the damages determined to have been sustained by them, trebled as provided by law, with any applicable civil penalties, statutory damages and punitive damages, and that judgment be entered against Defendants on behalf of Plaintiffs and each member of the Classes;

D.      That Plaintiffs and the proposed Classes be awarded restitution of all improperly collected funds and/or that Defendants be ordered to disgorge their ill-gotten gains, and that a constructive trust be imposed over all such amounts for the benefit of the Classes;

E.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining their unlawful conduct alleged in this Complaint;

F.      That Plaintiffs and members of the proposed Classes be awarded prejudgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint in this action;

G.      That Plaintiffs and the proposed Classes recover the costs they incurred in this suit, including attorneys' fees and costs, as provided by law; and;

H.      That the Court direct all such further relief as it deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.

Dated:  January 23, 2013                    Respectfully submitted,


                                            /S/Kevin Landau_____
                                            **TAUS, CEBULASH & LANDAU, LLP**
                                            Brett Cebulash  (BC 0044)
                                            Kevin S. Landau (KL 2467)
                                             80 Maiden Lane, Suite 1204
                                            New York, NY 10038
                                            Telephone:  (212) 931-0704
                                            Fax:  (212) 931-0703
                                            Email:  bcebulash@tcllaw.com
                                                    klandau@tcllaw.com


                                            **BERGER & MONTAGUE, P.C.**
                                            Shanon J. Carson**
                                            Patrick Madden**
                                                **pro hac vice* applications forthcoming
                                            1622 Locust Street
                                            Philadelphia, PA 19103
                                            Telephone: (215) 875-4656
                                            Fax: (215) 875-4604
                                            Email:  scarson@bm.net
                                                    pmadden@bm.net


                                            **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
                                            Robert K. Shelquist**
                                                **pro hac vice* application forthcoming
                                            100 Washington Avenue South, Suite 2200
                                            Minneapolis, MN 55401
                                            Telephone: 612-339-6900
                                            Email:  rkshelquist@locklaw.com


                                            *Attorneys for Plaintiffs*