**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

JIMMY LYONS, JACQUELINE LYONS, LISA CHAMBERLIN ENGELHARDT, GERALD COULTHURST, ENRIQUE DOMINGUEZ, FRANCES ERVING, JOHNNIE ERVING ANTHONY PAPAPIETRO, and SHEILA D. HEARD individually and on behalf of all others similarly situated,

      Plaintiffs,

      v.

LITTON LOAN SERVICING LP, GOLDMAN SACHS GROUP, INC., ARROW CORPORATE MEMBER HOLDINGS LLC, SAXON MORTGAGE SERVICES, INC., MORGAN STANLEY, OCWEN FINANCIAL CORPORATION, OCWEN LOAN SERVICING, LLC, ASSURANT, INC. (d/b/a Assurant Specialty Property), AMERICAN SECURITY INSURANCE COMPANY, STANDARD GUARANTY INSURANCE COMPANY, AMERICAN MODERN INSURANCE GROUP, and AMERICAN MODERN HOME INSURANCE COMPANY

      Defendants.

Civil Action No.  13 Civ. 00513 (ALC)

**SECOND AMENDED
CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**



---

## INTRODUCTION

1.    This is a proposed "force-placed" **hazard** insurance class action brought by Plaintiffs Jimmy Lyons, Jacqueline Lyons, Lisa Chamberlin Engelhardt, Gerald Coulthurst, Enrique Dominguez, Frances Erving, Johnnie Erving, Anthony Papapietro and Sheila D. Heard (collectively, "Plaintiffs"), on behalf of themselves and all other persons who have or had a residential mortgage loan serviced by defendants Litton Loan Servicing LP ("Litton"), Goldman Sachs Group, Inc. ("Goldman Sachs"), Arrow Corporate Member Holdings LLC ("Arrow")

{2592 / CMP / 00119718.DOCX v1}

(Litton, together with Goldman Sachs and Arrow, "Litton Defendants"), Saxon Mortgage Services, Inc. ("Saxon"), Morgan Stanley (Saxon, together with Morgan Stanley, "Saxon Defendants"), Ocwen Loan Servicing, LLC ("OLS"), and/or Ocwen Financial Corporation ("OFC") (OLS, together with OFC, "Ocwen Defendants") (the Litton Defendants, Saxon Defendants and Ocwen Defendants are collectively referred to as the "Loan Servicing Defendants") and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property.

2.      Plaintiffs also bring claims against Assurant, Inc. (d/b/a Assurant Specialty Property) ("Assurant, Inc." or "ASP"), and Assurant Inc. subsidiaries American Security Insurance Company ("ASIC"), and Standard Guaranty Insurance Company ("SGIC") (Assurant, Inc., together with ASIC and SGIC, "Assurant Defendants"), as well as American Modern Insurance Group ("AMIG") and its subsidiary American Modern Home Insurance Company ("AMHIC") (AMIG, together with AMHIC, "American Modern Defendants"), which provided and were substantially involved in the force-placed hazard insurance schemes detailed herein. The Ocwen Defendants are named in connection with their own force-placed insurance practices, and are also named in their capacities as successor in interest to Litton and Saxon.

3.      The allegations herein are based upon personal knowledge as to matters concerning Plaintiffs and their own acts, and upon information and belief as to all other matters. The allegations that are not based on Plaintiffs' personal knowledge result from investigation by Plaintiffs' counsel.

4.      Plaintiffs challenge, as further described herein, the Loan Servicing Defendants' practice of purchasing force-placed insurance from the Assurant Defendants and/or American Modern Defendants (collectively, "Insurer Defendants") pursuant to agreements that return a

financial benefit to the Loan Servicing Defendants, the Insurer Defendants, and/or or their affiliates that is unrelated to any contractual or other bona fide interest in protecting the lender's insurable interest in the loan, and which results in unauthorized, unjustified and unfairly inflated costs to the borrower for force-placed hazard insurance in violation of law.

5.      The Loan Servicing Defendants acted together with the Insurer Defendants (collectively, "Defendants") to exploit the Loan Servicing Defendants' ability to force-place hazard insurance in order to reap additional, unjustified profits in the form of fees, commissions, rebates, reinsurance and other forms of consideration at the expense of borrowers whose hazard insurance was force-placed.  These fees and charges were not legitimately related to the cost of the force-placed hazard insurance or to the legitimate purpose for which force-placed hazard insurance may be purchased – which is to protect the lender's security interest in the property.

6.      As a condition of funding borrowers' loans, lenders require that borrowers purchase and agree to maintain hazard insurance coverage on the secured property.  Plaintiffs were required to obtain and maintain hazard insurance as a condition of their mortgage.

7.      When borrowers fail to maintain their hazard insurance policies, the Loan Servicing Defendants replace those policies with more expensive policies, known as "force-placed" or "lender-placed" policies ("FPI" or "LPI").

8.      Assurant, Inc., by one of its subsidiaries and/or affiliates, has entered into agreements that establish that ASP, through a subsidiary such as ASIC or SGIC, provides these force-placed policies to the Saxon Defendants and/or the Ocwen Defendants pursuant to exclusive contracts. *See*, *e.g.*, Exhibit 1,[1] Assurant, Inc., 2012 Annual Report on Form 10-K

---

[1] All Exhibits are included in the Compendium of Exhibits Attached to the First Amended Complaint (Volumes I and II), submitted herewith.

(Feb. 20, 2013) ("Assurant 2012 10-K"), at 5 ("The majority of our lender-placed agreements are exclusive").

9.      These exclusive contracts include not just agreements for the provision of insurance written by Assurant, Inc. subsidiaries such as ASIC or SGIC, but also include other loan servicing functions outsourced by loan servicers and performed by ASP.

10.      Similarly, the American Modern Defendants also entered into agreements with the Litton Defendants that established the American Modern Defendants as the exclusive force-placed provider for the Litton Defendants.  *See* Exhibit 2, NYDFS Consent Order, *In the Matter of American Modern Home Insurance Company*, dated May 30, 2013 ("American Modern NYDFS Consent Order").

11.      The American Modern Defendants also entered into agreements with loan servicers to provide not just insurance written by AMHIC, but AMIG also arranged for outsourced loan servicing functions to be performed by other AMIG affiliates.  *See* American Modern NYDFS Consent Order.

12.      The Loan Servicing Defendants force borrowers to pay amounts purportedly charged for force-placed insurance by diverting the monthly mortgage payments and/or debiting the borrowers' escrow accounts.

13.      Force-placed policies provide less coverage and borrowers are charged substantially more than required to insure their properties due to the perverse incentives and lucrative financial benefits that are shared between the Loan Servicing Defendants and the Insurer Defendants which are unrelated to the provision of force-placed hazard insurance.

14.     Further, such policies often provide unnecessary or duplicative coverage, in that they are improperly backdated to collect premiums for time periods during which the mortgagor has absolutely no risk of loss or are placed on properties where there is no lapse in coverage.

15.     The charges paid by and/or assessed to Plaintiffs and members of the proposed Classes also include amounts not attributable to the cost of insuring the property but, instead, include charges associated with tracking and/or monitoring *all* the loans serviced by the respective Loan Servicing Defendants.

16.     However, the Loan Servicing Defendants and other loan servicers are already compensated for tracking and monitoring loan portfolios as part of their servicing agreements.

17.     In addition, the Loan Servicing Defendants have outsourced other loan servicing functions (including but not limited to escrow analysis, loss draft, and customer service functions) to force-placed insurance providers, such as the Insurer Defendants, at below market rates.  Consequently, the small percentage of borrowers who are charged for FPI shoulder the costs of outsourced services performed on the Loan Servicing Defendants behalf for their entire loan portfolios – resulting, effectively, in a kickback to the servicers and the unjust enrichment of the Loan Servicing Defendants and Insurer Defendants at the borrowers' expense.  *See, e.g.*, Exhibit 3, Testimony of Birny Birnbaum on Behalf of the Center for Economic Justice before the Florida Office of Insurance Regulation (July 3, 2012) ("Birnbaum Florida Testimony").

18.     All or some of the Insurer Defendants also agreed to reinsure the hazard insurance policies that were force-placed on borrowers with subsidiaries of the Loan Servicing Defendants. *See e.g.*, Exhibit 2, American Modern NYDFS Consent Order at ¶ 10 ("American Modern had a 50% quota share reinsurance agreement with Arrow Syndicate 1910 ('Arrow'), a captive reinsurer of Goldman Sachs, under which Arrow made approximately $120 million nationally

from 2008 to 2011 through reinsuring the insurance American Modern placed on homes securing mortgage loans serviced by Goldman Sachs's subsidiary Litton Loan Servicing, LP"); *see also* Exhibit 4, NYDFS Consent Order, *In the Matter of American Security Insurance Company, et al.*, dated March 2013 ("Assurant NYDFS Consent Order"), at ¶¶ 13-15.

19.     While reinsurance can, and often does, serve a legitimate purpose, here it does not.  On information and belief, the reinsurance arrangements alleged here provided that all or some of the Loan Servicing Defendants would receive large portions of the amounts charged to borrowers for the force-placed policies by way of ceded "reinsurance" premiums to certain affiliates of the Loan Servicing Defendants.  The Insurer Defendants also received a "ceding fee" in connection with these reinsurance agreements.  *See* Exhibit 4, Assurant NYDFS Consent Order at ¶15.  These ceded premiums and ceding fees were nothing more than kickbacks between Defendants and a method for Defendants to profit from the force-placement of borrowers' hazard insurance.

20.     While reinsurance affiliates of servicers purportedly provided reinsurance, they did not assume any real risk, making those contracts illegitimate and designed solely for the purpose of funneling a significant portion of the force-placed insurance premiums ultimately charged to borrowers back to affiliates of the Loan Servicing Defendants, such as Arrow,  and increasing force-placed insurance charges.

21.     Borrowers have no say into the selection of the force-placed insurance carrier or terms of the force-placed insurance policies.  Indeed, FPI policies are commercial policies purchased by the Loan Servicing Defendants from the Insurer Defendants.

22.     Borrowers have no opportunity to comparison-shop for force-placed insurance policies.  The terms and conditions of the insurance policy, as well as the amount ultimately

charged to borrowers, are determined by the servicer and/or the insurer, rather than negotiated between the borrower and the insurer. *See* Exhibit 5, Testimony of J. Robert Hunter, of the Consumer Federation of America dated May 17, 2012 ("Hunter NYDFS Testimony"), at 10.

23.     For their part, loan servicers like the Loan Servicing Defendants have no incentive to comparison shop for the best rate.   Rather, servicers are financially motivated to utilize the insurer that offers the best financial benefit to the servicer in terms of illicit commissions, ceded reinsurance premiums and/or other benefits such as discounted insurance tracking services that are established as part of the secret arrangements among the servicers, insurers and their affiliates.   Further, because the servicer's "commission" and/or reinsurance premium is directly tied to the price of the policy, the servicer actually has an incentive to purchase the highest price insurance – reflecting an interest of the servicer diametrically opposed to that of the borrower who is being charged for the insurance. *See, e.g.,* Exhibit 5, Hunter NYDFS Testimony at 1.

24.     As noted by Birny Birnbaum:

> The incentives and potential for abuse in the administration of LPI [lender-placed insurance] are great.  Consumers do not request the insurance, but are forced to pay for it.  The cost of LPI is much higher than a policy the borrower would purchase on his or her own.  Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases, the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the lender from the force-placement of the coverage.

*See* Exhibit 6, Birny Birnbaum, Executive Director of the Center for Economic Justice, Testimony of Before the U.S. House of Representatives Subcommittee on Insurance, Housing and Community Opportunity Committee on Financial Services (July 28, 2011), at 6.

25.     Moreover, as previously noted, servicers are further incentivized to bundle the cost of outsourced loan servicing functions into the force-placed insurance agreement, the cost of which is fraudulently charged to the borrowers.  For example, agreements with the Assurant Defendants and American Modern Defendants included provisions whereby the Insurer Defendants, or affiliates of the Insurer Defendants, would continuously monitor the servicer's mortgage portfolio to verify the existence of insurance on each mortgaged property.

26.     In the event that borrowers are identified as not maintaining adequate insurance coverage, a series of form "cycle letters" are automatically generated and delivered to the borrowers and the insurer automatically issues an insurance certificate on the property on behalf of and for the benefit of the lender and/or servicer.

27.     Thus, where these servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they and their affiliates are not acting as true insurance brokers or agents, as they perform no service for the commissions they receive other than simply providing the referral.  *See* Exhibit 7, Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, American Banker (November 10, 2010) (hereinafter "Ties to Insurers"), *available at* http://www.americanbanker.com/issues/175_216/ ties-to-insurers-servicers-in-trouble-1028474-1.html (last visited Nov. 19, 2013).

28.     The web of relationships among the Defendants and the arrangements between and among them served to funnel profits to the Loan Servicing Defendants, Insurer Defendants, and their subsidiaries and affiliates.

29.     As one journalist observed:

> In the pantheon of modern-day mortgage abuses, force-placed insurance hasn't attracted much attention.  But it generates hundreds of millions of dollars a year in fees and commissions for insurance companies, banks and other financial institutions. Policies are sometimes backdated to cover periods that have already passed.
>
> In essence, critics say, high-priced insurance policies cover a time when no events happened.  And often, the mortgage company and the force-placed-insurance company are affiliated, with the mortgage company receiving a "service fee" in return for the business.  But homeowners don't know that."

*See* Exhibit 8, Dave Lieber, Everyone Profits Off Force-Placed Insurance, Except Homeowner, Star-Telegram (Oct. 1, 2011).

30.     These very practices have drawn the scrutiny of state and federal bodies charged with the oversight of force-placed insurance.  In October 2011, a number of mortgage servicers and insurers, including Defendants, received subpoenas from the New York Department of Financial Services ("NYDFS") with respect to lender-placed insurance activities dating back to September 2005.

31.     The NYDFS conducted hearings on May 17, 18 and 21, 2012, during which the force-placed insurance practices of Defendants, their affiliates, subsidiaries and bank partners were among the topics addressed by witnesses and in written testimony.   Superintendent Benjamin Lawsky noted in his opening statement that the Department's initial inquiry uncovered "serious concerns and red flags" which included:  (1) exponentially higher premiums for force-placed insurance than regular homeowners insurance; (2) extraordinarily low loss ratios; (3) harm to distressed borrowers; (4) lack of competition in the market; (5) force-placed insurance has become a major profit center for both banks and insurers; and (6) "tight relationships

between banks, their subsidiaries and insurers." As Superintendent Lawsky summarized, the net result of these practices:

> Take[] the form of large commissions being paid by insurers to the banks for what appears to be very little. In other cases, banks have set up reinsurance subsidiaries who take over the risk from the insurance companies. Thus, the banks pay high premiums for coverage that is highly profitable and then those profits revert right back to the banks through reinsurance agreements.
>
> \*        \*        \*        \*
>
> In sum, when you combine [the] close and intricate web of relationships between banks and insurance companies on the one hand, with high premiums, low loss ratios and lack of competition on the other hand, it raises serious issues and questions....

*See* Exhibit 9, Opening Statement of Benjamin M. Lawsky, Superintendent of Financial Services (May 17, 2012).

32.    The NYDFS heard testimony from several of the Defendants as well as noted experts in the course of its force-placed insurance investigation. *See, e.g.*, Exhibit 5, Hunter NYDFS Testimony; Exhibit 10, NYDFS Written Testimony of John Frobose President of American Security Insurance Company in response to April 12, 2012 Notice of Public Hearings; and Exhibit 11, Birny Birnbaum, Center for Economic Justice, Testimony Before NYDFS on Force-Placed Insurance 15 (May 21, 2012) ("Birnbaum NYDFS Testimony").

33.    As a result of its investigation, NYDFS found:

> [I]nsurers and banks built a network of troubling relationships and payoffs that helped drive premiums sky high. Those improper practices created significant conflicts of interest and saddled homeowners, taxpayers, and investors with millions of dollars in unfair and unnecessary costs.
>
> \*        \*        \*
>
> Indeed, even though banks and servicers are the ones who choose which force-placed insurance policy to purchase, the high

> premiums are ultimately charged to homeowners, and, in the event
> of foreclosure, the costs are passed onto investors.

*See* Exhibit 12, New York Department of Financial Services Press Release dated March 21, 2013

("NYDFS March 21, 2013 Press Release").

34.    The NYDFS investigation further found that these practices resulted in a market characterized by "reverse competition." The insurers competed by offering servicers and lenders a share in the profits, rather than by offering lower prices. *Id.*

35.    The National Association of Insurance Commissioners ("NAIC") is the standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia and five U.S. territories. The NAIC establishes standards and best practices, conducts peer review, and coordinates regulatory oversight. Pursuant to these duties, the NAIC also investigated the force-placed insurance industry and found those practices so troubling that it held its own public hearings on August 9, 2012. *See* Exhibit 13, Mark E. Ruquet, *NAIC Promises Greater Focus on Force-Placed Insurance as CFPB Proposes Rules*, PropertyCasualty360.Com (Aug. 10, 2012), *available at* http://www.propertycasualty360.com/2012/08/10/naic-promises-greater-focus-on-force-placed-insura. The NAIC, like the NYDFS, found there to be enough troublesome information regarding the force-placed insurance industry and its associated practices to warrant its full attention.

36.    The NAIC includes a discussion of "reverse competition" and lender-placed insurance on its website:

> A key regulatory concern with the growing use of lender-placed
> insurance is "reverse competition," where the lender chooses the
> coverage provider and amounts, yet the consumer is obligated to
> pay the cost of coverage. Reverse competition is a market
> condition that tends to drive up prices to the consumers, as the
> lender is not motivated to select the lowest price for coverage since

> the cost is born by the borrower. Normally competitive forces tend
> to drive down costs for consumers. However, in this case, the
> lender is motivated to select coverage from an insurer looking out
> for the lender's interest rather than the borrower.

*See* http://www.naic.org/cipr_topics/topic_lender_placed_insurance.htm (last visited November 19, 2013).

37.     As a result of the NYDFS investigation into force-placed insurance practices, on March 21, 2013, the NYDFS and Assurant, Inc. and its subsidiaries ASIC and American Bankers Insurance Company of Florida entered into a Consent Order pursuant to which Assurant, Inc. and its subsidiaries agreed to make changes in their force-placed insurance practices and to reduce the amounts ultimately charged to borrowers whose insurance was force-placed. *See* Exhibit 4, Assurant NYDFS Consent Order. Certain borrowers whose insurance was force-placed will be entitled to restitution of a portion of the force-placed premium which they paid. Assurant, Inc. and its subsidiaries also agreed to pay the sum of fourteen million dollars ($14,000,000) to the NYDFS. *Id.* at ¶ 31. Under the Assurant NYDFS Consent Order, the Assurant Defendants were specifically prohibited from, *inter alia*, in the State of New York:  paying commissions to servicers in connection with force-placed insurance, reinsuring force-placed policies with affiliates of servicers, paying contingent commissions based on underwriting profitability or loss ratios, and providing free or below cost outsourced services to servicers, lenders or their affiliates. *Id.* at ¶¶ 7-11.

38.     The NYDFS investigation further resulted in a Consent Order entered between AMIG and its subsidiaries, including but not limited to AMHIC. *See* Exhibit 2, American Modern NYDFS Consent Order. Under the Consent Order, the American Modern Defendants similarly agreed to, in the State of New York, refrain from:  paying commissions to servicers in connection with force-placed insurance, reinsuring force-placed policies with affiliates of

servicers, paying contingent commissions based on underwriting profitability or loss rations, and providing free or below cost outsourced services to servicers, lenders or their affiliates. *Id.* at ¶¶ 6-11.

39.     In addition, on September 1, 2011, the NYDFS had previously entered into an agreement with Goldman Sachs, Litton and OFC regarding these entities' adherence to certain mortgage servicing practices. *See* Exhibit 14, Press Release, Superintendent Lawsky Announces Agreement with Goldman Sachs, Ocwen, Litton on Groundbreaking New Mortgage Practices (Sept. 1, 2011), *available at* http://www.dfs.ny.gov/about/press/pr110901.htm (hereinafter "NYDFS Sept. 1, 2011 Press Release"). Included in this agreement is the requirement that the loan servicers "ensure that any force-placed insurance be reasonably priced in relation to claims incurred" and a prohibition against "force-placing insurance with an affiliated insurer." *Id.*; *see also* Exhibit 15, N.Y. Dep't of Fin. Servs. Banking Dep't, Agreement on Mortgage Servicing Practices (Sept. 1, 2011), *available at* http://www.dfs.ny.gov/about/press/clocwen.pdf.   The agreement was entered into as a condition of the NYDFS's approval of the Ocwen Defendants' acquisition of Litton and did not preclude any future investigations of past practices or release any future claims or actions. *See* Exhibit 14, NYDFS Sept. 1, 2011 Press Release.

40.     The Loan Servicing Defendants' unlawful actions include as described in further detail below, *inter alia*: (a) abuse of their authority to force-place hazard insurance to generate unjustified profits for themselves and their affiliates which were not disclosed to borrowers whose insurance was force-placed; (b) electing to purchase higher-priced insurance policies from their exclusive force-placed insurance providers for their mutual benefit; (c) entering into pre-arranged agreements to acquire high-priced, force-placed insurance from the Insurer Defendants thereby diminishing any benefit to be gained by borrowers through an open market or

competitive purchasing environment; (d) entering into pre-arranged agreements designed to yield exorbitant force-placed insurance charges to class members in order to maximize their own profits without any regard whatsoever for competitive pricing, to the detriment of borrowers; (e) backdating the force-placed insurance policies to charge for retroactive and unnecessary coverage; (f) entering into captive reinsurance arrangements designed to funnel premiums to Defendants rather than as a vehicle to transfer risk and protect the interests of the lender; (g) giving and receiving "kickbacks" in the form of purported fees, payments, unearned commissions, "rebates" and/or other things of value from providers of force-placed insurance (including the Insurer Defendants) for the procurement of the force-placed policies; (h) improperly exploiting their ability to manage and gain access to escrow funds in breach of fiduciary obligations relating to the management of escrow funds in order to increase profits; (i) misrepresenting to Plaintiffs and Class members the reasons for the high cost of force-placed insurance to Plaintiffs and Class members; (j) omitting to inform Plaintiffs and Class members that force-placed insurance practices did not only protect the lender's interest in Plaintiffs' and Class members' properties but also generated unwarranted profits for Defendants and fellow scheme members; (k) misrepresenting that force-placed hazard insurance costs more because it is provided without underwriting, and (l) force-placing hazard insurance coverage in excess of the lender's insurable interest in the property.

41.     Plaintiffs assert herein the following claims against the Loan Servicing Defendants: (1) state/common law claims for breach of the Loan Servicing Defendants' contractual obligations, including the implied covenant of good faith and fair dealing, owed to Plaintiffs and the other Class members, (2) state/common law claims for breach of the Loan Servicing Defendants' fiduciary duties/misappropriation and/or conversion of escrow funds held

and managed by the Loan Servicing Defendants for the purpose of paying Escrow Items in accordance with the terms of Plaintiffs' mortgages; (3) state/common law claims for unjust enrichment; (4) state statutory claims brought under consumer protection statutes for the states of New York, Illinois and Florida;  (5) state/common law claims for disgorgement and declaratory relief; and (6) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1961(3) and 1962(c).

42.    The Insurer Defendants' unlawful actions include:  (a) aiding and abetting the Loan Servicing Defendants' breaches of their fiduciary duties by colluding with the Loan Servicing Defendants to charge borrowers for unconscionably high-priced, unnecessary and duplicative force-placed hazard insurance coverage and related services, including tracking the Loan Servicing Defendants' loan portfolios and binding and obligating Plaintiffs and Class members, through the improper utilization of access to escrow funds, to pay for the improper force-placed insurance to maximize Defendants' profits to the detriment of borrowers;  (b) misrepresenting the reasons for the high cost of force-placed insurance;  (c) failing to inform Plaintiffs and Class members that the scheme participants would be improperly profiting from the force-placed insurance;  (d) colluding with the Loan Servicing Defendants to misrepresent to Plaintiffs and Class Members that the Loan Servicing Defendants were authorized to force-place high-cost, unnecessary, and duplicative insurance in the manner described herein; and (e) force-placing hazard insurance coverage in excess of the amount required by the lender.

43.    Plaintiffs herein assert the following claims against the Insurer Defendants: (1) state/common law claims for aiding and abetting the Loan Servicing Defendants' breaches of their fiduciary duties;(2) state/common law claims for restitution/unjust enrichment and disgorgement and declaratory relief; (3) state statutory claims under the Illinois Consumer Fraud

and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*;. and (4) violations of the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1961(3) and 1962(c).

44.    Plaintiffs do not challenge the rates of their force-placed insurance as excessive

nor Defendants' right to force-place insurance.  Rather, Plaintiffs challenge, among other things,

and as set forth herein, the Defendants' *decision to purchase* force-placed hazard insurance from

insurers that provide an improper financial benefit to Defendants and/or their affiliates.  The

Loan Servicing Defendants pass on charges for "reimbursement" of the insurance premiums paid

by them to the Insurer Defendants, despite the fact that (1) the rates charged by the Insurer

Defendants far exceed the cost of borrower-purchased insurance (while providing substantially

less coverage); and (2) the charges for which the Loan Servicing Defendants seek

"reimbursement" do not constitute their actual costs once the "commissions" tracking fees and

other payments between the Insurer Defendants and the Loan Servicing Defendants are taken

into account.    Plaintiffs seek statutory and compensatory damages, as well as

restitution/disgorgement of Defendants' unjust and unlawful enrichment.  Similarly, Plaintiffs

challenge the Insurer Defendants' business practice of obtaining the business of loan servicers

(such as the Loan Servicing Defendants)  through the offering and payment of these illicit

kickbacks.

## JURISDICTION AND VENUE

45.    This Court has jurisdiction over the subject matter of this action pursuant to 18

U.S.C. §§ 1961, 1962 and 1964.

46.    This Court also has diversity jurisdiction pursuant to the Class Action Fairness

Act, 28 U.S.C. § 1332(d)(2) ("CAFA"), given that minimal diversity exists among Plaintiffs and

Defendants, there are more than 100 members in the Classes, and the amount in controversy in

this action exceeds $5,000,000.

47.     There are plainly over 100 members in the classes.  For example, as of Sept. 30, 2012, Ocwen serviced approximately 789,000 loans nationwide.  *See* Standard & Poors, Servicer Evaluation:   Ocwen  Loan  Servicing,  LLC,  available  at  http://www.standardandpoors.com /ratings/ articles /en/us/? articleType=HTML&assetID =1245344276856 (last visited Nov. 18, 2013).   Litton and Saxon further annually serviced approximately 300,000 and 154,000 loans, respectively.   Force-placed insurance industry experts estimate that roughly 2% of all borrowers in a servicer's loan portfolio are force-placed with insurance.  *See* Ex. 60, Testimony of Birny Birnbaum Before the Office Of Insurance Regulation Praetorian Insurance, July 3, 2012 ("I estimate that 1-2% of mortgage borrowers have LPI placed on their loans…"); *see also* Ex. 61, Testimony of J. Robert Hunter, before The Office of Insurance Regulation Praetorian Insurance, July 3, 2012 ("the 2 percent of borrowers who are force-placed pay all or much of the cost of tracking 100 percent of the portfolio of lender loans").  Thus, Plaintiffs currently estimate that approximately 24,860 borrowers were force-placed by Defendants annually (i.e. 2% of 789,000+300,000+154,000).

48.     Moreover, the amount in controversy far exceeds $5,000,000.   As previously noted, the Loan Servicing Defendants force-placed insurance on approximately 24,860 properties annually.  Extrapolating from the average of the charges imposed on Plaintiffs for force-placed insurance as representative of the class (($4,374.75 + $685 + $2,434 + $1,352.57 + $5,575.35 + $3,570 + $1,248)/7 = $2,748.52), Plaintiffs currently estimate that Defendants force-place approximately $68 million of force-placed insurance annually (calculated by multiplying the estimated 24,860 policies force-placed annually by the average charge of $2,748.52 per policy). Experts estimate that over 40% of the amounts charged to borrowers represent kickbacks between defendants.  *See e.g. id.*  Thus, Plaintiffs currently roughly estimate class-wide damages

to be in excess of $27 million for each year in the class period.   Indeed, the Litton Defendants alone generated approximately $120 million in unlawful earnings from just the reinsurance component of the kickback scheme.  *See* American Modern NYDFS Consent Order.

49.     This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

50.     Venue is proper in this District under 28 U.S.C. § 1391(b) because one or more Defendants reside in this District, regularly conduct business in this District, and/or a substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

### Plaintiffs

**Plaintiffs Jimmy and Jacqueline Lyons**

51.     Plaintiffs Jimmy Lyons and Jacqueline Lyons, husband and wife, currently reside, and at all times relevant hereto resided, in Palm Bay, Florida, and are citizens of Florida.

52.     On or about October 26, 2006, Mr. and Mrs. Lyons refinanced their home mortgage loan with Fremont Investment and Loan (the "Lyons Mortgage").   The loan was secured by property located at 1007 SW La Belle Avenue, Palm Bay, Florida 32908 (the "Lyons Property").   The amount of the refinanced loan was $196,350.00.   *See* Exhibit 16, Lyons Mortgage.

53.     The Lyons Mortgage was serviced by the Litton Defendants prior to the Ocwen Defendants' purchase of Litton on or around September 1, 2011.

**Plaintiff Lisa Chamberlin Engelhardt**

54.     Plaintiff Lisa Chamberlin Engelhardt, formerly known as Lisa Nietling, currently resides, and at all times relevant hereto resided, in Virginia Beach County, Virginia, and is a citizen of Virginia.

55.     On or about September 23, 2008, Ms. Engelhardt and her former husband, Daniel Nietling, refinanced the original loan on her home with a mortgage loan from Countrywide Bank, FSB (the "Engelhardt Mortgage") secured by her property in Virginia Beach, VA (the "Engelhardt Property").  The amount of the loan was $261,500.00.  *See* Exhibit 17, Engelhardt Mortgage.

56.     The servicing rights for the Engelhardt Mortgage were acquired by Bank of America from Countrywide Bank, FSB when Bank of America acquired Countrywide.  Bank of America then transferred the loan to OLS effective July 1, 2012.

**Plaintiff Gerald Coulthurst**

57.     Plaintiff Gerald Coulthurst currently resides, and at all times relevant hereto resided, in Kings County, New York, and is a citizen of New York.

58.     On or about May 30, 2007, Mr. Coulthurst re-financed a loan with a mortgage loan from Delta Funding Corporation (the "Coulthurst Mortgage") secured by his property located in Brooklyn, NY (the "Coulthurst Property").  The amount of the loan was $350,000.00. *See* Exhibit 18, Coulthurst Mortgage.

59.     At all times relevant hereto, the Coulthurst Mortgage was serviced by OLS.

**Plaintiff Enrique Dominguez**

60.     Plaintiff Enrique Dominguez currently resides, and at all times relevant hereto resided, in Spring, Texas, and is a citizen of Texas.

61.     On or about August 29, 2005, Mr. Dominguez and his wife Lourdes Bourdeth, entered into a mortgage with Fremont Investment and Loan (the "Dominguez Mortgage") secured by their property in Spring, Texas (the "Dominguez Property").  The amount of the loan was $78,400.00.  *See* Exhibit 19 Dominguez Mortgage.

62.     At all times relevant hereto, the Dominguez Mortgage was serviced by OLS.

**Plaintiffs Frances and Johnnie Erving**

63.     Plaintiffs Frances Erving and Johnnie Erving, husband and wife, currently resides, and at all times relevant hereto resided, in Hallandale, Florida, and are citizens of Florida.

64.     On or about July 21, 2006, the Ervings obtained a home mortgage loan from NovaStar Mortgage, Inc. ("NovaStar") for the Property in the amount of $191,000 ("Erving Mortgage"). *See* Exhibit 20, Erving Mortgage

65.     The Erving Mortgage was serviced by the Saxon Defendants prior to the Ocwen Defendants purchase of Saxon in or around March 18, 2012.  Thereafter, the Erving Mortgage was serviced by OLS.

**Plaintiff Anthony Papapietro**

66.     Plaintiff Anthony Papapietro ("Papapietro") currently, and at all times relevant hereto, resides in Richmond County, New York, and is a citizen of New York.

67.     On or about June 20, 2005, Papapietro financed the purchase of his home with a mortgage loan from Washington Finance, a division of AIG Federal Savings Bank (the "Papapietro Mortgage").  The Papapietro Mortgage was secured by property located at 437 Edgemont Road, Stroudsburg, Pennsylvania, 18360 ( the county register identifies the lot as 404 Northgate Estates, Stroudsburg, PA 18360) (the "Papapietro Property").  The amount of the loan was $405,600.00. *See* Exhibit 21, Papapietro Mortgage.

68.     At various times, the Papapietro Mortgage was serviced by the following lenders or servicers: Popular Mortgage Servicing, Inc. ("PMSI"), Equity One, Inc. ("Equity"), The Litton Defendants and the Ocwen Defendants.  The Papapietro Mortgage was serviced by the Litton Defendants prior to the Ocwen Defendants' purchase of Litton on or around September 1, 2011.

**Plaintiff Sheila D. Heard**

69.     Plaintiff Sheila D. Heard ("Heard") currently, and at all times relevant hereto, resides in East St. Louis, Illinois, and is a citizen of Illinois.

70.     On or about May 24, 1999, Heard financed the purchase of her home with a mortgage loan from Provident Bank (the "Heard Mortgage").  The Heard Mortgage was secured by property located at 1021 N 42nd Street, East St. Louis, IL 62204 (the "Heard Property").  The amount of the loan was \$37,825.00.  *See* Exhibit 62, Heard Mortgage.

71.     Shortly afterward, the Litton Defendants assumed the servicing rights to the Heard Mortgage.  The Heard Mortgage was serviced by the Litton Defendants prior to the Ocwen Defendants' purchase of Litton on or around September 1, 2011.

## The Loan Servicing Defendants

**The Litton Defendants**

72.     Defendant Goldman Sachs is a Delaware corporation with its principal place of business located in New York, New York.

73.     Defendant Litton, during a portion of the Class Period, was a subsidiary of Goldman Sachs.  According to a consent order between Goldman Sachs and the Board of Governors of the Federal Reserve System, "by virtue of its indirect ownership of Litton, Goldman Sachs was the 23rd largest servicer of residential mortgages in the United States," and Goldman Sachs, through Litton, serviced residential mortgages held by various investors, including the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, and other government-sponsored entities.  *See* Exhibit 22, *In re* Goldman Sachs Grp., Inc., Consent Order (Sept. 1, 2011), *available at* http://www.federalreserve.gov/newsevents /press/ enforcement/enf20110901f1.pdf.

74.     Defendant Arrow is a Delaware corporation and a subsidiary of Goldman Sachs. During the relevant time, Arrow owned 100% of Lloyds of London Arrow Syndicate 1910, through which the illusory reinsurance payments described herein were funneled back to Goldman Sachs.   According to a Consent Order entered with the NYDFS, Arrow made approximately $120 million nationally from 2008 to 2011 reinsuring the insurance the American Modern Defendants placed on homes securing mortgage loans serviced by Goldman Sachs's subsidiary Litton. *See* Exhibit 2, American Modern NYDFS Consent Order.

75.     On September 1, 2011, OFC acquired Litton from Goldman Sachs. *See* Exhibit 23, Ocwen Financial Corporation 2011 Form 10-K, filed February 29, 2012.   As part of the Litton acquisition, defendants OFC and Goldman Sachs agreed to certain indemnification provisions, pursuant to which the two entities agreed to share certain losses resulting from third-party claims arising out of Litton's pre-closing servicing activities. *Id.* At the time of the sale, Litton serviced just under 300,000 mortgage loans with a value of $41.2 billion.   Upon information and belief, Litton's force-placed insurance practices complained of herein fall within the scope of these indemnification provisions.

**The Saxon Defendants**

76.     Defendant Saxon is a Texas corporation with its principal place of business located at 4708 Mercantile Drive N., Fort Worth, Texas.   During its time of operation, Saxon was a residential mortgage servicer that managed home loan payments and transactions for primarily non-prime home loans throughout the United States. *See* Saxon, Who We Are, https://www.saxononline.com/common/about/ (last accessed Dec. 3, 2012).   Upon information and belief, Saxon ceased the majority of its mortgage servicing operations in or around April 2012.   As of June 2011, Saxon serviced approximately 154,000 loans with a value of $10.9 billion.

77.     Defendant Morgan Stanley is a Delaware corporation with its principal place of business located at 1585 Broadway, New York, New York.   At all times relevant to this complaint, Morgan Stanley was the corporate parent of Morgan Stanley Mortgage Capital Holdings LLC ("MSMCH"), which was the corporate parent of Saxon Capital Inc. ("Saxon Capital"), which was the corporate parent of Saxon Capital Holdings, Inc. ("SCH"), which was the corporate parent of SCI Services, Inc. ("SCI"), which was the corporate parent of Saxon. According to a Consent Order entered between the Board of Governors of the Federal Reserve System and Morgan Stanley, Morgan Stanley had substantial involvement with respect to servicing loans through Saxon. *See* Exhibit 24.

78.     On October 19, 2011, OFC entered into a purchase agreement with SCI, SCH, MSMCH and Morgan Stanley ("Purchase Agreement") pursuant to which, among other things, OFC agreed to acquire, *inter alia*, all of the issued and outstanding stock of SCI (a subsidiary of Saxon Capital and the corporate parent of Saxon).   On March 18, 2012, Morgan Stanley, MSMCH, SCI, Saxon, OFS and OLS entered into an Amended and Restated Purchase Agreement ("Amended Purchase Agreement"), pursuant to which OLS acquired servicing rights on loans previously serviced by the Saxon Defendants.   While OLS was identified as the "Buyer" in the Amended Purchase Agreement, OCF remained a party to the purchase, expressly assuming liability pursuant to a loss share provision.

**The Ocwen Defendants**

79.     Defendant OFC is a Florida corporation with a principal place of business located at 2002 Summit Blvd., Suite 600, Atlanta, Georgia.

80.     Defendant OLS is a Delaware company with a principal place of business located at 1661 Worthington Road, West Palm Beach, Florida.   OLS is a subsidiary of OFC.   OFC, with its affiliates, is one of the largest third-party servicers of subprime residential mortgage loans in

the United States.   According to Standard & Poors, as of Sept. 30, 2012, Ocwen serviced approximately 789,000 loans.   The mortgaged properties securing these loans are dispersed throughout all 50 states, the District of Columbia, and two U. S. territories, concentrated primarily in New York, California, Florida, Texas and Illinois.

**The Insurer Defendants**

### The Assurant Defendants

81.   Defendant Assurant, Inc., a Delaware corporation, "is a provider of specialized insurance products and related services in North America and select worldwide markets," including "lender-placed" or "force-placed" insurance.  Assurant, Inc. is one of the two dominant providers of force placed insurance in the United States.   *See* Exhibit 4, Assurant NYDFS Consent Order at 6.  According to the Assurant 2012 10-K, "the majority of [Assurant Inc.'s] lender-placed agreements are exclusive" and those agreements require the Assurant Defendants to "automatically issue these policies when a borrower's insurance coverage is not maintained." *See* Exhibit 1 at 5.  Assurant, Inc. has four operating segments – Assurant Solutions, Assurant Specialty Property, Assurant Health, and Assurant Employee Benefits.

82.   Assurant, Inc. does business as Assurant Specialty Property.  Assurant Specialty Property is a registered trade name owned by Assurant, Inc.

83.   ASIC, SGIC and other Assurant, Inc. affiliates are not independently operating subsidiaries; rather, Assurant, Inc. controls the operations of ASIC and SGIC through its Assurant Specialty Property operating segment.  For example, the decisions of John Frobose, president of ASIC, are directed by Assurant, Inc. through Assurant Specialty Property.

84.   Assurant, Inc. Senior Vice President, Gene Mergelmeyer, who reports directly to Assurant, Inc. President and Chief Executive Officer Robert Pollack, directs and controls the day

to day operations of Assurant, Inc. subsidiaries, including ASIC and SGIC, through Assurant Specialty Property. Mr. Frobose reports directly to Mr. Mergelmeyer.

85.     Assurant Specialty Property is the Assurant, Inc. division which provides outsourced mortgage servicing functions to mortgage servicers and coordinates the force-placement insurance written by affiliates such as ASIC and SGIC. According to its regulatory filings, Assurant, Inc. "offers" lender placed homeowner's insurance and "[t]he largest product line within Assurant Specialty Property is homeowners insurance, consisting principally of fire and dwelling hazard insurance offered through [Assurant's] lender-placed programs." *See* Exhibit 1, Assurant 2012 10-K at 4. Assurant, Inc. uses "a proprietary insurance-tracking administration system linked with the administrative systems of our clients to continuously monitor the clients' mortgage portfolios to verify the existence of insurance on each mortgaged property and identify those that are uninsured" and when a lapse is confirmed, "a lender-placed policy is procured by the lender." *Id.*

86.     Defendant ASIC is a Delaware corporation with its principal place of business in Atlanta, Georgia and is a subsidiary of Assurant, Inc. that does business throughout the United States. *See* Assurant 2012 10-K at Exhibit 21.1. ASIC writes force-placed insurance policies in all fifty states and the District of Columbia. Upon information and belief, ASIC also provides or has provided services to the Saxon Defendants and/or the Ocwen Defendants in connection with their force-placed insurance practices, including, but not limited to: (1) tracking borrower's loans to determine the existence of hazard insurance; (2) placing force-placed insurance for the Saxon Defendants and/or the Ocwen Defendants when there has been a lapse, and (3) handling all customer service duties related to force-placed insurance. ASIC is a wholly owned subsidiary of Interfinancial, Inc., which, in turn, is a wholly owned subsidiary of Assurant, Inc.

87.     Defendant SGIC is a Delaware corporation with its principal place of business in Atlanta, Georgia.  SGIC is a subsidiary of ASIC.

**The American Modern Defendants**

88.     Defendant AMIG is a subsidiary of Munich Re Group, a German corporation headquartered in Munich, with its U.S. corporate office located in Amelia, Ohio.  AMIG is a provider of insurance products including "lender-placed" hazard insurance.  *See About American Modern*, American Modern Insurance Group, http://fid.amig.com/about.html (last accessed Jan. 22, 2013).   AMIG "writes insurance policies mostly through three companies," American Modern Home Insurance Company, American Family Home Insurance Company, and American Modern Select Insurance Company.   *See, About Us*, American Modern Insurance Group, http://www.amig.com/aboutus.html (last accessed July 13, 2013).

89.     AMIG affiliate Midwest Enterprises, Inc. (d/b/a Ameritrac Business Solutions) is an affiliate of AMIG that provides outsourced services to mortgage servicers.

90.     Defendant AMHIC is a subsidiary of AMIG that underwrites force-placed insurance policies.

## FACTUAL ALLEGATIONS

**A.     Defendants Abused Force-Placed Insurance Mortgage Clauses to Generate Hidden and Unearned Profits**

91.     Each loan owned and/or serviced by the Loan Servicing Defendants is secured by a mortgage or deed of trust on the underlying property.

92.     In order to protect the mortgagee's interest in the secured property, mortgage loan contracts typically allow the lender or third party servicer to "force-place" insurance when the borrower fails to maintain the requisite insurance.  Plaintiffs' and the Class members' mortgage loan contracts contain such provisions affording the Loan Servicing Defendants the authority to

force-place their insurance in the event of a lapse.  The failure of a borrower to maintain hazard insurance is clearly contemplated by the mortgage contract and such a failure by the borrower does not result in a material failure to perform under the mortgage contract.

93.     However, the discretion afforded the Loan Servicing Defendants to force-place insurance is limited by the bounds of reasonable conduct and by the express terms of the mortgage contract itself.  In an effort to reap profits from the borrower which are not required or contemplated by the mortgage contract and through other conduct described herein with respect to the force placement of insurance, the Loan Servicing Defendants have routinely exceeded the bounds of reasonableness and the spirit, intent and letter of the mortgage contract by force-placing insurance in a manner and in amounts that are not required to protect the lender's interest in the property.

94.     The typical mortgage contract does not disclose that the lender or loan servicer will receive a financial benefit and/or generate profits in connection with the force-placed insurance policy.  Instead, the contract limits the authority of the mortgage servicer to force-place insurance only to protect the lenders' interest in the secured property.  *See* Exhibit 16, Lyons Mortgage, at ¶ 9; Exhibit 17, Engelhardt Mortgage, at ¶ 9; Exhibit 18, Coulthurst Mortgage, at ¶ 9; Exhibit 19, Dominguez Mortgage, at ¶ 9; Exhibit 20, Erving Mortgage, at ¶ 9; Exhibit 21, Papapietro Mortgage, at ¶ 9; and Exhibit 62, Heard Mortgage, at ¶ 7.

95.     These lender-placed or "force-placed" insurance policies are almost always more expensive than standard insurance coverage, as evidenced by the amounts charged to Plaintiffs. Such policies can cost as much as ten times more than standard policies.  *See* Exhibit 12, NYDFS March 21, 2013 Press Release.

96.     While the force-placed insurance policy is for the benefit of the lender, the cost for it, including the improper charges complained of herein, are passed on to the borrower. *Id.*

97.     Once a lender and/or servicer receives evidence that a borrower has obtained his/her own insurance policy, the force-placed coverage should be fully or partially canceled.

**B.      Mortgage Loan Servicers Commonly Have Undisclosed Lucrative Pre-Arranged Agreements to Refer Borrowers to Certain Force-Placed Insurance Providers**

98.     The force-placement of insurance policies is a very lucrative business.  Here, the Saxon Defendants and Ocwen Defendants force-placed hazard insurance with the Assurant Defendants in accordance with pre-arranged agreements and in such a way as to receive and maximize their financial benefit.  Similarly, the Litton Defendants force-placed hazard insurance with the American Modern Defendants under exclusive arrangements that maximized their own financial interests.

99.     The Loan Servicing Defendants benefited because they placed Plaintiffs' force-placed insurance policies with the Insurer Defendants which had already agreed to share revenue in the form of direct commission payments, below cost tracking services, illusory reinsurance arrangements, and/or other compensation.   Indeed, as Birny Birnbaum of the Center for Economic Justice, an experienced and noted expert in the area of force-placed insurance stated:

> Servicers have financial incentives to force-place the insurance because the premiums include commissions and other considerations for the servicer.  With some servicers, the insurance is reinsured through captive reinsurer of the servicer, resulting in additional revenue to the servicer from the force-placement coverage.

*See* Exhibit 11,Birnbaum NYDFS Testimony, at 15.

100.     The Loan Servicing Defendants and the Insurer Defendants profited from the ability to exploit their authority to force-place insurance in several ways, including through commission arrangements depicted below in the following graphic from *American Banker*:

# Sharing in the Profits

How servicers make money arranging force-placed coverage

## Commissions

**To replace lapsed homeowners coverage, the servicer, working through a subsidiary, buys policy from insurer**

**Servicer advances premiums to insurer**

**Insurer pays portion of premium back to subsidiary as a commission**

**Servicer bills borrower for the policy**

**If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale**





## Reinsurance

**To replace lapsed coverage, servicer buys policy on home from insurer**

**Servicer advances premiums to insurer**

**Subsidiary of servicer reinsures part of the policy, gets a cut of premiums**

**If necessary, subsidiary buys letter of credit from another party**

**Servicer bills borrower for the policy**

**If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale**

## C.    Defendants' Profit Making Commission Arrangements

101.    Under the commission arrangement, the provider of the force-placed insurance policy pays a commission either directly to the servicer or to a subsidiary posing as an insurance "agent." Typically, under such an arrangement, commissions are paid to a "licensed insurance agency" that is simply an affiliate or subsidiary of the servicer and exists only to collect the kickbacks or commissions collected from the force-placed insurance provider.

102.    The Assurant Defendants have acknowledged that they pay commissions in connection with force-placed insurance:

> Commissions to Insurance Producers Affiliated with Mortgage Servicers
>
> In some cases, ASIC and ABIC pay commissions to insurance agencies and brokers that are affiliates of mortgage servicers. …

> The evidence from the [NYDFS] indicates that the affiliated agencies and brokers do little or no work for the commissions ASIC and ABIC pay them. ASIC, ABIC and their affiliates do much of the work associated with forceplaced insurance, including tracking insurance coverage and communicating with homeowners. These arrangements could create an incentive for mortgage servicers to purchase higher priced force-placed insurance and for mortgage servicers to place more homeowners into force-placed insurance, because their affiliates earn more commission as premiums increase.... Commissions paid to affiliates of servicers is a form of reverse competition; when insurers compete for servicers' business by offering higher commissions to servicers' affiliates, there is no incentive to reduce force-placed insurance premium rates. Commissions are paid to affiliates of servicers because they are a cost of staying in the market, not for any particular work the affiliates perform. Commissions on force-placed insurance have been reduced in recent periods.

*See* Exhibit 4, Assurant NYDFS Consent Order, Findings ¶¶ 11-12.

103.    The American Modern Defendants have also acknowledged that they pay commissions in connection with force-placed insurance:

### Commissions to Insurance Producers Affiliated with Mortgage Servicers

> In some cases, American Modern pays commissions to insurance agencies and brokers that are affiliates of mortgage servicers . . . The evidence from the [NYDFS] investigation indicates that affiliated agencies and brokers do little or no work for the commissions American Modern pays them . . . Commissions paid to affiliates are a form of reverse competition; when insurers compete for servicers' business by offering higher commissions to servicers' affiliates, there is no incentive to reduce force-place insurance premium rates. Commissions are paid to affiliates of servicers because they are the cost of staying in the market, not for any particular work the affiliates perform.

*See* Exhibit 2, American Modern NYDFS Consent Order, Findings ¶¶12-13.

104.    Assurant, Inc. has agreed to cause its affiliates, including ASIC, to cease paying these commissions with respect to borrowers in New York in the NYDFS Consent Order. *See* NYDFS Consent Order at 9.

105.    J. Robert Hunter of the Consumer Federation described these practices in his testimony before the NYDFS in connection with the Department's inquiry into force-placed insurance practices:

> In some instances, lenders use [force-placed] insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or broker[s] or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using "fronting" primary insurers to direct the coverage to lender-affiliated captive reinsurers. Lenders often receive free or below cost service from affiliated service providers.

*See* Exhibit 5, Hunter Testimony at 1.

## D.    The Loan Servicing Defendants Improperly Passed on Servicing Costs to Borrowers Who Were Required to Pay for Force-Placed Hazard Insurance

106.    Moreover, the Loan Servicing Defendants coordinated with the Insurer Defendants to perform certain loan servicing functions.   In so doing, the Loan Servicing Defendants transferred the cost of servicing to the Insurer Defendants.   As a result, these servicing costs were included in the charges assessed to borrowers purportedly for force-placed insurance.

107.    Because the Insurer Defendants provided these outsourced services at below-market rates, but then conspired with the Loan Servicing Defendants to include the actual cost of those services in the amounts charged to borrowers, this arrangement functioned as an undisclosed kickback to both the Insurer Defendants and the Loan Servicing Defendants.   The Loan Servicing Defendants received the outsourced services for free or at below market rates, and the Insurer Defendants conspired with the Loan Servicing Defendants to unlawfully charge borrowers for these services.

108.    Industry insiders acknowledge that force-placed insurance premiums are "a lot more expensive than other alternatives" because the administrative costs "are bundled into the

costs of the premium." *See* Exhibit 25, Testimony of Joseph Marcowicz (PRP Claims), Public Hearing on Private Lender-Placed Insurance, Property and Casualty Insurance (C) Committee Market Regulation and Consumer Affairs (D) Committee, National Association of Insurance Commissioners, August 9, 2012, ("Markowicz Testimony"). Mr. Markowicz also confirmed that administrative costs "tend to keep premium costs high" because expenses "which include the administrative work of the letter campaigns and tracking services provided to the loan servicer" are bundled into the premium." *Id.*

109.   As discussed in greater detail below, on March 6, 2012, Fannie Mae issued a Request for Proposal ("RFP") after observing that the existing force-placed insurance system "may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms." *See* Fannie Mae Request For Proposal dated March 6, 2012 attached as Exhibit 58.

110.   The RFP further noted that, in addition to payment of unnecessary commissions/fees, "Fannie Mae is often paying twice for Insurance Tracking services; once via the servicing fee that Fannie May pays to Servicers, and again via the Lender Placed Insurance premiums, since those premiums may include or subsidize the costs of tracking services." *Id.*

111.   Indeed, John Frobose, President of ASIC, has also confirmed this practice, acknowledging that, "ASIC monitors policy status for possible lapses in coverage, such as when a homeowner's standard policy has been cancelled or is about to expire"   *See* Exhibit 63, Written Testimony of John Frobose, New York Department of Financial Services Testimony (April 12, 2012). Mr. Frobose has also admitted that the Assurant Defendants include the cost of

outsourced services in the amounts charged to servicers for force-placed insurance policies. *Id.* at 10.

112.   The Loan Servicing Defendants and the Assurant Defendants then conspired to unlawfully, and fraudulently, pass these costs onto the borrowers.

113.   The NYDFS Consent Orders ban this practice in the future with respect to force-placed policies provided for certain borrowers in New York.

**E.     Defendants Cannot Justify the High Cost of Force-Placed Insurance Charged to Borrowers**

114.   Servicer explanations for the high cost of force-placed insurance are "unsupported by any evidence." *See* Exhibit 11, Birnbaum NYDFS Testimony at 1.

115.   Servicers commonly attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property.   However, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting. *Id.*

116.   Additionally, the Insurer Defendants also have the capability to write, and have written, blanket force-placed insurance policies on certain REO properties that are less expensive than the amounts charged to borrowers.

117.   Force-placed insurance policies are not underwritten on an individual policy basis.   Rather, servicers' contracts with force-placed insurance providers require, or at least permit, the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

118.   As J. Robert Hunter stated in his recent testimony before the NYDFS, "lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance." *See* Exhibit 5, Hunter NYFSD Testimony at 5.

Yet, it does not.  Instead, as a result of the arrangements between those participating in the monitoring, placing and administering of force-placed insurance, consumers are gouged.

119.    Force-placed insurer subsidiaries are highly profitable businesses.  "Among a published ranking of companies with the strongest operating insurance subsidiaries, several bank holding companies stand out . . . .  Companies with insurance subsidiaries providing force-placed property insurance were at the top of the list."  *See* http://www.mainstreet.com/print/18604. (last visited November 19, 2013).

120.    Servicers also attempt to justify the high price of force-placed insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting.  However, as *American Banker* noted:

> Though part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry—even after accounting for the generous commissions and other payments that servicers demand.

*See* Exhibit 7, Ties to Insurers.

121.    Birny Birnbaum, in his testimony before the NYDFS, also presented statistics collected by the NAIC reflecting nationwide loss ratios for LPI hazard insurance during the 2004-2011 period as being, on average, more than 35 percentage points lower than the ratios for commercially available homeowners policies.  *See* Exhibit 11, Birnbaum NYDFS Testimony at 9.  When confined to the period from 2007-2011, the disparity between LPI hazard insurance loss ratios and those of commercially available homeowners policies was nearly 42 percentage points.  *Id.*

122.    Moreover, because the policies are not individually underwritten, the force-placed insurer is spared the costs associated with individual underwriting which should actually decrease the cost of insurance.  *See* Exhibit 11, Birnbaum NYDFS Testimony at 26.

**F.** **The Loan Servicing Defendants' Interest In the Force-Placed Insurance is the Kickbacks, Commissions and Fees They Receive**

123.    Although it may appear that the Loan Servicing Defendants force-place hazard insurance on mortgaged properties to protect against their risk of losing any amounts in the event of damage to the collateral, such "risk" is illusory.

124.    While lenders originate mortgages, these mortgages are frequently packaged into securities and sold to investors.  Thereafter, a servicing affiliate of the originating lender often continues to service those mortgages for a fee on behalf of the purchaser of the mortgages, often Fannie Mae or Freddie Mac, but neither the originating lender nor its servicing affiliate bears the risk that the mortgagees will default on the loan or that the collateral on the loan will become impaired.  Rather, that risk is borne by the borrower and/or the current lender/owner of the loan.

125.    Such servicers thus receive kickbacks and commissions for force-placed insurance policies at the expense of their customers, but with no risk to their own "investment."

**G.** **Defendants Routinely Require Redundant or Otherwise Unnecessary Insurance**

126.    The Loan Servicing Defendants have routinely required borrowers to pay for unnecessary insurance coverage.  Such examples include, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the mortgagee's insurable interest in the secured property; (b) backdating force-placed insurance policies so that they cover time periods already passed when the policy is placed, thus requiring borrowers to pay for retroactive coverage for by-gone periods of time for which no risk of loss exists; and (c) requiring borrowers to pay for force-placed insurance policies despite the existence of a Lender's Loss Payable Endorsement that already protects the lender's interest in the property.

127. The NAIC has indicated that insurance is "prospective in nature." *See, e.g.,* Exhibit 7, Ties to Insurers ("[Insurance policies] should not be back-dated to collect premiums for a time period that has already passed" (quoting NAIC)).

128. Moreover, many hazard insurance policies contain a Lender's Loss Payable Endorsement. This endorsement typically protects the lender for a period of at least ten days after the termination of the insurance policy. Accordingly, force-placing insurance policies effective immediately following the termination of the borrower's policy, and charging borrowers large amounts for such insurance, is unlawful and unfair because borrowers are charged for needless and duplicative insurance coverage.

129. Furthermore, the Loan Servicing Defendants had no permissibly insurable interest beyond the outstanding principal balance on the borrowers' mortgages. However, upon information and belief, the Loan Servicing Defendants and Insurer Defendants conspired to force-place insurance coverage at the last known coverage amount regardless of the outstanding principal balance on the mortgage. Thus, by conspiring to purchase insurance coverage greater that the outstanding principal balance on the loans, the Loan Servicing Defendants unlawfully benefitted by increased kickbacks and the Insurer Defendants unlawfully benefitted through writing a greater amount of insurance.

## H. Defendants Charged Plaintiffs For Redundant Or Otherwise Unnecessary Insurance Pursuant to Lucrative Pre-Arranged Agreements

### Plaintiffs Jimmy and Jacqueline Lyons

130. As previously noted, the Lyons Mortgage was serviced by the Litton Defendants.

131. In January 2010, the Lyons Plaintiffs entered into a Home Affordable Modification Agreement with Litton ("Modification Agreement"). Pursuant to the Modification Agreement, Litton established an escrow account for the Lyons Plaintiffs, and insurance

premiums and property taxes were thereafter to be paid out of the Lyons Plaintiffs' escrow account.

132.    Before entering into the Modification Agreement, the Lyons Plaintiffs did not have an escrow account; however, in accordance with the requirements of their mortgage, the Lyons Plaintiffs maintained hazard insurance on their property.   Immediately prior to the Modification Agreement, the Lyons Plaintiffs had a hazard insurance policy with HomeWise Preferred Insurance Company, with a policy period of December 3, 2008 through December 3, 2009 and an annual premium of $1,299.00.   *See* Exhibit 26, HomeWise Insurance Declaration Page.   This homeowners' policy covered the structure of the Lyons Plaintiffs' residence as well as personal property and loss of use.   *Id.*

133.    On or about December 10, 2009, Litton sent the Lyons Plaintiffs a letter[2] informing them "that the insurance policy on [their] property has been canceled or is no longer in effect" and that they "are currently insured under a temporary binder (effective 12/03/2009)." *See* Exhibit 27, Litton Letter.   The letter demanded proof of coverage within 60 days from the date of the letter.   *Id.*   Upon receipt of this letter, the Lyons Plaintiffs, believing that Litton was now responsible for making the premium payments out of the Lyons Plaintiffs' escrow account, contacted Litton and asked why Litton had not paid the premium.   A Litton representative assured the Lyons Plaintiffs that Litton would make the payment.

134.    On or about January 5, 2010, HomeWise sent the Lyons Plaintiffs a Cancellation Acknowledgement informing them that their hazard insurance policy had been cancelled for nonpayment, effective December 3, 2009.   *See* Exhibit 28, HomeWise Cancellation

---

[2] The date printed on this letter is December 10, 2010; however, this appears to be a mistake. The letter clearly stated that the temporary insurance binder was "effective 12/03/2009."

Acknowledgement. Upon receipt of this notice, the Lyons Plaintiffs again contacted Litton about making the insurance payment. A Litton representative again assured the Lyons Plaintiffs that Litton would make the payment. The Lyons Plaintiffs also contacted HomeWise to inform them that Litton would be paying the premium.

135.   On or about February 11, 2010, Litton sent the Lyons Plaintiffs a letter informing them that Litton had received proof of insurance. *See* Exhibit 29, Proof of Insurance Received. The letter stated: "[w]e have received proof of insurance for the above referenced account and our records have been updated to reflect your policy information. There has been no additional charge to your account." *Id.* Relying on this letter, the Lyons Plaintiffs thought Litton had paid the insurance premium and that their insurance was current.

136.   On or about January 27, 2011, Litton sent the Lyons Plaintiffs a letter indicating that the Lyons Plaintiffs' "insurance coverage lapsed from 12/03/2010 to 01/03/2011" and that Litton had purchased fire insurance for this period and "charged [Plaintiffs'] escrow account $371.52 to pay for the premium." *See* Exhibit 30, January 27, 2011 Letter and EOI. The letter was accompanied by an "Evidence of Insurance," which shows that the force-placed policy was purchased from AMHIC. *Id.* The agency that procured the policy was listed as Southwest Business Corporation. *Id.*

137.   The Lyons Plaintiffs' "Escrow Account Disclosure Statement," dated April 18, 2011, lists three insurance payments that were made out of the Lyons Plaintiffs' escrow account. *See* Exhibit 31, Escrow Account Disclosure Statement. All three payments were made in January 2011. *Id.* The first payment, for $1,975.42, *id.*, was for a preferred homeowner's (hazard) insurance policy for the period of January 3, 2011 through January 3, 2012. *See* Exhibit 32, Universal Property 2011 Declaration Page. The second payment, for $4,374.75, was

described as "LPLACED FIRE." *See* Exhibit 31. The third payment, for $371.52, was also described as "LPLACED FIRE." *Id.* The $371.52 payment was for the force-placed hazard policy covering the one-month period from December 3, 2010 through January 3, 2011. *See* Exhibit 30.

138.    The Lyons Plaintiffs contacted Litton to request documentation related to the $4,374.75 payment that was made from Plaintiffs' escrow account; however, Litton refused to provide any documentation.

139.    To date, the Lyons Plaintiffs do not know which force-placed hazard policy was obtained with the $4,374.75 payment. However, the Lyons Plaintiffs believe that the $4,374.75 charge was for a force-placed policy covering the year 2010. The Lyons Plaintiffs had maintained preferred hazard insurance on their property from the time of their refinance in October 2006 until at least December 3, 2009. The Lyons Plaintiffs also have proof of preferred hazard insurance from January 2011 through January 2013. Thus, the only period unaccounted for is for the period from December 3, 2009 through January 2011.

140.    In December 2009 and again in January 2010, Litton represented to the Lyons Plaintiffs that it would make the requisite insurance payments to their preferred insurer, thereby keeping their preferred insurance current. Litton sent the Lyons Plaintiffs a letter, dated February 11, 2010, representing that Litton had received proof of insurance for their account. *See* Exhibit 29. However, in January 2011, Litton charged $4,374.75 to the Lyons Plaintiffs' escrow account for a force-placed policy that was, on information and belief, backdated to cover the year 2010. *See* Exhibit 31. The policy was backdated despite the fact that there was no damage to the property and/or claims arising out of damage to the property during 2010 – a fact that Litton could have easily known or discovered.

141. Although the force-placed policy was more than twice as costly as the Lyons Plaintiffs' preferred 2011 policy and more than three times as costly as the Lyons Plaintiffs' preferred 2009 policy, the force-placed policy provided less coverage, in that it did not cover Plaintiffs' personal property.

**Plaintiff Lisa Chamberlin Engelhardt**

142. In or around July 2012, at the time OLS began servicing the Engelhardt Mortgage, the escrow account for Ms. Engelhardt's mortgage had a positive balance of $249.00.

143. On October 18, 2012, Ms. Engelhardt purchased a voluntary hazard insurance policy from Homesite Group, Inc. ("Homesite"). Representatives of Homesite contacted OLS to inform them of the insurance policy and to request payment from the mortgage escrow account.

144. On November 1, 2012, despite Ms. Engelhardt having provided proof of hazard insurance to OLS, OLS force-placed a hazard insurance policy on her property.

145. Upon information and belief, OLS force-placed hazard insurance on Englehardt's property through the Assurant Defendants.

146. In January 2013, OLS informed Ms. Engelhardt that the force placed insurance policy covered the period between June 2012 and October 2012 and that OLS had charged her $685 for 103 days of force-placed insurance.

147. OLS sought reimbursement for the force-placed insurance out of the escrowed funds but despite repeated requests, failed for two months to pay the premiums for Ms. Engelhardt's policy with Homesite.

**Plaintiff Gerald Coulthurst**

148. Pursuant to the Coulthurst Mortgage, Mr. Coulthurst is required to insure the property which serves as collateral for the loan. In accordance with that requirement, Mr.

Coulthurst obtained hazard insurance prior to closing and did not escrow premiums, instead paying them directly to the insurer.

149.   Defendant OLS sent Mr. Coulthurst a notice dated October 4, 2008 informing him that OLS did not have a current hazard insurance policy on file for his property and indicating OLS's intent to force-place a policy. *See* Exhibit 64. According to the letter, Mr. Coulthurst's voluntary policy had lapsed on September 28, 2008. *Id.*

150.   On December 13, 2008, OLS sent another notice stating that "[t]hirty days from [December 13, 2008], [OLS] will charge your escrow account $3,612 for insurance coverage if you do not provide acceptable proof of coverage before that time." *See* Exhibit 65.

151.   OLS ultimately force-placed the policy on or about January 12, 2009, with the coverage backdated to September 28, 2008.

152.   Upon information and belief, OLS force-placed hazard insurance on the Coulthurst property through the Assurant Defendants.

153.   Mr. Coulthurst obtained a homeowner's policy from State Farm Insurance to supplant the force-placed policy. The premiums for the State Farm policy were to be paid from Mr. Coulthurst's escrow account.

154.   On June 13, 2009, OLS sent a letter to Mr. Coulthurst affirming its receipt of proof of voluntary insurance on the Coulthurst Property, but indicating that it would still charge Mr. Coulthurst $2,434 for the prorated lapse period from September 28, 2008 through June 1, 2009.

155.   On or about November 27, 2010, OLS force placed another hazard insurance policy on the Coulthurst Property. Mr. Coulthurst received an insurance declaration page from ASIC dated November 27, 2010 referencing a force placed insurance policy with a term from

September 29, 2010 through September 29, 2011 with an annual premium of $4,519.00.  *See* Exhibit 66.

**Plaintiff Enrique Dominguez**

156.    Pursuant to the Dominguez's Mortgage, Mr. Dominguez is required to insure the property which serves as collateral for the loan.  In accordance with that requirement, Mr. Dominguez obtained hazard insurance prior to closing.

157.    At all relevant times, Mr. Dominguez's mortgage has been serviced by OLS and secured by his property in Spring, Texas.  The Ocwen Defendants assumed the servicing responsibilities for this loan as part of its acquisition of Litton in 2011.

158.    During the transition from Litton to OLS, Mr. Dominguez sent two mortgage payments to Litton because he had not received information on where to direct his payments for OLS.  The two payments were accompanied by directions for Litton to forward the payments to OLS.  The payments were not forwarded.

159.    Mr. Dominguez made a catch-up payment of approximately $3,000 at OLS's instruction to avoid foreclosure.

160.    After paying the $3,000, in approximately February 2012, Mr. Dominguez received a notice from OLS that his hazard insurance coverage had lapsed.

161.    Then, on or about March 24, 2012, OLS sent Mr. Dominguez a letter informing him that since OLS had not received "proof of acceptable insurance coverage," OLS had obtained insurance on his behalf, and the "premium will be charged to [his] escrow account." *See* Exhibit 33.  The letter stated that OLS had "incurred expenses in placing this insurance policy." *Id.*  The letter stated further "[s]uch expenses are recoverable by us as stated in your loan documents." *Id.*  Finally, the letter informed Mr. Dominguez that "[p]art of the policy

premium charged to [his] escrow account may be used by the insurance carrier to reimburse [Ocwen] for . . . expenses" incurred by OLS "in placing this insurance policy." *Id.*   The letter did not inform Mr. Dominguez that, as loan servicer, OLS was obligated to cover these expenses.

162.    Enclosed with the letter was an insurance declarations page indicating that the force-placed insurance provider was SGIC. *See* Exhibit 34.  The policy was backdated with a coverage period from November 1, 2011 through November 1, 2012, provided coverage of $73,703 and an annual premium of $1,352.57. *Id.*

163.    On October 7, 2012, OLS sent a letter to Mr. Dominguez informing him that the lender-placed policy would be renewed on November 1, 2012 with a premium of $1,391.36.

164.    In order to prevent the force-placed policy from being renewed for another year, Mr. Dominguez purchased homeowner's insurance from Loya Insurance Company effective October 16, 2012.  The Loya policy provided building coverage of $102,970 and content coverage of $30,891.  The annual premium for the Loya policy was $765.00. *See* Exhibit 35.

**Plaintiffs Frances and Johnnie Erving**

165.    Under the Erving Mortgage, hazard insurance was required as a condition to close.  Exhibit 20 at § 5.

166.    On or around November 1, 2007, NovaStar assigned, sold and/or transferred the servicing rights on the Erving Mortgage to Saxon. *See* Exhibit 36.

167.    On or about August 24, 2009, an Assignment of Mortgage was recorded indicating that NovaStar had assigned the Mortgage to Deutche Bank National Trust Co., as Trustee for NovaStar Mortgage Funding Trust Series 2006-4. *See* Exhibit 37.

168.    On October 6, 2008, the Ervings filed for bankruptcy protection in the United States Bankruptcy Court, Southern District of Florida ("Bankruptcy Court").  The Bankruptcy

Court entered an order granting a discharge under section 1328(a) of Title 11 of the Bankruptcy Code on December 18, 2009 and on February 18, 2010, the Bankruptcy Court entered a Final Decree.

*Post-Bankruptcy Saxon Force-Placed Hazard Insurance on the Erving Property*

169.    After the Bankruptcy Court entered the Final Decree, o the Saxon Defendants sent the Ervings a letter stating that the force-placed hazard insurance policy previously purchased by the Saxon Defendants covering the Erving Property would be renewed in approximately 30 days, with an annual premium of $4,811.68. *See* Exhibit 38.

170.    The Saxon Defendants subsequently force-placed a hazard insurance policy on the Property covering the period between August 9, 2010 and August 9, 2011, with annual premium of $4,811.68. The Saxon Defendants selected ASIC as the force-placed hazard insurance provider and the policy provided $189,342 of coverage for the house structure only. *See* Exhibit 39.

171.    Approximately one year later, on or about August 25, 2011, the Saxon Defendants sent the Ervings a letter stating that the Defendants had again renewed the force-placed hazard insurance policy and would charge the premium to the Ervings' account. *See* Exhibit 40. The letter included a copy of the policy and declaration page identifying ASIC as the force-placed insurance provider with an effective date of August 9, 2011 and a total annual cost of $4,989.17. *Id.* The policy provided $189,342 of coverage for the house structure only and did not include coverage for personal property, loss of use, personal liability and medical payments to others. *Id.*

172.    By contrast, the Ervings previously paid an annual premium of approximately $1,232 for hazard insurance through Citizens Property Insurance Corporation before the Saxon Defendants force-placed hazard insurance on the Property. *See* Exhibit 41.

### Ocwen Force-Placed Hazard Insurance on the Erving Property

173.    By letter dated March 12, 2012, Saxon informed the Ervings that, effective April 2, 2012, Saxon would be transferring the servicing of their account to OLS. Exhibit 42. The letter further indicated that the servicing transfer "does not affect any term or condition of your financing agreement, other than terms directly related to the servicing" of the Ervings' account. Id. Indeed, Saxon represented that even monthly payments made through Saxon's automated payment program will continue with OLS. *Id.*

174.    The Ervings subsequently received two letters, both dated April 14, 2012, indicating that the hazard insurance policies previously force-placed by Saxon through ASIC would not be renewed. Exhibit 43. The stated reason for nonrenewal: "Request by the Named Insured Mortgagee." The hazard policy was set to expire on August 9, 2012.

175.    As advised, OLS did not renew the hazard policy previously force-placed by Saxon. Instead, after the ASIC policy force-placed by Saxon expired, the Ocwen Defendants force placed a new policy with ASIC.

176.    The hazard policy, which expired on August 9, 2012, was first replaced with temporary coverage in the form of an insurance binder and later force-placed with a yearlong policy with an effective date of August 9, 2012 and expiring August 9, 2013. Exhibit 44. Like the ASIC policy previously force placed by Saxon, the ASIC policy force-placed by the Ocwen Defendants provided $189,342 in coverage; however, the ASIC policy the Ocwen Defendants force-placed had an annual premium of $5,575.35 – an increase of more than $580.

177.    The Ervings also received correspondence from OLS containing half-truths, misinformation and omissions. *See e.g.*, Exs. 45, 46, and 47. This correspondence concealed the fact that the Ocwen Defendants were not merely force-placing insurance to protect the lenders'

security interest in the property and instead subverting the force-placed insurance process in order to generate additional, unjust profits at the borrowers' expense.

**Plaintiff Anthony Papapietro**

178.   Pursuant to the Papapietro Mortgage, Mr. Papapietro is required to insure the property which serves as collateral for the loan.  In the event that coverage of the property is not maintained, "Lender may obtain insurance coverage, at Lender's option and Borrower's expense."  *See* Exhibit 21, Papapietro Mortgage at § 5.

179.   During early 2009 Equity began servicing Mr. Papapietro's loan.

180.   During late 2009 Litton began servicing Mr. Papapietro's loan.

181.   A billing statement from Litton dated September 14, 2009 shows a $3,570.00 transaction for "Lender Placed Ins PA" posted on "8/27/09."  *See* Exhibit 52.

182.   A billing statement from Litton dated October 15, 2009 shows a $3,345.81 transaction for "Lender Placed Ins Re" posted on "9/17/09."  *See* Exhibit 53.

183.   A transaction history prepared by Litton and provided to the Plaintiff shows two transactions in the amount of $3,546.00 on "02/24/11."  *See* Exhibit 54.

184.   Litton charged Mr. Papapietro for a homeowner's insurance policy with American Security Insurance Company with a coverage period from 09/01/2011 to 09/01/2012 and annual premiums of $3,273.00.  *See* Exhibit 55.

185.   Mr. Papapietro carried a homeowner's policy with Allied Insurance with a term of 2/14/2011-2/14/2012.  The annual premium on Plaintiffs' Allied policy was $794.63.  *See* Exhibit 56.

**Plaintiff Sheila D. Heard**

186.   Pursuant to the Heard Mortgage, Ms. Heard is required to insure the property which serves as collateral for the loan.  In the event that coverage of the property is not

maintained, "Lender may obtain insurance coverage, at Lender's option and Borrower's expense." *See* Exhibit 62, Heard Mortgage at § 5

187.    Litton began servicing Ms. Heard's loan prior to 2006.   Since that time, Ms. Heard has had hazard insurance force placed on numerous occasions, including: by notice dated April 21, 2006 (*see* Heard April 2006 Notice of FPI Binder, attached hereto as Exhibit 67, evidencing binder for coverage in the amount of $35,745 for dwelling only at an annual premium of $416.53); and notice dated July 13, 2006 (*see*  Heard July 13, 2006 Notice of FPI, attached hereto as Exhibit 68, evidencing coverage in the amount of $35,745 for dwelling only at a premium of $416.53).   This FPI policy was backdated to August 15, 2005, *almost a full year prior* to the Heard July 13, 2006 Notice of FPI, and provided limited coverage of the dwelling only through August 15, 2006.

188.    The FPI policy was underwritten by Underwriters at Lloyd's of London through the Southwest Business Corporation Insurance Agency. *Id.*

189.    The FPI policy coverage was renewed for the period August 15, 2006 through August 15, 2007 and August 15, 2007 through August 15, 2008 on similar terms.  *See* Heard August 24, 2006 Notice of FPI and Heard August 30, 2007 Notice of FPI, attached hereto as Exhibits 69 and 70.

190.    Subsequently, on or about August 25, 2011, Litton again force placed a policy, this time with American Modern Home, but also using Southwest Business Corporation as the insurance agency. *See* Heard 2011 Notice of FPI, attached hereto as Exhibit 71.

191.    The policy provided dwelling coverage only in the amount of $32,257 and the annual premium was $316.  The policy covered the period August 15, 2010 through August 15, 2011. *See id.*

192.    The Heard 2011 Notice of FPI included the false and misleading statement that, "We have incurred expenses in placing this Insurance Binder and policy. Such expenses are recoverable by us as stated in your loan documents. Part of the policy premium charged to your escrow account may be used by the insurance carrier to reimburse us for these expenses." *Id.*

193.    On or about September 13, 2011, Litton notified Ms. Heard of cancellation of her FPI policy due to her loan being transferred to Ocwen. *See* Heard Sept. 2011 Notice of FPI Cancellation, attached hereto as Exhibit 72.

194.    Ocwen also notified Ms. Heard by letter that it had no record of hazard insurance coverage and requesting proof of insurance. *See id.*

195.    Then, on or about October 15, 2011 Ocwen notified Ms. Heard by letter that it had the right to "charge you for the cost of the insurance" and that they had force-placed a 60-day insurance binder through American Security Insurance Company with a coverage period from Sept. 1, 2011 through Oct. 31, 2011, followed by a letter dated Nov. 26, 2011, force placing the policy at an annual premium $1,248.00 and including a Nov. 26, 2011 Declaration page from ASIC for the policy period Sept. 1, 2011 through Sept. 11, 2012 at an annual premium of $1,248.00 covering the dwelling only in the amount of $115,000. *See* Heard October 2011 Ocwen Notice of FPI, attached hereto as Exhibit 73, and Heard November 2011 Ocwen Notice of FPI attached hereto as Exhibit 74.

196.    Ms. Heard then obtained her own hazard insurance through Allstate with a policy effective date of August 5, 2012 through August 5, 2013. *See* Heard Allstate Policy, attached hereto as Exhibit 75. The annual policy premium was $521.02 and provided dwelling coverage in the amount of $114,000, personal property coverage in the amount of $45,600, and liability coverage in the amount of $100,000.

197.   Then on August 18, 2012 Ocwen notified Ms. Heard they had cancelled the ASIC

policy as of Aug. 5, 2012 due to the fact that Ms. Heard had provided proof of her insurance with

Allstate.  *See* Heard Ocwen Notice of Cancellation, attached hereto as Exhibit 76.  Despite the

cancellation, Ocwen retained an "additional insurance charge of $1,156… for the period of time

that the coverage was in force."  *Id.*

198.   The Allstate Policy Ms. Heard obtained cost $521.00—less than half the cost of

the ASIC policy it replaced and it provided substantially more coverage, including liability and

personal property coverage.

**The Kickback Scheme Constitutes Mail and Wire Fraud**

199.   The kickback scheme alleged herein constitutes mail and/or wire fraud in

violation of 18 U.S.C. §§ 1341 and 1343.

200.   As pled throughout, the Loan Servicing Defendants and the Insurer Defendants

fraudulently conspired to charge borrowers amounts over and above the amount required to

insure the mortgaged properties and protect the lender's security interest and over and above the

amount actually paid by the Loan Servicing Defendants to the Insurer Defendants.

201.   For example, the cost of tracking and monitoring mortgages in the Loan Servicing

Defendants' portfolios is a loan servicing function for which loan servicers are separately

compensated.

202.   However, the Loan Servicing Defendants and Insurer Defendants conspired to

charge borrowers for such loan servicing functions by disguising amounts charges to borrowers

for force-placed insurance as amounts required to insure the lenders' security interest in the

mortgaged properties.

203.   The Loan Servicing Defendant and the Insurer Defendants also conspired to

charge borrowers amounts not attributable to insuring their properties.  For example, the

American Modern Defendants and the Litton Defendants entered into an illusory reinsurance agreement whereby money was funneled back to Litton's parent, Goldman Sachs, through Arrow, a Goldman Sachs affiliate.   The reinsurance purportedly purchased by the Assurant Defendants through this arrangement transferred no actual risk, but rather was simply a mechanism to provide kickbacks to the Litton Defendants.

204.   Additionally, as Mr. Frobose acknowledged before the NYDFS, the Assurant Defendants also bundled amounts for other purported "expenses" into amounts charged for force-placed insurance, such as commissions paid to agents affiliated with servicers, reimbursement of expenses incurred by servicers in performing placement-related activities, expenses incurred by the Assurant Defendants in acquiring business, and other expenses. Frobose NYDFS Testimony, at 10.

205.   By categorizing outsourced loan servicing functions, illusory reinsurance, commissions paid to servicers, and other charges as "expenses," and then conspiring to pass the cost of such "expenses" on to borrowers whose insurance was force-placed, when the borrowers were not obligated to pay such amounts, the Loan Servicing Defendants and the Insurer Defendants committed fraud.

206.   This fraud was perpetrated through the mails.  Prior to the placement of force-placed insurance policies, the Loan Servicing Defendants and Insurer Defendants caused to be delivered through the mail a series of "cycle letters" that disguised the true nature of the amounts charged to borrowers.

207.   For example, none of the cycle letters delivered on behalf of the Litton Defendants, Saxon Defendants and/or Ocwen Defendants disclosed that borrowers were being