charged for outsourced loan servicing functions which the servicers obligated to perform were separately compensated for performing.

208.    Additionally, none of the cycle letters delivered on behalf of the Litton Defendants, Saxon Defendants and/or Ocwen Defendants disclosed that commission payments were made to agents or brokers that performed no actual services.

209.    Similarly, none of the cycle letters delivered on behalf of the Litton Defendants, Saxon Defendants and/or Ocwen Defendants disclosed that the reinsurance purchased from affiliated reinsurers involved no real transfer of risk.

210.    These statements are materially false and misleading and omit facts necessary to make the statements not misleading.

211.    The notices and statements issued to borrowers are fraudulent in themselves and misrepresent that the Loan Servicing Defendants are simply exercising their rights under borrowers' mortgage loan agreements.

212.    The Loan Servicing Defendants and the Insurer Defendants also committed wire fraud, as amounts fraudulently collected from borrowers were transferred between the Loan Servicing Defendants and Insurer Defendants via wire transfer.

## J.    <u>Government Response</u>

213.    As discussed above, force-placed insurance practices of mortgage lenders and servicers, insurance providers and insurance producers are currently the subject of a number of government investigations prompted by concerns that consumers are being gouged when they are force-placed in insurance following a lapse in their policies.

214.    Thus, state attorneys general have taken action concerning loan servicers' abusive practices concerning force-placed insurance.   Recently, a coalition of forty-nine (49) state attorneys general entered into an historic joint state-federal settlement agreement with the

country's five largest loan servicers ("National Mortgage Settlement") to address numerous problems that have surfaced during the foreclosure crisis. *See* www.nationalmortgagesettlement.com/ (last accessed Sept. 7, 2012), the official website established by the government relating to the settlement; *see also* Exhibit 57, Jeff Horwitz, Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies, American Banker (Mar. 10, 2011, 12:25 PM), *available at* http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-1034213-1.html.

215. Among other terms, the proposed settlement would essentially prohibit servicers from profiting from force-placed insurance. Specifically, under the proposed settlement, mortgage servicers: (a) shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has not paid for property insurance; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on the secured property; (c) must work with the borrower to continue or reestablish the existing homeowner's policy; (d) shall continue to make payments if there is a lapse in payment and the payments are escrowed regardless of homeowner payment; and (e) must purchase the force-placed insurance for a commercially reasonable price. *Id.*; *see also* Consent Judgment, *United States of America v. Bank of America Corp.*, Civ. No. 1:12-cv-00361-RMC (D.D.C. Apr. 14, 2012) (ECF No. 14 Section VII).

216. The Consumer Financial Protection Bureau issued two notices on proposed rules "to protect homeowners from surprises and costly mistakes by their mortgage servicers," which included specific provisions for "avoiding costly force-placed insurance." *See "Consumer Financial Protection Bureau Proposes Rules to Protect Mortgage Borrowers"* (Aug. 10, 2012), *available at* http://www.consumerfinance.gov/pressreleases/consumer-financial-protection-bureau-proposes-rules-to-protect-mortgage-borrowers/ (last visited November 19, 2013).

217.   These rules became final on January 17, 2013.  The new regulations prohibit servicers of federally regulated mortgage loans from force-placing insurance unless a servicer has a reasonable basis to believe that the borrowers insurance has lapsed.  Servicers must provide notice of force-placement three times at 45, 30 and 15 days in advance of issuing a policy. Moreover the charge for any service that was actually performed must "bear a reasonable relationship to the servicers cost of providing the service."  A servicer cannot force-place insurance if the borrower has an existing escrow account if the servicer can continue the existing insurance, even if the servicer must advance the funds for the insurance.  *See* Summary of Final Mortgage      Servicing      Rules      (January      17,      2013),      *available*      *at* http://files.consumerfinance.gov/f/201208_cfpb_detailed_summary_proposed_mortgage_servici ng_rules.pdf (last visited November 19, 2013); *see also*, 12 CFR 1024.

218.   On March 6, 2012, Fannie Mae issued a Request for Proposal ("RFP") after observing that the existing force-placed insurance system "may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms."  *See* Exhibit 58, Fannie Mae Request for Proposal dated March 6, 2012.  In its March 6, 2012 RFP, Fannie Mae stated that it had conducted an "extensive internal review" of the lender-placed insurance process, and found that the process "can be improved through unit price reductions and fee transparency to the benefit of both the taxpayers and homeowners."  In particular, Fannie Mae made the following observations:

- "Lender Placed Insurers often pay commissions/fees to Servicers for placing business with them.  The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums[.]"

- "The existing system may encourage Servicers to purchase

Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms . . . . Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down."

- "[M]uch of the current lender placed insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner."

*See* Exhibit 58, Fannie Mae RFP.

219.    The RFP further noted that, in addition to payment of unnecessary commissions/fees, "Fannie Mae is often paying twice for Insurance Tracking services; once via the servicing fee that Fannie May pays to Servicers, and again via the Lender Placed Insurance premiums, since those premiums may include or subsidize the costs of tracking services." *Id*

220.    Fannie Mae stated that it sought to "[r]estructure the business model to align Servicer incentives with the best interest of Fannie Mae and homeowners." Among other things, Fannie Mae sought to "[e]liminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae" and to "[s]eparate the commissions and fees for Insurance Tracking Services from the fees for Lender Placed Insurance to ensure transparency and accountability." *Id.* at 3.

221.    On March 25, 2013, the Federal Housing Finance Agency ("FHFA") issued a Notice regarding Lender Placed Insurance. This Notice "sets forth an approach to address certain practices relating to lender placed insurance that the [FHFA] considers contrary to prudent business practices [and] to appropriate administration of Fannie Mae and Freddie Mac (the Enterprises) guaranteed loans," and which result in "litigation and reputational risks." *See* Exhibit 59, Federal Housing Finance Agency, No. 2013-05 Lender Placed Insurance, Terms and Conditions.

222.    FHFA prohibits:

Certain Sales Commissions.  The Enterprises shall prohibit sellers and servicers from receiving, directly or indirectly, remuneration associated with placing coverage with or maintaining placement with particular insurance providers.

223.    The FHFA acknowledged:

- "Reportedly, premiums for lender placed insurance are generally double those for voluntary insurance and, in certain instances, significantly higher." *Id.* at 2.

- "[T]he multiples involved may not reflect claims experience..." *Id.*

- "Loss ratios for lender placed insurance are significantly below those for voluntary hazard insurance and some states have required or have considered rate reductions of 30 percent or more." *Id.*

- "Concerns about lender placed insurance costs, compensation and practices have been raised by the National Association of Insurance Commissioners, state regulators, the Consumer Financial Protection Bureau, state attorneys general and consumer organizations.  Generally, the focus has centered on excessive rates and costs passed on to borrowers, as well as commissions and other compensation paid to servicers by carriers.  In order to keep lender placed insurance costs to the Enterprises as low as possible, practices that provide incentives for and do not deter higher costs should be avoided." *Id.* at 3.

## K.    RICO ALLEGATIONS

224.    Plaintiffs and members of the Classes and Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

225.    Based on Plaintiffs' current knowledge, the following persons constitute a group of individual persons associated who constitute a RICO enterprise that is referred to herein as the "Litton Force-Placed Insurance Enterprise":  The Litton Defendants, the American Modern Defendants, and other insurance producers and entities involved in force-placing insurance on behalf of the Litton Defendants not named as defendants herein who assist the Litton Defendants

and American Modern Defendants in effectuating their scheme to defraud Plaintiffs and other borrowers who were required to pay for force-placed hazard insurance.

226.    Based on Plaintiffs' current knowledge, the following persons constitute a group of individual persons associated who constitute a RICO enterprise that is referred to herein as the "Saxon Force-Placed Insurance Enterprise":  The Saxon Defendants, the Assurant Defendants, and other insurance producers and entities involved in force-placing insurance on behalf of the Saxon Defendants not named as defendants herein who assist the named defendants in effectuating their scheme to defraud Plaintiffs and other borrowers who were required to pay for force-placed hazard insurance.

227.    Additionally, based on Plaintiffs' current knowledge, the following persons constitute a group of individual persons associated who constitute a separate but related RICO enterprise that is referred to herein as the "Ocwen Force-Placed Insurance Enterprise":  The Ocwen Defendants, the Assurant Defendants, and other insurance producers and entities involved in force-placing insurance on behalf of the Ocwen Defendants not named as defendants herein who assist the named defendants in effectuating their scheme to defraud Plaintiffs and other borrowers who were required to pay for force-placed hazard insurance.

228.    The Litton Force-Placed Insurance Enterprise, the Saxon Force-Placed Insurance Enterprise and the Ocwen Force-Placed Insurance Enterprise are organizations that have engaged in, and whose activities have affected, interstate commerce.

229.    While each of the Defendants participated in and are members of the Litton Force-Placed Insurance Enterprise, Saxon Force-Placed Insurance Enterprise and/or the Ocwen Force-Placed Enterprise, they also have an existence separate and distinct from the enterprises. The structures of the enterprises are reflected in the allegations herein.  In particular, the Loan

Servicing Defendants each implemented plans to exploit their authority as loan servicers acting on behalf of the mortgagors who owned Plaintiffs' and the Members of the Classes' mortgages to force-place high-priced insurance from their exclusive providers such as the Assurant Defendants and/or the American Modern Defendants. What outwardly appeared to be legitimate force-placed insurance activities was in reality a scheme devised and implemented by Defendants to enrich themselves at Plaintiffs' and Members of the Classes' expense, using affiliates to funnel improper kickbacks in the form of fees, commissions, "rebates," service in kind, and other consideration to them, and thereby generate a profit for themselves and the other enterprise participants at Plaintiffs and other borrowers' expense, causing injury to Plaintiffs' and borrowers' business or property.

**Conduct of the RICO Enterprise**

230.   As members of the Litton Force-Placed Insurance Enterprise, Saxon Force-Placed Insurance Enterprise and/or Ocwen Force-Placed Insurance Enterprise, Defendants engaged in the following conduct in furtherance of the aims and objectives of the enterprise:

(a)   The Loan Servicing Defendants exercised (and abused) their authority to force-place Plaintiffs' and other borrowers' hazard insurance granted under the terms of the mortgage contracts. Rather than renewing Plaintiffs' and other borrowers' existing policies or obtaining the insurance at a commercially reasonable price, the Loan Servicing Defendants force-placed the insurance with exclusive providers, thus choosing a more expensive policy to enrich themselves at Plaintiffs' and Members of the Classes' expense.

(b)   The Loan Servicing Defendants and their affiliates and subsidiaries, in coordination with the Insurer Defendants, provided and administered excessively priced policies charging Plaintiffs and other borrowers not only for the cost of their force-placed insurance, but also charging them for the costs of kickbacks, fees, commissions and other consideration in the

form of force-placed insurance premiums that were either charged directly to Plaintiffs and other borrowers, added to Plaintiffs' existing mortgage loan balances or charged to their escrow accounts.

   (c)  The Loan Servicing Defendants entered into exclusive deals with the Insurer Defendants to force-place hazard insurance on terms incorporating or requiring ancillary services and arrangements designed to generate additional profits that were steered to fellow scheme members.

   (d)  The Insurer Defendants paid fees, commissions, rebates, "earnouts" and other consideration to the Loan Servicing Defendants, purportedly for their role as "insurance producers" when they did not, in fact, produce any insurance business or provide legitimate insurance agency services, as at all times relevant to this complaint the Loan Servicing Defendants had entered into exclusive agreements with the Insurer Defendants.  In effect, the Loan Servicing Defendants used these arrangements to establish conduits to funnel a portion of Plaintiffs' and Members of the Classes' premiums back to themselves.

   (e)  Defendants colluded to include in the charges assessed to the small number of borrowers whose insurance was force-placed the costs of servicing the Loan Servicing Defendants' entire portfolio of loans (*i.e.*, for portfolio monitoring, tracking and related administrative functions) in addition to the costs directly attributable to force-placing the insurance.  This practice operated as a subsidy to the Loan Servicing Defendants, as loan servicers.  This practice also allowed the Insurer Defendants to collect payments for portfolio and monitoring from the borrowers whose insurance was force-placed when the Loan Servicing Defendants were already paid for such services through their loan servicing agreements.  The structures created between the Loan Servicing Defendants, the Insurer Defendants and their

affiliates operated to funnel the profits derived directly to the Defendants. *See, e.g.*, Ex. 3, Birnbaum Florida Testimony at 1-3, 7.

(f)     Upon information and belief, the Loan Servicing Defendants' tracking and outsourcing was performed by the Insurer Defendants for little or no charge.

**Defendants' Misrepresentations and Omissions**

231.   As set forth herein, the Loan Servicing Defendants and the Insurer Defendants made numerous material misrepresentations, omissions and half-truths to borrowers and others in furtherance of their fraudulent scheme.   These misrepresentations, omissions and half-truths created a false impression that Defendants were operating within the bounds of their contractual authority.   The intricate and secretive operations of the force-placed insurance scheme, which are of the type that ordinary consumers and borrowers would not be able to be aware of, necessitate Defendants to have made full disclosure of all the relevant facts necessary to avoid misrepresentations, omissions and half-truths.   Instead, Defendants kept the true nature of their activities concealed and borrowers were harmed as a result.   In order for Defendants' fraudulent force-placed insurance scheme to be successful, Defendants intentionally maintained the appearance of traditional provision of insurance disguising the improper provision of high cost, duplicative and unnecessary force-placed insurance as an unremarkable and legitimate transaction when it was not.   In order to maintain the illusion of legitimacy, Defendants deceived Plaintiffs and Members of the Classes by failing to disclose the true nature of their self-dealing, profit making venture.

**Predicate Acts of Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343**

232.   Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire

fraud). As set forth below, Defendants have engaged in conduct violating each of these laws to effectuate their scheme.

233. For the purpose of executing and/or attempting to execute the above described scheme to obtain money by means of false or fraudulent pretenses, representations or promises, each of the Defendants, in violation of 18 U.S.C. § 1341, on two or more occasions, throughout the Class period and up to and including the present, either caused matter and things to be delivered by the Postal Service or by private commercial interstate carriers or knew and agreed that matter and things would be delivered by the Postal Service or by private or commercial interstate carriers, including, as described in greater detail below, loan documents, correspondence relating to the provision of force-placed hazard insurance, such as applications, agreements, checks or money orders, notices, correspondence to Plaintiffs and Members of the Classes and correspondence and memoranda to and among each other.

234. For the purpose of executing and/or attempting to execute the above described scheme to obtain money by means of false or fraudulent pretenses, representations or promises, each of the Defendants, in violation of 18 U.S.C. § 1343, on two or more occasions, through the Class period and up to and including the present, transmitted and received by wire, matter and things, including transfers of money, correspondence, reports, memoranda, manuals, applications and agreements and were transmitted over the telephone or through facsimile, electronic mail and internet.

235. Each of the Defendants sent matter and things via the postal service, private or commercial carrier, wire or other interstate media, as described in the foregoing incorporated paragraphs and set forth with specificity below, in furtherance of their scheme to force-place high-cost, unnecessary and duplicative force-placed insurance.

236.    These notices, telephone calls, correspondence and other communications allowed Defendants to execute their plan and were used to perpetuate the misrepresentations and omissions that lay at the core of Defendants' scheme.  While providing an outward appearance of legitimacy, the communications misrepresented the nature and extent of the Loan Servicing Defendants' authority to force-place insurance and misrepresented that Defendants were force-placing insurance to protect the lender's interest in the secured property while failing to inform Plaintiffs and the Classes that Defendants were engaging in a self-dealing, profit making enterprise at borrowers' expense, and included:

(a)    Notices sent by the Loan Servicing Defendants, the Insurer Defendants, or their subsidiaries, with the Loan Servicing Defendants' knowledge and consent, to Plaintiffs and Members of the Classes informing them of their authority to force-place hazard insurance.  A series of these notices, often referred to as "cycle letters," was sent to Plaintiffs and each Class member, amounting to hundreds of thousands of mailings in furtherance of the Defendants' scheme.  *See e.g,* Exhibits 27, 29, 30, 33, 38, 40, 42, 45, 46, 47, 64, 65, 67, 68, 69, 70, 71, 72, 73, 74; *see also* Frobose NYDFS Testimony.;

(b)    The cycle letters contained false information, half-truths and/or omitted information.  Specifically, these cycle letters concealed the fact that Defendants were not merely force-placing insurance in order to protect the lenders' interest in the property, but instead were subverting the right to force-placed insurance in order to reap additional profits for themselves at the borrowers' expense;

(c)    The Insurer Defendants used the wires to monitor and track the Loan Servicing Defendants' portfolios and to identify borrowers whose insurance had lapsed.  This

monitoring and tracking function was done pursuant to the scheme and specifically in an effort to find additional scheme victims;

(d)     The Loan Servicing Defendants and the Insurer Defendants mailed policies and declarations to Plaintiffs and Members of the Classes.   These policies and declarations, like the cycle letters, also contained half-truths, misinformation and omit critical information needed by borrowers to protect themselves from the scheme;

(e)     Defendants communicated to Plaintiffs and Members of the Classes through the mail, email, and on the internet.   These communications were in furtherance of the force-placed insurance scheme;

(f)     Upon information and belief, the Loan Servicing Defendants maintained separate websites through which Plaintiffs and Members of the Classes could pay for the fraudulently placed force-placed insurance charges and obtain information regarding their escrow accounts. *See e.g.,* Exhibit 77, Make a Payment, http://www.saxononline.com. *See also* https://www.ocwencustomers.com/oc/home.jsp. (last accessed Nov. 18, 2013).

(g)     Similarly, the Loan Servicing Defendants' websites did not contain information necessary for borrowers to understand the true nature and purpose of the force-placed insurance scheme;

(h)     Defendants used the wires to establish and manage Plaintiffs' and Members of the Classes' escrow accounts, including funding and transferring money which should not have been funded or transferred, from the escrow accounts to themselves;

(i)     Defendants exchanged amounts fraudulently taken from each other by way of wire transfers, and

(j)     Defendants accepted the improperly-gained payment of money from Plaintiffs and Members of the Classes through the mail and by computer transfer/payment of funds;

**Predicate Acts of National Stolen Property Act ("NSPA"), 18 U.S.C. § 2314**

237.    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 2314 known as the National Stolen Property Act ("NSPA"). As set forth herein, Defendants have engaged in conduct violating the NSPA to effectuate their scheme.

238.    Defendants, in conjunction with and in conspiracy with each other, devised, intended to devise, and carried out their force-placed insurance schemes by converting and transferring Plaintiffs' and Class Members' escrowed funds. These converted funds were pooled and transferred on a daily basis to pay for the force-placed flood insurance policies.

239.    The monies transferred from Plaintiffs' and the Class' escrow accounts are pooled and transferred between the Loan Servicing Defendants and Assurant in the form of premiums and/or commissions. These transfers frequently, if not always, exceed $5,000. In doing so, Defendants committed repeated violations of the NSPA.

**Pattern of Racketeering Activity**

240.    Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering, *i.e.*, indictable violations of 18 U.S.C. §§ 1341, 1343, and/or 2314 as described herein, during the Class period. Indeed, Defendants have committed thousands of such acts in connection with the hundreds of thousands of loans for which they force-placed insurance.

241.    The multiple acts of racketeering activity that Defendants committed and/or conspired to commit were related to each other, and amount to and pose a threat of continued

racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

**Defendants' Conduct Caused Direct Injury**

242. Plaintiffs and Members of the Classes suffered direct and proximate harm as a result of Defendants' misrepresentations, omissions, deceptions and acts of concealment and caused injury to their property and/or business in the following ways:

      (a) Defendants force-placed Plaintiffs and Members of the Classes into high-cost policies which resulted in unjust profit to Defendants rather than renewing Plaintiffs' and Members of the Classes' existing policies or purchasing and then seeking reimbursement from Plaintiffs and members of the Classes for policies at a commercially reasonable price;

      (b) Defendants added charges for high cost, unnecessary and duplicative force-placed insurance to Plaintiffs' and Members of the Classes' escrow accounts;

      (c) Defendants conspired to adding amounts equaling unpaid force-placed insurance charges to the balance of Plaintiffs' and Members of the Classes' loans adding to their debt and reducing their equity in their homes;

      (d) Imposing additional costs and debt obligations;

      (e) Charging for unnecessary and duplicative force-placed insurance.

**Conspiracy Allegations**

243. In violation of 18 U.S.C. 1962(d), Defendants have, as set forth above, conspired to violate 18 U.S.C. 1962(c). The object of the conspiracy was to generate secret profits for Defendants through the Defendants' improper and unlawful abuse of the Loan Servicing Defendants' authority to force-place hazard insurance for borrowers whose hazard insurance had lapsed. Instead of providing reasonably priced insurance, Defendants sought reimbursement for unnecessarily high-priced policies for unnecessary, duplicative and back-dated force-placed

insurance. Defendants acted together and misrepresented the reasons for the high cost of the insurance and omitted to inform Plaintiffs and the Classes that they were making a substantial profit from the provision of force-placed insurance in a manner inconsistent with their duties and authority granted them under Plaintiffs' and Members of the Classes' mortgage contracts.

244. As set forth above, each of the Defendants knowingly, willfully and unlawfully agreed and combined to conduct or participate, directly or indirectly, in the conduct of the affairs and activities of the Litton Force-Placed Insurance Enterprise, Saxon Force-Placed Insurance Enterprise and/or Ocwen Force-Paced Insurance Enterprise through a pattern of racketeering activity, including indictable acts under 18 U.S.C. §§ 1341, 1343, and/or 2314 in violation of 18 U.S.C. § 1962(c).

245. The agreement between and among the Defendants to act in concert to defraud Plaintiffs and the Classes is evident from the conduct in which each engaged that supported and was used by each to implement the improper, deceptive and misleading fraudulent scheme.

246. Each of the Defendants engaged in multiple overt acts in furtherance of the conspiracy to defraud borrowers who were required by the Loan Servicing Defendants to pay for force-placed insurance, including misrepresenting the true reasons for the high cost of force-placed insurance and failing to inform borrowers that they were profiting from the transaction at their expense. Additionally:

(a) The Loan Servicing Defendants, through their exclusive providers of force-placed insurance and their affiliates and subsidiaries, developed and forwarded misleading notices to Plaintiffs and the Classes which did not disclose that were using the force-placed insurance process to generate additional profits for themselves, rather than simply force-placing insurance to protect the lenders' insurable interests in the property

(b)    By entering into exclusive deals whereby the force-placed insurance providers, the Insurer Defendants and their affiliates and subsidiaries, not only charged for the cost of providing force-placed insurance, but also enabled the Loan Servicing Defendants to charge the small subset of borrowers whose insurance was force-placed for the costs of servicing the Loan Servicing Defendants' loan portfolio, including such portfolio-wide administrative activities as tracking and monitoring, the costs of which were not properly included in amounts charged to Plaintiffs and other borrowers for force-placed insurance charges and that had already been paid for through loan servicing agreements with the Loan Servicing Defendants.

(c)    Paying fees, unnecessary "commissions," illusory reinsurance or other consideration to subsidiaries and affiliates of the Loan Servicing Defendants for producing insurance business when these subsidiaries and affiliates do not perform the traditional role of an insurance broker and do not and did not, in fact, produce any insurance given that the Loan Servicing Defendants had entered into exclusive deals with the Insurer Defendants.  These affiliates did not perform any of the traditional duties of insurance producer, such as evaluating the individual needs of the policy holder or seeking the most competitive price for the borrower.

## CLASS ACTION ALLEGATIONS

247.   Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following national class as against the Litton Defendants (the "Litton National Hazard Class"):

> All persons who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by one or more of the Litton Defendants and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property, including but not limited to those force-placed policies procured through the American Modern Defendants and/or their affiliates or subsidiaries

248.   In the alternative, and to the extent deemed necessary by the Court, Plaintiffs seek to certify additional state hazard subclasses against the Litton Defendants (the "Litton Hazard Subclasses"), as follows:

> All persons or entities in the State of Florida who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by one or more of the Litton Defendants and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property, including but not limited to those force-placed policies procured through the American Modern Defendants and/or their affiliates or subsidiaries (the "Litton Florida Hazard Sub-Class").

> All persons or entities in the State of Pennsylvania who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by one or more of the Litton Defendants and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property, including but not limited to those force-placed policies procured through the American Modern Defendants and/or their affiliates or subsidiaries (the "Litton Pennsylvania Hazard Sub-Class").

> All persons or entities in the State of Illinois who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by one or more of the Litton Defendants and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property, including but not limited to those force-placed policies procured through the American Modern Defendants and/or their affiliates or subsidiaries (the "Litton Illinois Hazard Sub-Class").

249.   Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following national class as against the Saxon Defendants (the "Saxon National Hazard Class"):

> All persons who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by one or more of the Saxon Defendants and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property, including but not limited to those force-placed policies procured through the Assurant Defendants and/or their affiliates or subsidiaries.

250.    In the alternative, and to the extent deemed necessary by the Court, Plaintiffs seek to certify a state hazard subclass (the "Saxon Hazard Subclass"), as follows:

> All persons or entities in the State of Florida who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by one or more of the Saxon Defendants and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property, including but not limited to those force-placed policies procured through the Assurant Defendants and/or their affiliates or subsidiaries.

251.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following national class as against the Ocwen Defendants (the "Ocwen National Hazard Class"):

> All persons who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by one or more of the Ocwen Defendants and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property, including but not limited to those force-placed policies procured through the Assurant Defendants and/or their affiliates or subsidiaries.

252.    In the alternative, and to the extent deemed necessary by the Court, Plaintiffs seek to certify state hazard subclasses against the Ocwen Defendants (the "Ocwen Hazard Subclasses"), as follows:

> All persons or entities in the State of New York who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by one or more of the Ocwen Defendants and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property, including but not limited to those force-placed policies procured through the Assurant Defendants and/or their affiliates or subsidiaries (the "Ocwen New York Hazard Subclass").

> All persons or entities in the State of Florida who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by one or more of the Ocwen Defendants and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured

property, including but not limited to those force-placed policies procured through the Assurant Defendants and/or their affiliates or subsidiaries (the "Ocwen Florida Hazard Subclass").

All persons or entities in the State of Texas who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by one or more of the Ocwen Defendants and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property, including but not limited to those force-placed policies procured through the Assurant Defendants and/or their affiliates or subsidiaries (the "Ocwen Texas Hazard Subclass").

All persons or entities in the State of Virginia who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by one or more of the Ocwen Defendants and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property, including but not limited to those force-placed policies procured through the Assurant Defendants and/or their affiliates or subsidiaries (the "Ocwen Virgina Hazard Subclass").

All persons or entities in the State of Pennsylvania who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by one or more of the Ocwen Defendants and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property, including but not limited to those force-placed policies procured through the Assurant Defendants and/or their affiliates or subsidiaries (the "Ocwen Pennsylvania Hazard Subclass").

All persons or entities in the State of Illinois who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit owned, originated and/or serviced by one or more of the Ocwen Defendants and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property, including but not limited to those force-placed policies procured through the Assurant Defendants and/or their affiliates or subsidiaries (the "Ocwen Illinois Hazard Subclass").

253.   The Ocwen National Hazard Class, Saxon National Hazard Class, Litton National Hazard Class, Owcen Hazard Subclasses, Saxon Hazard Subclass, and Litton Hazard Subclasses are collectively referred to as the "Classes."

254.    The Classes exclude Defendants and any entity in which Defendants have a controlling interest, as well as their officers, directors, legal representatives, successors and assigns.

255.    The membership in each of the proposed Classes is so numerous that joinder of all members is impracticable.

256.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

257.    Plaintiffs' claims are typical of the claims of the Classes to which they belong.

258.    There are questions of law and fact common to each of the Classes, which will generate common answers central to the resolution of the case.  These include but are not limited to:

        (a)     The nature, scope and implementation of Defendants' unlawful, improper and fraudulent acts;

        (b)     Whether Defendants conspired in furtherance of the unlawful acts alleged herein;

        (c)     Whether Defendants have engaged in mail and wire fraud;

        (d)     Whether Defendants violated the NSPA;

        (e)     Whether Defendants have engaged in a pattern of racketeering activity;

        (f)     Whether the Litton Force-Placed Insurance Enterprise, Saxon Force-Placed Insurance Enterprise and/or the Ocwen Force-Placed Insurance Enterprise is an enterprise within the meaning of 18 U.S.C. § 1961(4);

        (g)     Whether Defendants conducted or participated in the affairs of the Litton Force-Placed Insurance Enterprise, Saxon Force-Placed Insurance Enterprise and/or Ocwen

Force-Placed Insurance Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

(h)     Whether Defendants' overt and/or predicate acts in furtherance of the conspiracy and/or direct acts in violation of 18 U.S.C. § 1962(c) proximately caused injury to Plaintiffs' and members of the Classes' business or property

(i)     Whether Defendants misrepresented the reason for the high cost of force-placed insurance;

(j)     Whether Defendants misrepresented that the Plaintiffs' and members of the Classes' mortgage contracts authorized them to force-place insurance in the manner they did;

(k)     Whether Defendants fraudulently concealed their scheme;

(l)     Whether Defendants maintained a policy of referring force-placed insurance business to insurers pursuant to pre-arranged agreements;

(m)     Whether the Loan Servicing Defendants maintained a policy of referring force-placed insurance business to affiliates;

(n)     Whether the Loan Servicing Defendants breached the terms of Plaintiffs' and members of the Classes' mortgages or loan contracts;

(o)     Whether the Loan Servicing Defendants breached their fiduciary duty to Plaintiffs and members of the Classes;

(p)     Whether the Insurer Defendants induced and/or participated in the Loan Servicing Defendants' breach of fiduciary duty.

(q)     Whether the Loan Servicing Defendants received commission payments from force-placed insurance providers;

(r)    Whether the Loan Servicing Defendants received unauthorized and illicit payments in connection with force-placed insurance that were unrelated to any *bona fide* service in connection with the force-placed insurance and its purpose;

(s)    Whether Defendants wrongfully backdated force-placed insurance policies;

(t)    Whether the Loan Servicing Defendants violated their implied covenant of good faith and fair dealing;

(u)    Whether the Loan Servicing Defendants intentionally or negligently made material misrepresentations and omissions to Plaintiffs and the Classes regarding the procurement of FPI policies from the Insurer Defendants and/or their affiliates or subsidiaries;

(v)    Whether Defendants received financial benefits from the force-placed insurance provider in the form of insurance monitoring, tracking and processing services;

(w)    Whether the provision in the Loan Servicing Defendants' standard residential mortgage agreements authorizing the Loan Servicing Defendants to charge borrowers for the "cost" of obtaining FPI is procedurally and substantively unconscionable because it does not authorize or contemplate that the Loan Servicing Defendants and/or their related entities would derive a hidden financial benefit by procuring FPI from the Insurer Defendants and/or their affiliates and subsidiaries, and where a portion of the amounts charged to residential borrowers' accounts are returned, transferred or paid to the Loan Servicing Defendants and/or related entities;

(x)    Whether the Insurer Defendants have been unjustly enriched by charging residential borrowers amounts for FPI procured from the Insurer Defendants and/or their

affiliates and subsidiaries, a portion of which was returned, transferred or paid to the Loan Servicing Defendants or to their related entities;

(y)      Whether Defendants or their affiliates participated in arrangements that involved kickbacks;

(z)      Whether Defendants are liable to Plaintiffs and the Classes for damages and, if so, the measure of such damages; and

(aa)     Whether Plaintiffs and the Classes are entitled to declaratory and injunctive relief.

259.     These and other questions of law and/or fact are common to the Classes and predominate over any questions affecting only individual members of the Classes.

260.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes. Plaintiffs have no claims antagonistic to those of the Classes. Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Classes.

261.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants.

262.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Classes would create a risk of adjudications with respect to individual members of the Classes which would, as a

practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

263.   Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

264.   Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT ONE

**BREACH OF CONTRACT**
**(INCLUDING IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**

**(ON BEHALF OF ALL CLASSES AGAINST THE LITTON DEFENDANTS, THE SAXON DEFENDANTS & AND THE OCWEN DEFENDANTS IN THEIR INDIVIDUAL CAPACITY AND AS SUCCESSOR IN INTEREST TO LITTON AND SAXON)**

265.   Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

266.   The Litton, Saxon and Ocwen Defendants serviced loans evidenced by substantially similar standard form notes and mortgage contracts or deeds of trust.

267.   In all of their actions described herein, the Litton, Saxon and Ocwen Defendants acted on their own behalf and as the duly authorized agent of the owner or assignee of the mortgage agreements of Plaintiffs and the Members of the Classes.   The Litton, Saxon and

Ocwen Defendants were contractually obligated to service the loans of Plaintiffs and the Members of the Classes pursuant to the terms of their mortgage agreements.

268.    To the extent that the mortgage contracts of Plaintiffs and the Class members permitted the Loan Servicing Defendants to unilaterally "force-place" insurance, the Litton, Saxon and Ocwen Defendants were contractually permitted to do so only to the extent required to reasonably protect the mortgagee's interest in the secured property.

269.    Nonetheless, the Litton, Saxon and Ocwen Defendants imposed or collected amounts that exceeded the amounts required to protect the mortgagee's interest in the policy. Such practices have included, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the mortgagee's interest in the secured property; (b) backdating force-placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite the fact that the time has lapsed and no loss occurred during the lapsed period; and (c) requiring borrowers to pay for force-placed insurance policies despite the existence of a Lender's Loss Payable Endorsement or standard mortgage clause that already protects the lender's interest in the property.

270.    By force-placing insurance that goes well beyond the pale of what is required to protect their interests, the Litton, Saxon and Ocwen Defendants breached express contractual obligations owed to Plaintiffs and the Members of the Classes.

271.    Further, every contract contains an implied covenant of good faith and fair dealing.

272.    The mortgage contracts of Plaintiffs and the Members of the Classes contained an implied covenant of good faith and fair dealing, pursuant to which the Litton, Saxon and Ocwen Defendants were bound to exercise the discretion afforded under the mortgage contract in good

faith and to deal fairly with Plaintiffs and the Members of the Classes in that regard.  Litton, Saxon and OLS are not allowed to evade the terms and spirit of the mortgage contract by exercising discretion afforded under the mortgage to force place insurance in a manner abusive to borrowers.

273.     Any discretionary authority granted the Litton, Saxon and Ocwen Defendants under the terms of Plaintiffs' and the Members of the Classes' mortgage contracts was subject to the Litton, Saxon and Ocwen Defendants' implied duty of good faith and fair dealing. Accordingly, to the extent that the mortgage contracts of Plaintiffs and the Members of the Classes permitted the Litton, Saxon and Ocwen Defendants to unilaterally "force-place" insurance, the Litton, Saxon and Ocwen Defendants were obligated not to exercise discretion to do so in bad faith for their own financial gain for the purposes of maximizing profits at borrowers' expense.

274.     The Litton, Saxon and Ocwen Defendants breached their duties of good faith and fair dealing in at least the following respects, among others:

(a)     Failing to make any effort to maintain borrowers' existing insurance policies and, instead—for the sole purpose of maximizing their own profits—forcing borrowers to pay for insurance policies from providers of the Litton, Saxon and Ocwen Defendants' choice, such as the Insurer Defendants.  These policies needlessly came with substantially greater costs and less coverage than borrowers' existing policies, while providing an improper financial benefit to the Loan Servicing Defendants and/or their affiliates;

(b)     Using their discretion to choose a force-placed insurance provider and policy in bad faith and in contravention of the parties' reasonable expectations by purposefully

forcing borrowers to pay for more than the cost of protecting the lender's interest in the secured property;

(c)     Failing to seek competitively priced insurance on the open market and instead selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies were continually purchased through the same companies;

(d)     Assessing excessive, unreasonable, and unnecessary insurance policy charges against Plaintiffs and the members of the Classes and misrepresenting the reason for the cost of the policies;

(e)     Backdating force-placed insurance policies to cover time periods which had already passed and for which there was already absolutely no risk of loss;

(f)     Misrepresenting in their force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time and/or the lender's coverage under a "standard mortgage clause" and/or a Lender's Loss Payable Endorsement;

(g)     Procuring force-placed insurance policies to cover time periods during which the mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement;

(h)     Conspiring to charge borrowers for outsourced loan servicing functions that should not be charged to borrowers, and

(i)     Failing to provide borrowers with any opportunity whatsoever to opt out of having their force-placed insurance policies provided by an insurer with whom the Loan Servicing Defendants had a reinsurance or commission arrangement or an affiliate relationship.

275.     As direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing and the express terms of the mortgage contracts,

Plaintiffs and the Members of the Classes have suffered damages and are entitled to the relief sought herein for such breaches of contract.

## COUNT TWO

## UNJUST ENRICHMENT/DISGORGEMENT

### (ON BEHALF OF ALL CLASSES AGAINST THE INSURER DEFENDANTS, , AND IN THE ALTERNATIVE AGAINST THE LITTON DEFENDANTS, THE SAXON DEFENDANTS AND THE OCWEN DEFENDANTS)

276.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

277.    Plaintiffs and the Members of the Classes have conferred a substantial benefit upon the Insurer Defendants and the Litton, Saxon and Ocwen Defendants derived from the force-placed hazard insurance premiums paid by Plaintiffs and the Members of the Classes.

278.    By, among other things, charging Plaintiffs and the members of the Classes for unnecessary and exorbitantly-priced FPI policies pursuant to exclusive contracts with the Litton, Saxon and Ocwen Defendants, and by backdating policies, the Insurer Defendants were able to collect substantial premiums for unnecessary and unusable property insurance coverage.  The Insurer Defendants were unjustly enriched by these practices.

279.    The Insurer Defendants further profited by receiving payments for portfolio monitoring and tracking when such servicers were already paid to the Loan Servicing Defendants as part of the Litton, Saxon and Ocwen Defendants' loan servicing agreements.

280.    These payments were accepted and retained by the Insurer Defendants under circumstances such that it would be inequitable for the Insurer Defendants to retain the benefit without payment to Plaintiffs and the members of the Classes.

281.    As a result of the Insurer Defendants' unjust enrichment, Plaintiffs and the Members of the Classes have sustained damages in an amount to be determined at trial and seek

full disgorgement and restitution of the Insurer Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

282.     In addition to the Insurer Defendants, plaintiffs allege that the Litton, Saxon and Ocwen Defendants were also unjustly enriched at Plaintiffs' and other members of the Classes' expense, as the Litton, Saxon and Ocwen Defendants, upon information and belief, received kickbacks in the form of commissions, reinsurance, subsidized portfolio tracking and monitoring, and other things of value.   In the event the Court determines that there is no contractual arrangement between Plaintiffs and any of the Litton, Saxon and Ocwen Defendants, Plaintiffs in the alternative also bring unjust enrichment claims against the Litton, Saxon and Ocwen Defendants.

283.     Further, Plaintiffs and the Members of the Classes, individually and on behalf of the public, seek restitution and disgorgement of profits realized by the Insurer Defendants and the Litton, Saxon and Ocwen Defendants as a result of their unfair, unlawful and/or deceptive practices.

**COUNT THREE**

**BREACH OF FIDUCIARY DUTY/MISAPPROPRIATION OF FUNDS HELD IN TRUST**

**(ON BEHALF OF ALL CLASSES AGAINST LITTON, SAXON & OLS,
AND AGAINST THE OCWEN DEFENDANTS AS SUCCESSOR IN INTEREST TO
LITTON AND SAXON)**

284.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

285.     Litton, Saxon and OLS control and/or controlled the establishment, funding requirements and maintenance of escrow accounts for the purposes of paying taxes, assessments, insurance premiums and other items set forth in borrowers' mortgages; hold, held, control and/or

controlled the funds in escrow, and are obligated under Plaintiffs' and members of the Classes' mortgages to return any excess funds in accordance with the terms of the mortgage.

286.   Litton, Saxon and OLS, as servicers of Plaintiffs' and members of the Classes' mortgage, required payment of and/or accepted monies from Plaintiffs and members of the Classes for Escrow Items identified in their mortgages on a monthly basis and held them in Plaintiffs' and members of the Classes' escrow accounts.  Similarly, Litton, Saxon and OLS, as the servicers of Plaintiffs' and members of the Classes' mortgages, when force-placing hazard insurance, require payment therefore and deducted and/or charged the cost of the premiums to Plaintiffs' and members of the Classes' escrow accounts.

287.   Litton, Saxon and OLS were obliged to hold, manage and control these escrow funds in trust, and owed Plaintiffs and members of the Classes the highest fiduciary duty with respect to the handling of such funds.

288.   Litton, Saxon and OLS breached their fiduciary duties to Plaintiffs and the members of the Classes by, *inter alia*: (a) unilaterally using escrow funds to purchase force-placed insurance at a cost and in amounts that were inflated solely in order to generate additional profits for Defendants; (b) profiting from unnecessary and excessive force-placed insurance policies that were purchased from escrow funds at the expense of Plaintiffs and members of the Classes; (c) unilaterally utilizing the escrow funds to pay for unnecessary and duplicative insurance for the purpose of increasing Defendants' profits; and (d) improperly depleting the escrow funds for unnecessary, unauthorized and duplicative hazard insurance resulting in additional costs and injury to Plaintiffs and members of the Classes.

289.    These actions were undertaken by Litton, Saxon and OLS in bad faith solely for the benefit of Defendants and were not intended to benefit Plaintiffs or other members of the Classes.

290.    As a direct result of Litton, Saxon and OLS's actions and subversion of Plaintiffs' and the Classes' interests to Defendants' own interests in reaping additional, extravagant and unauthorized fees and profits, Plaintiffs and the Classes have suffered injuries in the form of unnecessary and excessive escrow charges, unnecessary and improper depletion of escrow funds intended for and properly allocated to other Escrow Items, a loss of funds from their escrow accounts and/or loss of equity in the property due to increases in the amounts due under the mortgage to cover escrow shortfalls.

291.    Plaintiffs and the Classes are entitled to all damages resulting from the Litton, Saxon and OLS's breaches of their fiduciary obligations and misappropriation of escrow funds. In addition, Plaintiffs and the Classes are entitled to punitive damages because Litton, Saxon and OLS acted in bad faith in deliberate and/or reckless disregard of their rights and their obligation to hold Plaintiffs' and the Classes' escrow funds in trust.

## COUNT FOUR

### AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY

### (ON BEHALF OF ALL CLASSES AGAINST THE INSURER DEFENDANTS, GOLDMAN SACHS, ARROW, MORGAN STANLEY, AND OFC)

292.    Plaintiffs restate and incorporate the preceding paragraphs of the Complaint as if they were fully set forth herein.

293.    Litton, Saxon and OLS breached their fiduciary duties to Plaintiffs and the Class as set forth hereinabove, including specifically as set forth in Count Three.

294.    The Insurer Defendants, Goldman Sachs, Arrow, Morgan Stanley and OFC actively induced and/or participated in Litton's, Saxon's and OLS's breaches of their fiduciary duties through the conduct described hereinabove, including, but not limited to, offering Litton, Saxon and OLS the opportunity to reap additional profits and facilitating the realization of such profits through a scheme to force-place borrowers serviced by the Loan Servicing Defendants in unnecessary, duplicative and exorbitantly priced force-placed insurance and tracking services sold by the Insurer Defendants, in exchange for kickbacks, sham commissions, fees for sham services and "rebates" paid to the Loan Servicing Defendants.

295.    The Insurer Defendants further actively induced and/or participated in Litton's, Saxon's and OLS's breaches of their fiduciary duties through the provision of tracking services that identified and implemented the force-placement of Plaintiffs and members of the Classes in unnecessary, duplicative and exorbitantly priced hazard insurance and facilitated the billing and payment for such insurance.

296.    As a result of the breach of fiduciary duties to Plaintiffs and members of the Classes by the Loan Servicing Defendants that the Insurer Defendants, Goldman Sachs, Arrow, Morgan Stanley and OFC induced and/or participated in as hereinabove described, Plaintiffs and members of the Classes suffered damages in the form of unnecessary and excessive escrow charges, unnecessary and improper depletion of escrow funds intended for and properly allocated to other Escrow Items, a loss of funds from their escrow accounts, and/or loss of equity in the property due to increases in the amounts due under the mortgage to cover escrow shortfalls.

297.    Plaintiffs and the Classes are entitled to all damages resulting from the Loan Servicing Defendants' breach of their fiduciary obligations and misappropriation of escrow funds and the Insurer Defendants, Goldman Sachs, Arrow, Morgan Stanley and OFC are liable

for these damages by virtue of their conduct aiding and abetting the Loan Servicing Defendants' wrongful conduct.

## COUNT FIVE

## CONVERSION

## (ON BEHALF OF ALL CLASSES AGAINST THE LOAN SERVICING DEFENDANTS)

298.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

299.    The Loan Servicing Defendants had and continue to have a duty to maintain and preserve their borrowers' mortgage escrow accounts, and to prevent their diminishment or alteration through their own wrongful acts.

300.    The Loan Servicing Defendants wrongfully and intentionally collected force-placed hazard insurance premiums from their borrowers' mortgage escrow accounts.

301.    The Loan Servicing Defendants collected these force-placed hazard insurance premiums by wrongfully and intentionally taking specific and readily identifiable funds from their mortgage customers' escrow accounts.

302.    The Loan Servicing Defendants have assumed and exercised the right of ownership over these funds without authorization to do so and in hostility to the rights of Plaintiffs and the Classes without legal justification.

303.    The Loan Servicing Defendants have retained these funds unlawfully without the consent of Plaintiffs and the members of the Classes and have deprived them from exercising control over the funds.

304.    The Loan Servicing Defendants intend to permanently deprive Plaintiffs and the members of the Classes of these funds.

305.    Plaintiffs and members of the Classes properly own these funds, not the Loan Servicing Defendants, who now claim that they are entitled to their ownership contrary to the rights of Plaintiffs and the members of the Classes.

306.    Plaintiffs and the members of the Classes are entitled to the immediate possession of these funds.

307.    The Loan Servicing Defendants have wrongfully converted these specific and readily identifiable funds.

308.    The Loan Servicing Defendants wrongful conduct is of a continuing nature.

309.    As a direct and proximate result of the Loan Servicing Defendants' wrongful conversion, Plaintiffs and the Classes have suffered and continue to suffer actual damages. Plaintiffs and the members of the Classes are entitled to recover from the Loan Servicing Defendants all damages and costs permitted by law, including all amounts that the Loan Servicing Defendants have wrongfully converted, which are specific and readily identifiable.

**COUNT SIX**

**<u>VIOLATION OF NEW YORK GENERAL BUSINESS LAW SECTION 349</u>**

**(ON BEHALF OF THE NEW YORK SUBCLASS AGAINST THE OCWEN DEFENDANTS)**

310.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

311.    New York's General Business Law § 349 ("GBL 349") prohibits deceptive and misleading business practices.  GBL § 349 prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce . . .".

312.    At all times relevant hereto, the Ocwen Defendants have engaged in, and continue to engage in, unconscionable acts or practices and used unfair or deceptive acts in the conduct of their trade and/or commerce in the State of New York.

313.    The Ocwen Defendants did market and advertise their mortgage services and disseminated that information, through brokers and other marketing tools to all consumers and the public at large.

314.    At all times relevant hereto, the Ocwen Defendants utilized standard form mortgage contracts when contracting with Plaintiff Coulthurst and members of the New York Subclass, who executed mortgage contracts with lenders whose mortgages the Ocwen Defendants serviced.

315.    The policies, acts and practices alleged herein were intended to result and did result in the payment of inflated premiums for force-placed insurance by Plaintiff Coulthurst and members of the New York Subclass and which in turn were intended to generate unlawful or unfair kickbacks or commissions for Ocwen Defendants.

316.    Specifically, the Ocwen Defendants had an exclusive relationship with their vendor and the preferred insurance carrier, whereby they would pay unreasonable and inflated premiums for force-placed insurance policies, charge that amount to Plaintiff Coulthurst and members of the New York Subclass, and would then receive a kickback or commission based on a percentage of the insurance policy's premium.

317.    By engaging in the prohibited conduct, the Ocwen Defendants committed materially deceptive acts or practices in violation of New York's General Business Law § 349.

318.    As a result of the Defendant's deceptive acts and practices in violation of New York's General Business Law § 349, Plaintiff Coulthurst and members of the New York Subclass suffered damages by paying excessively-high premium rates for force-placed insurance.

## COUNT SEVEN

### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

### (ON BEHALF OF THE FLORIDA SUBCLASS AGAINST LITTON, SAXON AND OLS)

319.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

320.    Florida's Deceptive and Unfair Trade Practices Act, section 501.201, et seq. ("FDUTPA"), prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."   FDUTPA § 501.201.

321.    Plaintiffs Jimmy and Jacqueline Lyons, Frances and Johnnie Erving, and the Florida Subclass are "consumers" as defined in section 501.203(7) of FDUTPA.

322.    Litton, Saxon and OLS have engaged in, and continue to engage in, unconscionable acts or practices and used unfair or deceptive acts in the conduct of their trade and/or commerce in the State of Florida, as described herein.

323.    The policies, acts and practices alleged herein were intended to result and did result in the payment of inflated premiums for force-placed insurance by Plaintiffs Jimmy and Jacqueline Lyons, Frances and Johnnie Erving, and the Florida Subclass and which in turn were intended to generate unlawful or unfair kickbacks or commissions for Litton, Saxon and OLS and their affiliates.

324.    Specifically, Litton, Saxon and OLS had exclusive relationships with their vendors and the preferred insurance carriers, whereby they would pay premiums for force-placed hazard insurance which included amounts that would then be paid back to Litton, Saxon and OLS as kickbacks or commissions based on a percentage of the insurance policy's premium, and then charged those premiums to Plaintiffs and the Florida Subclass.

325.    Litton's, Saxon's and OLS's conduct of charging Plaintiffs Jimmy and Jacqueline Lyons, Frances and Johnnie Erving, and the Florida Subclass for kickbacks and commissions in connection with force-placed hazard insurance violates FDUPTA and was conceived, devised, planned, implemented, approved, and executed within Florida, which has an interest in prohibiting violations of FDUPTA.

326.    Litton, Saxon and OLS are not banks or savings and loan associations regulated by the Florida Office of Financial Regulation of the Financial Services Commissions.  Litton, Saxon and OLS are not banks or savings and loan associations regulated by federal agencies.

327.    Plaintiffs Jimmy and Jacqueline Lyons, Frances and Johnnie Erving, and the Florida Subclass sustained damages as a direct and proximate result of the Loan Servicing Defendants' unfair and unconscionable practices.  Section 501.211(2), Florida Statutes, provides Plaintiffs Jimmy and Jacqueline Lyons, Frances and Johnnie Erving, and the Florida Subclass a private right of action against Litton, Saxon and OLS and entitles them to recover their actual damages, plus attorneys' fees and costs

328.    Plaintiffs Jimmy and Jacqueline Lyons, Frances and Johnnie Erving, and the Florida Subclass have suffered and will continue to suffer irreparable harm if Litton, Saxon and OLS continue to engage in such deceptive, unfair, and unreasonable practices.

## COUNT EIGHT

## VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1, *et seq.*

### (AGAINST THE ASSURANT DEFENDANTS, THE AMERICAN MODERN DEFENDANTS, THE LITTON DEFENDANTS AND OCWEN DEFENDANTS ON BEHALF OF THE ILLINOIS SUBCLASSES)

329.   Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

330.   The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* provides, in pertinent part: "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact … in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damage thereby…." *See* 815 ILCS 505/2.

331.   Defendants' business practices alleged herein are deceptive acts or practices and, thus, constitute multiple, separate and independent violations of 815 ILCS 505/1, *et seq.* These deceptive acts and practices, brought on behalf of the Litton Illinois Subclass and Ocwen Illinois Subclass (collectively, "Illinois Subclasses") include, without limitation:

(a)     Failing to make any effort to maintain borrowers' existing insurance policies and, instead, for the sole purpose of maximizing their own financial gain, purchasing and charging borrowers for force-placed insurance policies from providers of Defendants' choice, such as ASIC and SGIC.  These policies needlessly came with substantially greater premiums, while providing less coverage than borrowers' existing policies;

(b)       Choosing a force-placed insurance provider and policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay for more than the cost of protecting the lender's interest in the secured property;

(c)       Selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies are continually purchased through the same companies;

(d)       Assessing excessive, unreasonable and unnecessary insurance policy premiums against plaintiff Heard and the Illinois Subclasses and misrepresenting the reason for the cost of the policies;

(e)       Backdating force-placed insurance policies to cover time periods which have already passed and for which there was already absolutely no risk of loss;

(f)       Misrepresenting in force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time and/or the lender's coverage under a Lender's Loss Payable Endorsement or standard mortgage clause;

(g)       Procuring force-placed insurance policies to cover time periods during which the mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement or standard mortgage clause;

(h)       Failing to provide borrowers with any opportunity to opt out of having their force-placed insurance policies provided by an insurer with whom Defendants had a kickback arrangement;

(i)     Misrepresenting that the charges imposed for force-placed insurance were to protect the lenders interests in the property and that any portions of the premiums returned to Defendants were for expense incurred in connection with forced-placing insurance; and

(j)     Engaging in other unfair or unlawful conduct as described in this Complaint.

332.    Defendants engaged in these deceptive acts or practices in the conduct of business, trade or commerce in the State of Illinois.

333.    Defendants' communications with plaintiff Heard and the Illinois Subclass members in which they notify mortgagees that force-placed insurance has been or will be purchased on the mortgaged property and communications or documents which purport to describe or proscribe Defendants' practices of force-placed insurance are directed to consumers as that term is defined under Illinois Law.

334.    Defendants' deceptive acts or practices alleged herein are likely to mislead reasonable consumers acting reasonably under the circumstances, including plaintiff Heard and members of the Illinois Subclasses.

335.    Defendants' deceptive acts or practices alleged herein constitute consumer-oriented conduct in that Defendants' deceptive acts or practices were directed to, and affected, consumers of mortgage and home insurance products, including plaintiff Heard and the Illinois Subclass members.

336.    Defendants' deceptive acts or practices alleged herein have a broad, adverse impact on consumers, including plaintiff Heard and the Illinois Subclass members.

337.    Defendants' deceptive acts or practices alleged herein are part of a pattern of conduct by Defendants to defraud consumers, are ongoing and are likely to continue to harm the

public and frustrate the public interest in commercially reasonable and non-deceptive insurance and mortgage servicing practices between Defendants and the residents of Illinois whose mortgages they service.

338.   Defendants' deceptive acts or practices alleged herein have been furthered, in part, through a pattern of standard written communications disseminated broadly by or on behalf of Defendants to thousands of Illinois residents whose mortgages they service.

339.   Defendants' deceptive acts or practices alleged herein are material in that they relate to matters that would reasonably be expected to be important to a reasonable consumer in making his or her decision whether to do business with Defendants.

340.   Plaintiff Heard and the Illinois Subclass members were injured as a direct or proximate result of Defendants' deceptive acts or practices set forth in this Complaint. Defendants' deceptive acts or practices caused injury and damages to plaintiff Heard and the Illinois Subclass members in an amount to be proven at trial, including paying excessive and commercially unreasonable premiums for homeowners insurance.

341.   Plaintiff Heard and the Illinois Subclass members seek to recover their actual damages, injunctive relief, costs and reasonable attorneys' fees, pursuant to 815 ILCS 505/1, *et seq.*

**COUNT NINE**

**VIOLATION OF THE RACKETEER INFLUENCED AND
CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(C) – RICO**

**(ON BEHALF OF ALL CLASSES AGAINST ALL DEFENDANTS)**

342.   Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

343.    This claim for relief arises under 18 U.S.C. § 1962(c).

344.    Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

345.    As set forth above (particularly in ¶¶ 199-212, 224-246) and in the succeeding paragraphs, Defendants have violated 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the Litton Force-Placed Insurance Enterprise, Saxon Force-Placed Insurance Enterprise and/or the Ocwen Force-Placed Insurance Enterprise, through a pattern of racketeering acts indictable under 18 U.S.C. §§ 1341, 1343 and 2314 which resulted in injury to Plaintiffs and the Classes.

346.    As a direct and proximate result, Plaintiffs and Members of the Classes have been injured in their business or property by predicate acts which make up the Defendants' pattern of racketeering activity as described herein.

## COUNT TEN

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(D) – RICO CONSPIRACY

### (ON BEHALF OF THE ALL CLASSES AGAINST ALL DEFENDANTS)

347.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

348.    This claim for relief arises under 18 U.S.C. § 1962(d).

349.    In violation of 18 U.S.C. § 1962(d), Defendants have, as set forth above (particularly in ¶¶ 199-212, 224-246) conspired to violate 18 U.S.C. § 1962(c) by conducting, or

participating directly or indirectly in the conduct of the affairs of the Litton Force-Placed Insurance Enterprise, Saxon Force-Placed Insurance Enterprise and/or Ocwen Force-Placed Insurance Enterprise.

350.   As a direct and proximate result, Plaintiffs and Members of the Classes have been injured in their business or property by predicate acts which make up the Defendants' pattern of racketeering activity as described herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Classes and award the following relief:

A.   That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

B.   That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.   Compensatory, consequential, and general damages in an amount to be determined at trial;

D.   An award of treble the amount of damages suffered by Plaintiffs and members of the Classes as proven at trial plus interest and attorneys' fees and expenses pursuant to 18 U.S.C. §§ 1962 (c) and (d);

E.   Punitive damages;

F.   Restitution of all improperly collected funds and/or disgorgement of Defendants' ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Classes;

G.   An injunction requiring Defendants to cease the activities described herein and provide for adequate procedures and policies to ensure that Defendants' unlawful conduct does

not continue. Such policies and procedures should include, without limitation, that Defendants: (1) are prohibited from force-placing insurance when the servicer knows or has reason to know that the borrower has a policy in effect that meets the minimum requirement of the loan documents; (2) cannot force-place insurance that is in excess of the lender's interest in the mortgaged property; (3) are prohibited from purchasing the force-placed insurance from a subsidiary, affiliate, or any entity in which they have an ownership interest; (4) must make reasonable efforts to continue or reestablish the borrower's *existing* insurance policy if there is a lapse in payment; and (5) must purchase any force-placed insurance for a commercially reasonable price.

H.    Pre- and post-judgment interest;

I.    Plaintiffs' costs and reasonable attorneys' fees; and

J.    Such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.

Dated: November 19, 2013                    Respectfully submitted,

                                            **LOWEY DANNENBERG COHEN
                                            & HART, P.C.**

                                    By:     *Jeanne D'Esposito*

                                            Barbara J. Hart (BH-3231)
                                            Jeanne D'Esposito (JD-5843)
                                            Noelle Ruggiero (NR-9349)
                                            One North Broadway, Suite 509
                                            White Plains, NY 10601-2301
                                            Telephone:    (914) 997-0500
                                            Facsimile:    (914) 997-0035

**NORAH HART**
305 Broadway, 14th Floor
New York, New York 10007
Telephone:     (212) 897-5865
Facsimile:     (646) 537-2662

**TAUS, CEBULASH & LANDAU, LLP**
Brett Cebulash
Kevin S. Landau
 80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone:  (212) 931-0704
Fax:  (212) 931-0703
Email:  bcebulash@tcllaw.com
            klandau@tcllaw.com

**BERGER & MONTAGUE, P.C.**
Shanon J. Carson
Patrick Madden
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-4656
Fax: (215) 875-4604
Email:  scarson@bm.net
            pmadden@bm.net

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Robert K. Shelquist
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: 612-339-6900
Email: rkshelquist@locklaw.com

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Edward W. Ciolko
Peter A. Muhic
Tyler S. Graden
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**NIX PATTERSON & ROACH, LLP**
Jeffery J. Angelovich
Michael B. Angelovich
Brad Seidel
Christopher R. Johnson
205 Linda Drive
Daingerfield, TX  75638
Telephone:  (903) 645-7333
Facsimile:  (903) 645-4415

**DEALY SILBERSTEIN**
**& BRAVERMAN, LLP**
Milo Silberstein
225 Broadway, Suite 1405
New York, NY 10007
Tel: 212-385-0066
Fax: 212-385-2117

**CUNEO GILBERT & LaDUCA, LLP**
Charles J. LaDuca
8120 Woodmont Avenue
Bethesda, MD 20814
Tel:  202-789-3960
Tel: 202-789-1813
www.cuneolaw.com

*Attorneys for Plaintiffs*