UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JIMMY LYONS, *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>LITTON LOAN SERVICING LP., *et al.*,<br><br>                    Defendants. | Civil Action No. 1:13-cv-00513-ALC-HBP<br><br>Judge Andrew L. Carter Jr.<br><br>Magistrate Judge Henry Pitman |

**MEMORANDUM IN SUPPORT OF MOTION TO SEVER OF DEFENDANTS AMERICAN MODERN INSURANCE GROUP, INC. AND AMERICAN MODERN HOME INSURANCE COMPANY**

**I.      INTRODUCTION**

Plaintiffs' Second Amended Complaint is a hopeless jumble of disparate claims, transactions, and parties ripe for severance. Nine individual named plaintiffs, residing in five different states, have sued twelve separate defendants, some affiliated and some not, some who serviced their mortgages and some who did not, and some who issued lender-placed insurance (LPI) to their loan servicer and some who did not. Each plaintiff does not assert claims against each defendant, but only against the loan servicer that serviced his or her mortgage and the insurance company from whom the loan servicer obtained LPI for that plaintiff's property.

This mishmash of unrelated parties and transactions is unwieldy, would result in extremely inefficient and cumbersome discovery, and makes it fundamentally unfair to defendants to litigate these claims together. Consequently, pursuant to Rules 20 and 21, defendants American Modern Insurance Group, Inc.[1] and American Modern Home Insurance Company (collectively, "American Modern") request the Court to sever plaintiffs' claims into

---

[1] American Modern Insurance Group, Inc. is a holding company that does not issue insurance, and against whom plaintiffs have no standing.

separate cases grouped by each loan servicer defendant with whom each plaintiff's loan was serviced and the insurer defendant that issued LPI relating to that loan, as follows:

| Case One | | Case Two | | Case Three | |
|---|---|---|---|---|---|
| **Plaintiffs** | **Defendants** | **Plaintiffs** | **Defendants** | **Plaintiffs** | **Defendants** |
| -Lyonses<br>-Papapietro<br>-Heard | -Litton Defendants<br>-American Modern | -Ervings | -Saxon Defendants<br>-Assurant Defendants | -Engelhardt<br>-Coulthurst<br>-Dominguez<br>-Ervings<br>-Papapietro<br>-Heard | -Ocwen Defendants<br>-Assurant Defendants |

This would align each plaintiff's claims against the loan servicer that serviced his or her loan and the insurance company from whom that servicer purchased LPI for that plaintiff's property.

## II.    RELEVANT FACTS

### A.    Each Plaintiff Alleges A Transaction Specific To Individual Defendants.

Each plaintiff asserts claims *only* against the loan servicer that serviced his or her mortgage and the insurance company from whom the loan servicer obtained LPI for that plaintiff's property.  For example, the Lyonses assert claims arising from a transaction with Litton Loan Servicing LP and entities related to Litton-specific LPI programs – defendants Goldman Sachs Group, Inc. and Arrow Corporate Member Holdings, LLC (the "Litton Defendants") – and the insurer that issued LPI to Litton for the Lyons' property, American Modern.  But the Lyonses do not allege any transactions with the Saxon Defendants or the Assurant Defendants.  Similarly, the Ervings assert claims arising from transactions with the Saxon Defendants and Ocwen Defendants, as well as the insurer issuing LPI to those servicers for the Ervings' property, the Assurant Defendants, but not against the Litton Defendants or American Modern.  And while Engelhardt asserts claims against Ocwen Loan Servicing and the Assurant Defendants, she does not against the Litton Defendants, Saxon Defendants, or

2

American Modern.[2]  The Second Amended Complaint ("SAC") alleges disparate and individual facts concerning each plaintiff's transaction with a different loan servicer.  (SAC ¶¶ 130-98).

Plaintiffs acknowledge the individual nature of these transactions and bases of their claims against defendants, separately defining the Litton Defendants, Saxon Defendants, Ocwen Defendants, Assurant Defendants, and American Modern.  (*Id*. ¶¶ 72-90).  Plaintiffs' RICO allegations are pleaded in similar trifurcated fashion, including the "Litton Force-Placed Insurance Enterprise," consisting of the Litton Defendants and American Modern Defendants; the "Saxon Force-Placed Insurance Enterprise," consisting of the Saxon Defendants and Assurant Defendants; and the "Ocwen Force-Placed Insurance Enterprise," consisting of the Ocwen Defendants and Assurant Defendants.  (*Id*. ¶¶ 225-27).  Even under the alleged class definitions, the prism through which trial of claims must be viewed, putative classes are grouped by loan servicer defendants; recognizing the significant impact of varying states' laws on their claims, plaintiffs also allege subclasses by states of residence of each plaintiff.  (*Id*. ¶¶ 247-52).

In sum, plaintiffs' claims involve different loans securing different properties, obtained from different lenders, in different transactions, with different documents under different loan and insurance programs, serviced by different servicers, at different times, in different states, involving different insurance companies with different practices and policies.

### B. Multi-Loan Servicer Consolidation Has Been Rejected By The MDL Panel.

The Second Amended Complaint represents an industry-wide pleading of unrelated LPI claims that has been rebuked by the Judicial Panel on Multidistrict Litigation on at least five

---

[2] "Saxon Defendants" include Saxon Mortgage Services, Inc. and Morgan Stanley; "Ocwen Defendants" include Ocwen Loan Servicing, LLC and Ocwen Financial Corporation; and "Assurant Defendants" include Assurant, Inc., American Security Insurance Company, and Standard Guaranty Insurance Company.  (SAC ¶¶ 1-2.)

3

separate occasions.[3]  Indeed, many of the same counsel for plaintiffs here argued that the Panel "has repeatedly recognized that industry-wide centralization is inappropriate where, as here, the actions involve different defendants, different products and different conduct." *In re Mortg. Lender Force-Placed Ins. Litig.*, MDL No. 2388, Member Case. No. CAC/8:11-cv-00915, dkt. no. 61 p. 9.  Instead, plaintiffs' counsel asserted that "[i]f any centralization occurs here … it should occur on a lender-by-lender basis." *Id.*; see also p. 3 ("[I]f the Panel determines that some measure of centralization is warranted, Plaintiff request [sic] that . . . centralization of force-placed insurance actions be organized by defendant lender rather than the omnibus and unwieldy multi-lender conglomeration sought in the Amended Motion.")

Plaintiffs' own counsel aptly argued to the Panel why claims involving different loan servicers and different LPI insurers should not proceed together:

- "Rather than involving a substantially identical industry-wide scheme, these cases involve lender-specific force-placed insurance practices that are separate and distinct from one another.  There is no basis for centralization." *In re Mortg. Lender Force-Placed Ins. Litig.*, MDL No. 2388, Member Case. No. CAC/8:11-cv-00915, dkt. no. 173 p. 6.

- "Significant differences exist over each lender's treatment of force-placed hazard, flood and wind insurance policies. . . . Moreover, each lender's practices with respect to these insurance lines substantially differ." *Id.* p. 7.

- "Each lender's force-placed insurance scheme also differs with respect to the amount of insurance and length of coverage that was force-placed. . . . [T]he contour of each lender's individualized scheme differs significantly." *Id.*

The Panel agreed and denied a motion to centralize LPI-based claims against multiple different lenders.  *In re Mortg. Lender Force-Placed Ins. Litig.*, 895 F. Supp. 2d 1352 (J.P.M.L. 2012).  The Panel was "not persuaded that the actions contain[ed] sufficient common questions

---

[3] *In Re: Mortg. Lender Force-Placed Ins. Litig.*, MDL No. 2388; *In Re: HSBC Mortg. Corp. Force-Placed Hazard Ins. Lit.*, MDL No. 2464; *In Re: JP Morgan Chase Bank, N.A., Mortg. Corp. Force-Placed Hazard Ins. Lit.*, MDL No. 2465; *In Re: Wells Fargo Bank, N.A., Mortg. Corp. Force-Placed Hazard Ins. Lit.*, MDL No. 2466; *In Re: Bank of America, N.A., Mortg. Corp. Force-Placed Hazard Ins. Lit.*, MDL No. 2467.

of fact to justify centralizing this litigation," holding:

> Each action involves only one mortgage lender and a different force-placed insurance program governed by a lender-specific agreement negotiated with an insurance company. Additionally, the mortgage contracts at issue vary widely as to key matters such as the amount of insurance coverage required, the payment of commissions, and other rights of the borrower and lender. Thus, individualized discovery and legal issues are likely to be numerous and substantial.

*Id*. at 1353. Yet the Second Amended Complaint includes the very same "omnibus and unwieldy multi-lender conglomeration" thought so poorly of, including claims by nine plaintiffs against three separate loan servicers and five insurer defendants.

Later some of the same plaintiffs' counsel argued in favor of consolidation of claims against only one loan servicer in a separate MDL proceeding precisely *because* only one servicer was involved. They asserted that "in stark contrast [to the earlier MDL proceeding], Plaintiffs seek to centralize <u>only</u> force-placed *hazard* claims *brought against one loan servicing bank (HSBC) and one forced-place insurer (Assurant)*." *In re HSBC LPI Hazard Litig.*, MDL 2464, Member Case No. PAE/2:11-cv-04074, dkt. no. 1-1 p. 2 (emphasis added). Plaintiffs' counsel stated their "proposed centralization differs materially from the attempt last year to centralize in one case <u>all</u> force-placed insurance cases against multiple banks and multiple force-placed insurance providers, involving all types of force-placed insurance (*e.g.,* hazard, flood, and wind) . . . ." *Id*. (emphasis in original). According to plaintiffs' counsel, "[t]he Panel rightfully denied that petition because there was no showing that the assorted actions against dozens of entities with dozens of different contractual arrangements 'contained sufficient common questions of fact to justify centralization of the litigation.'" *Id*.

### III.  LAW AND ARGUMENT

#### A.  Legal Standard

FED. R. CIV. P. 20 permits joinder of multiple plaintiffs and defendants if any right to relief is asserted "jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences," and "any question of law or fact common to all" plaintiffs or defendants arises.  Both the transactional relatedness *and* commonality requirements must be met; otherwise, misjoinder has occurred and the Court may add or drop parties or sever claims.  *Kalie v. Bank of Am. Corp.*, No. 12 Civ. 9192, 2013 WL 4044951, at *3 (S.D.N.Y. Aug. 9, 2013).  Indeed, "[i]t is settled that joinder is improper where the plaintiff does no more than assert that the defendants merely committed the same type of violation in the same way." *Peterson v. Regina,* 935 F. Supp. 2d 628, 638 (S.D.N.Y. 2013) (internal quotation marks omitted).  Under these principles, joinder here is improper and the claims should be severed.

Furthermore, FED. R. CIV. P. 21 "permits a court to add or drop parties to an action when doing so would serve the ends of justice and further the prompt and efficient disposition of the litigation."  *German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1400 (S.D.N.Y. 1995); *see also T.S.I. 27, Inc. v. Berman Enters., Inc.*, 115 F.R.D. 252, 254 (S.D.N.Y. 1987) ("Courts may order a Rule 21 severance when it will serve the ends of justice and further the prompt and efficient disposition of litigation.").

When deciding a motion to sever under Rule 21, courts in this jurisdiction consider the following factors:

> (1) whether the claims arise out of the same transaction or occurrence;
> (2) whether the claims present some common questions of law or fact;
> (3) whether settlement of the claims or judicial economy would be facilitated;
> (4) whether prejudice would be avoided if severance were granted; and

>  (5) whether different witnesses and documentary proof are required for the separate claims.

*Crown Cork & Seal Co., Inc. Master Ret. Trust v. Credit Suisse First Bos. Corp.,* 288 F.R.D. 331, 333 (S.D.N.Y. 2013). "Severance requires the presence of only one of these conditions." *Augme Techs., Inc. v. AOL Inc.,* No. 09 Civ. 4299, 2012 WL 2402065, at *2 (S.D.N.Y. June 26, 2012). All five of these factors warrant severance here.

> **B.    Plaintiffs' Claims Do Not Arise Out Of The Same Transaction Or Occurrence.**

Each plaintiff's claims arise out of a different transaction or occurrence – the servicing of each plaintiff's mortgage by one of the three different loan servicer defendants. That these disparate claims were originally brought as three separate actions – with each plaintiff asserting claims only against the loan servicer that serviced his or her mortgage and the insurer from whom LPI was purchased – demonstrates that plaintiffs' claims do not arise out of the same transaction or occurrence. And simply combining them into a single complaint with broad-brush allegations against an industry does not make it so.

The varying loan documents attached as exhibits to the Second Amended Complaint evidence the disparity in origins of plaintiffs' claims. (See SAC Exs. 16-22, 26-56, 62, 64-77.) The pleading also identifies the five separate loans from which plaintiffs' claims originated with different lenders, including Fremont Investment and Loan, Countrywide Bank, FSB, Delta Funding Corporation, NovaStar Mortgage, Inc., Washington Finance, and Provident Bank. (SAC ¶¶ 52, 55, 58, 64, 67, 70.) Each plaintiff's claim arises out of the purchase of LPI by either Litton, Saxon, or Ocwen for that plaintiff's loan from either American Modern or Assurant Defendants. No plaintiff has claims against all defendants. While a few plaintiffs (Ervings, Heard, Papapietro) are alleged to have had LPI purchased on their properties by more than one

servicer and from more than one insurer, each plaintiff's claim arises from separate and independent transactions.[4]

Not only do plaintiffs' claims arise out of different loan transactions, the configuration of the Second Amended Complaint bears a striking resemblance to a lineup of claims that some plaintiffs' counsel opposed before the MDL Panel. There, plaintiffs' counsel argued the attempted consolidation should be denied because it "improperly seeks to consolidate numerous different lenders and servicers . . . ." *In re Mortg. Lender Force-Placed Ins. Litig.*, MDL No. 2388, Member Case. No. CAC/8:11-cv-00915, dkt. no. 61 p. 7. Plaintiffs' counsel argued that "some banks generated 'kickbacks' through captive reinsurance programs, others received kickbacks by negotiating 'commissions' with independent insurers, and still others profited through ownership interests in the companies whose insurance the banks were force-placing."[5] *Id*. Therefore, argued plaintiffs' counsel, the "cases involve lender-specific force-placed insurance practices that are separate and distinct from one another," and "[t]here is no basis for centralization." *In re Mortg. Lender Force-Placed Ins. Litig.*, MDL No. 2388, Member Case. No. CAC/8:11-cv-000915, dkt. no. 173 p. 6.

The Second Amended Complaint, however, contains allegations against multiple loan servicers and insurers of the same lender-specific LPI practices for which consolidation was rejected by the MDL Panel. Plaintiffs, acknowledging that their claims emanate from different transactions with different parties, allege that "*[a]ll or some* of the Insurer Defendants also agreed to reinsure the hazard insurance policies that were force-placed on borrowers with

---

[4] The Second Amended Complaint alleges that LPI was purchased by Litton from the Assurant Defendants on Papapietro's property. (SAC ¶¶ 178-85). However, in the interest of candor to the Court, it appears from American Modern's records that LPI was purchased by Litton actually from American Modern for Papapietro's property.

[5] American Modern vehemently denies plaintiffs' characterization of transactions with loan servicers as "kickbacks."

8

subsidiaries of the Loan Servicing Defendants," and that "*all or some* of the Loan Servicing Defendants would receive large portions of the amounts charged to borrowers for the force-placed policies by way of ceded 'reinsurance' premiums to certain affiliates of the Loan Servicing Defendants." (SAC ¶¶ 18-19) (emphasis added).  There is no uniformity of allegations across all plaintiffs and all defendants because their claims admittedly do not arise from the same transaction or occurrence, but rather from servicer-specific and insurer-specific LPI practices.

At its heart, the Second Amended Complaint alleges that one loan servicer engaged in a transaction with one insurer, and that each plaintiff engaged in a transaction with one, and in three cases two, but not all, loan servicers.  Plaintiffs admit the separateness of the transactions:

> Here, the Saxon Defendants and Ocwen Defendants force-placed hazard insurance with the Assurant Defendants . . . .  Similarly, the Litton Defendants force-placed hazard insurance with the American Modern Defendants . . . .

(*Id.* ¶ 98.)  The Second Amended Complaint defines the alleged classes by loan servicer, the manner in which American Modern proposes claims be severed: the "Litton National Hazard Class," against the Litton Defendants and American Modern; the "Saxon National Hazard Class," against the Saxon Defendants with the Assurant Defendants; and the "Ocwen National Hazard Class," against the Ocwen Defendants with the Assurant Defendants.  (*Id.* ¶¶ 247, 249, 251.)

The Second Amended Complaint also refers to exclusive (and differing) contracts between the loan servicers and insurers, further demonstrating that the plaintiffs' claims do not arise from the same transaction or occurrence.  (*Id.* ¶ 8) ("Assurant, Inc. . . . has entered into agreements that establish that [it], through a subsidiary such as ASIC or SGIC, provides these force-placed policies to the Saxon Defendants and/or the Ocwen Defendants pursuant to exclusive contracts."); (*id.* ¶ 10) ("Similarly, the American Modern Defendants also entered into

9

agreements with the Litton Defendants that established the American Modern Defendants as the exclusive force-placed provider for the Litton Defendants.").

Plaintiffs' claims arise out of individualized loan agreements and each plaintiff's unique transaction with a lender, governed by servicer-specific programs and insurer-specific agreements by the Assurant Defendants and American Modern. Because only those plaintiffs whose loans were governed by the same servicer and on whose property the same insurer issued LPI bear any relation to one another, their claims should be severed and grouped accordingly.

### C. Plaintiffs' Claims Do Not Present Common Questions Of Law Or Fact.

The nine named plaintiffs reside in five different states, requiring application of each jurisdiction's laws to plaintiffs' state law claims. Moreover, plaintiffs' claims are subject to different loan documents, insurance programs, and loan servicer-specific agreements, all of which reflect differing fact circumstances. Although naming three separate groups of loan servicers and two different groups of insurers, the plaintiff-specific allegations are by each plaintiff against the loan servicer that serviced his or her loan and governed by a specific agreement negotiated with one insurance company that issued LPI on that plaintiff's property. (See SAC ¶¶ 130-98.) Severing plaintiffs' claims into separate cases organized by the loan servicer and insurer that relate to those claims comports with the allegations in the Second Amended Complaint and the ruling by the MDL Panel.

Arguing *for* consolidation in a later MDL proceeding, plaintiffs' counsel contended the related actions shared common questions of fact because they involved:

> (1) a single servicer – HSBC; (2) a single insurance entity – Assurant – the only force-placed insurance provider used by HSBC; (3) a single type of insurance – hazard; (4) the same contracts, agreements, policies, procedures and practices of and between HSBC and Assurant; and (5) the ability to calculate class wide damages utilizing the same documents and testimony from HSBC and Assurant.

agreements with the Litton Defendants that established the American Modern Defendants as the exclusive force-placed provider for the Litton Defendants.").

Plaintiffs' claims arise out of individualized loan agreements and each plaintiff's unique transaction with a lender, governed by servicer-specific programs and insurer-specific agreements by the Assurant Defendants and American Modern. Because only those plaintiffs whose loans were governed by the same servicer and on whose property the same insurer issued LPI bear any relation to one another, their claims should be severed and grouped accordingly.

### C.   Plaintiffs' Claims Do Not Present Common Questions Of Law Or Fact.

The nine named plaintiffs reside in five different states, requiring application of each jurisdiction's laws to plaintiffs' state law claims. Moreover, plaintiffs' claims are subject to different loan documents, insurance programs, and loan servicer-specific agreements, all of which reflect differing fact circumstances. Although naming three separate groups of loan servicers and two different groups of insurers, the plaintiff-specific allegations are by each plaintiff against the loan servicer that serviced his or her loan and governed by a specific agreement negotiated with one insurance company that issued LPI on that plaintiff's property. (See SAC ¶¶ 130-98.) Severing plaintiffs' claims into separate cases organized by the loan servicer and insurer that relate to those claims comports with the allegations in the Second Amended Complaint and the ruling by the MDL Panel.

Arguing *for* consolidation in a later MDL proceeding, plaintiffs' counsel contended the related actions shared common questions of fact because they involved:

> (1) a single servicer – HSBC; (2) a single insurance entity – Assurant – the only force-placed insurance provider used by HSBC; (3) a single type of insurance – hazard; (4) the same contracts, agreements, policies, procedures and practices of and between HSBC and Assurant; and (5) the ability to calculate class wide damages utilizing the same documents and testimony from HSBC and Assurant.

*In re HSBC LPI Hazard Litig.*, MDL 2464, Member Case No. PAE/2:11-cv-04074, dkt. no. 1-1 p. 8.  Here, conversely, these factual circumstances vary significantly ― there are multiple servicers (Litton, Ocwen, Saxon) and insurers (Assurant Defendants and American Modern) ― each operating under different agreements, policies, and procedures.  The evidence of American Modern's relationship with the Litton Defendants will be dramatically different from evidence of the Assurant Defendants' relationship with the Ocwen and Saxon Defendants.  And, American Modern's policies and procedures will be the subject of far different proof and distinct from that of the Assurant Defendants; indeed, the Assurant Defendants and American Modern are competitors.

The only common "fact" among plaintiffs is that LPI was purchased by one of three loan servicers from one of two insurers, but this superficial commonality is insufficient.  The Ninth Circuit recently rejected permissive joinder of claims against different lenders arising from mortgage practices, concluding that the different claims do not arise from the factual similarity required by Rule 20(a):

> While Plaintiffs allege in conclusory fashion that Defendants' misconduct was 'regular and systematic,' their interactions with Defendants were not uniform. . . .
>
> Plaintiffs own separate and unrelated properties across the country, they entered into separate loan transactions, and their dealings with Defendants were necessarily varied.  Nothing unites all of these Plaintiffs but the superficial similarity of their allegations and their common choice of counsel. . . .
>
> Plaintiffs merely allege that Defendants violated the same laws in comparable ways.  Rule 20(a) requires more.

*Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 870 (9th Cir. 2013).  These conclusions apply with equal force here, compelling the conclusion that plaintiffs' claims should be severed.

Not only do the facts vary greatly among plaintiffs, so too does the applicable law.  For

11

example, the second and third claims are for unjust enrichment and breach of fiduciary duty.[6] (SAC ¶¶ 276-91.)  These claims are governed by the laws of the jurisdiction in which the loan was made (there are five separate ones), given that those states have the most significant relationships to the transactions and parties.  *See Liberty Mut. Fire Ins. Co. v. E.E. Cruz & Co.*, 475 F. Supp. 2d 400, 407 (S.D.N.Y. 2007) ("In a diversity action, a federal court applies state substantive law in accordance with the choice-of-law provisions of the forum state."); *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 225-26 (1993) (recognizing "interest analysis" as the "preferred analytical tool in tort cases" to determine proper choice of law and the "center of gravity" or "grouping of contacts" choice of law theory as preferred in contract cases.)

Moreover, the state laws themselves are not uniform.  Under Florida unjust enrichment law, for example, "plaintiffs must show they *directly* conferred a benefit on the defendants." *Am. Safety Ins. Serv. v. Griggs*, 959 So. 2d 322, 331 (Fla. App. 2007) (emphasis added) (citing *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla.*, 667 So.2d 876, 879).  In New York, however, "[i]t does not matter whether the benefit is directly or indirectly conveyed." *Mfrs. Hanover Trust Co. v. Chem. Bank*, 160 A.D.2d 113, 118 (N.Y. Sup. Ct. 1990).

Furthermore, the Second Amended Complaint includes state-specific statutory claims under the New York General Business Law Section 349, Florida's Deceptive and Unfair Trade Practices Act, and the Illinois Consumer Fraud and Deceptive Business Practices Act.  (SAC ¶¶ 310-41.)  These claims are asserted only against the loan servicer who serviced the plaintiff's loan in each jurisdiction and the insurer from whom the servicer purchased LPI, further evincing that plaintiffs' claims should be severed and grouped by loan servicer and insurer that issued LPI on each plaintiff's property.  Plaintiffs' claims do not present common issues of fact or law.

---

[6] Plaintiffs also allege state law claims for breach of contract, conversion, and aiding and abetting breach of fiduciary duty.

      **D.**      **Severance Will Facilitate Judicial Economy.**

As currently structured, this action includes a tangle of defendants – loan servicing organizations and insurance companies – some of whom are direct competitors. Given the confidential and proprietary nature of the defendants' businesses, discovery will turn an already complex case into a quagmire.

For example, with all defendants lumped together as they are now, a multi-tiered protective order will be needed to ensure that confidential and proprietary business information is not improperly used by, or in certain circumstances even seen by, a competitor. Party representatives and even outside counsel may need to be excused at depositions of American Modern and Assurant Defendants, who are competitors, and from those portions of depositions of loan servicers' personnel that address agreements and practices of those insurers. The presentation of this testimony and documents to the Court similarly would have to be done under seal in fragmented fashion, requiring multiple filings of the same memoranda, with variations on which portions must be filed under seal. As argued by plaintiffs' counsel before the MDL Panel: "Placing multiple different defendants, many of whom are competitors, into the same action will inject additional and unnecessary complexity into this already complex litigation." *In re Mortg. Lender Force-Placed Ins. Litig.*, MDL No. 2388, Member Case. No. CAC/8:11-cv-00915, dkt. no. 61 p. 10 (quoting *In re Prescription Drug Co-Pay Subsidy Antitrust Litig.,* MDL No. 2370, 2012 WL 3143852, at *1 (J.P.M.L. Aug. 2, 2012)). This convoluted fragmentation of discovery and court filings would undoubtedly involve the Court's intervention as well. An easy fix, however, is to sever the claims.

Although severance would result in two additional cases, counsel can surely coordinate discovery so as to lessen the burden on the parties and Court. Because of the varying factual and

legal issues presented in the Second Amended Complaint, severing claims into separate cases by loan servicer will greatly ease what already promises to be complex discovery and will lend focus and clarity to the issues.

### E. Severing Claims Would Avoid Prejudice To Defendants.

Perhaps more importantly, severance would avoid fundamental unfairness to defendants of trying multiple disparate claims, transactions, and parties as industry-wide claims that even the allegations of the Second Amended Complaint do not support. When multiple plaintiffs assert claims against different lenders arising from different transactions, as they do here, any "'interest in economy is affirmatively disserved'" and a "'joint trial could lead to confusion of the jury and thereby prejudice [the] defendant.'" *Green v. CitiMortgage, Inc.*, No. 13 CV 2341, 2013 WL 6712482, at *6 (E.D.N.Y. Dec. 18, 2013) (internal citations omitted); *see also Falcone v. Underwriters at Lloyd's*, No. 13-CV-5950, 2013 WL 6667401, at *4 (E.D.N.Y. Dec. 17, 2013); *Hard Drive Prods., Inc. v. Does 1-188*, 809 F. Supp. 2d 1150, 1164 (N.D. Cal. 2011) (joining multiple unrelated claims will likely cause prejudice to defendants by imposing numerous hurdles).

The "spillover prejudice" of a joint trial and in determining class certification of disparate claims against different loan servicers and insurers, with different agreements, practices, and procedures, is manifest. *Kalie*, 2013 WL 4044951, at *6. Asking a jury to wade through the facts and law presented in conglomerated fashion by the Second Amended Complaint is a Herculean task wrought with the very real potential for confusion, mistake, and unfairness.

### F. Different Witnesses And Documentary Proof Are Required For Plaintiffs' Separate Claims.

Because this case involves "specific force-placed insurance practices that are separate and distinct from one another," plaintiffs' claims are subject to different witnesses and

14

documentary proof. *In re Mortg. Lender Force-Placed Ins. Litig.*, MDL No. 2388, Member Case. No. CAC/8:11-cv-000915, dkt. no. 173 p. 6. This is evidenced by the Second Amended Complaint, which includes as exhibits certain of the loan and insurance documents relating to each plaintiff, documents that differ in form and substance. And because each plaintiff asserts claims against fewer than all defendants, there would necessarily be different witnesses required for each plaintiff's claims. For example, the evidence required by plaintiffs with claims against Litton and American Modern will differ markedly from the evidence relating to the Saxon, Ocwen, and Assurant Defendants, against whom those plaintiffs have no claims.

If one plaintiff is successful in proving a claim against the loan servicer that serviced his or her mortgage, that will only bear, if at all, on the other plaintiffs also serviced by the same loan servicer and on whose property the same insurer issued LPI. It will have no bearing, however, on the plaintiffs whose loans were serviced by one of the other two named loan servicers or on whose property LPI was issued by a different insurer. This conclusion highlights why severing this action by loan servicer makes sense, and why litigating this case in its current motley fashion will be grossly inefficient, unnecessarily convoluted, and unfair to defendants.

**IV.     CONCLUSION**

For the many reasons identified above, plaintiffs' claims are misjoined under Rule 20 and severance is compelled by Rule 21. Plaintiffs' claims should be severed into three separate groups organized by loan servicer and insurer, as set forth in the table *supra*, at 2. Doing so has little, if any, downside and would dramatically increase the efficiency of pretrial proceedings and avoid the inherent unfairness of a homogenized class certification proceeding and trial.

Consequently, American Modern respectfully requests that the Court grant their motion to sever plaintiffs' claims.

Date: January 21, 2014					Respectfully submitted,

                                                              /s/ Mark A. Johnson
Mark A. Johnson (*pro hac vice*)
mjohnson@bakerlaw.com
Rodger L. Eckelberry (*pro hac vice*)
reckelberry@bakerlaw.com
Joseph E. Ezzie (*pro hac vice*)
jezzie@bakerlaw.com
Robert J. Tucker (*pro hac vice*)
rtucker@bakerlaw.com
BAKER HOSTETLER LLP
65 East State Street, Suite 2100
Columbus, Ohio 43215-4260
T 614.228.1541
F 614.462.2616

Lauren J. Resnick
lresnick@bakerlaw.com
BAKER HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
T (212) 589-4200
F (212) 589-4201

*Attorneys for Defendant American Modern Insurance Group, Inc. and American Modern Home Insurance Company*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on January 21, 2014, I electronically filed the foregoing with the Clerk of the United States District Court for the Southern District of New York through the CM/ECF system, thereby automatically serving all registered parties.

                                                              /s/ Mark A. Johnson
                                                              Mark A. Johnson