**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JIMMY LYONS, *et al.*, | **ECF Case** |
| Plaintiffs, | **13 Civ. 00513 (ALC) (HBP)** |
| v. | |
| LITTON LOAN SERVICING LP, *et al.*, | |
| Defendants. | |

| | |
|---|---|
| JOHN CLARIZIA, *et al.*, | **ECF Case** |
| Plaintiffs, | **13 Civ. 02907 (ALC) (HBP)** |
| v. | |
| OCWEN FINANCIAL CORPORATION, *et al.*, | |
| Defendants. | |

**DEFENDANTS LITTON LOAN SERVICING LP, OCWEN FINANCIAL**
**CORPORATION AND OCWEN LOAN SERVICING LLC'S**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SEVER**

BUCKLEYSANDLER LLP
Richard E. Gottlieb
Fredrick S. Levin
100 Wilshire Boulevard, Suite 1000
Santa Monica, CA 90401
Tel: (310) 424-3900

*Attorneys for Defendants Litton Loan Servicing LP,*
*Ocwen Financial Corporation, and Ocwen Loan*
*Servicing, LLC*

January 21, 2014

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 4

I.     Procedural History ................................................................................................ 4

II.    SAC Allegations .................................................................................................. 6

     A.    The SACs Tacitly Acknowledge That Plaintiffs' Claims *Should* Be Organized Transactionally ........................................................................ 6

     B.    The SACs Evidence That Plaintiffs' Claims Are Not Transactionally Related. .... 6

          1.    Plaintiffs' Claims Against Litton and American Modern are not Transactionally Related to Claims Against Saxon or OLS and Their Insurers. ................................................................................ 7

          2.    Claims Against Saxon Are not Transactionally Related to the Claims Against Litton or OLS and Their Insurers. ................................. 10

          3.    Claims Against OLS Are Not Transactionally Related to the Claims Against Litton or Saxon and Their Insurers. .............................. 11

     C.    The SACs Present Two Independent and Complex Corporate Transactions ....... 14

LEGAL STANDARD ..................................................................................................... 15

ARGUMENT .................................................................................................................. 15

I.     Plaintiffs' Claims Fail to Satisfy the Transactional Relatedness Test for Joinder. ........... 16

II.    Plaintiffs' Claims Fail to Satisfy the Commonality Test for Joinder. .............................. 21

III.   Judicial Economy Dictates that Plaintiffs' Claims Should be Severed. .......................... 22

IV.   Prejudice Will be Avoided if Severance is Granted. ....................................................... 23

V.    Different Witnesses and Documentary Proof are Required for Plaintiffs' Claims. .......... 24

CONCLUSION ............................................................................................................... 25

# **TABLE OF AUTHORITIES**

## Cases

*Abraham v. Am. Home Mortg. Servicing, Inc.*,
   2013 WL 2285205 (E.D.N.Y. May 23, 2013) ............................................................... 16

*Bias v. Wells Fargo & Co.*,
   2012 WL 2906664 (N.D. Cal. July 13, 2012) ............................................................... 19

*Castillo v. Taco Bell of America, LLC*,
   2013 WL 1120829 (E.D.N.Y. March 18, 2013) ............................................................ 10

*Crown Cork & Seal Co., Inc. Master Ret. Trust v. Credit Suisse First Boston Corp.*,
   288 F.R.D. 331 (S.D.N.Y. 2013) .................................................................................. 15

*Curtis v. Cenlar FSB*,
   2013 WL 5995582, at *2 (S.D.N.Y. Nov. 12, 2013) ...................................................... 4

*Deajess Med. Imaging, P.C. ex rel. Barry v. Geico Gen. Ins. Co.*,
   2005 WL 823884 (S.D.N.Y. Apr. 7, 2005) ................................................................... 24

*Deajess Med. Imaging, P.C. v. Allstate Ins. Co.*,
   2004 WL 1920803 (S.D.N.Y. Aug. 27, 2004) ............................................................... 22

*Deskovic v. City of Peekskill*,
   673 F. Supp. 2d 154 (S.D.N.Y. 2009) .............................................................. 7, 22, 23

*Hall v. Bank of Am., N.A.*,
   No. 1:12-cv-22700-FAM (S.D. Fla. Mar. 14, 2013) ..................................................... 18

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
   903 F.Supp.2d 198 (S.D.N.Y. 2012) .............................................................................. 4

*In re Mortg. Lender Force-Placed Ins. Litig.*,
   895 F. Supp. 2d 1352 (J.P.M.L. 2012) ........................................................ 3, 4, 10, 19, 23

*In re Wells Fargo Bank, N.A. Mortgage Corporation Force-Placed Hazard Insurance Litigation*,
   2013 WL 4041553 (MDL August 7, 2013) ..................................................................... 9

*Kalie v. Bank of America Corp.*,
   2013 WL 4044951 (S.D.N.Y. Aug. 9, 2013) ............................................... 15, 16, 17, 22

*Lewis v. Triborough Bridge & Tunnel Authority*,
   2000 WL 423517 (S.D.N.Y. April 19, 2000) ............................................................... 15

*Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Assoc.*,
   2013 WL 6508843, at *6 n.3 (S.D.N.Y. Dec. 12, 2013) ................................................. 4

*Simpkins v. Wells Fargo Bank, N.A.*,
   2013 WL 4559711 (S.D. Ill. Aug. 28, 2013) ............................................................... 23

*Smith v. Am. Sec. Ins. Co.*,
   2013 WL 6628358 (E.D.N.Y. Dec. 16, 2013) ......................................................... 20, 21

*Traina v. HSBC Mortg. Services, Inc.*,
   2013 WL 6576856 (E.D.N.Y. Dec. 12, 2013) ............................................................... 17

*Visendi v. Bank of America, N.A.*,
733 F.3d 863 (9th Cir. 2013) ................................................................................. 17, 21

**<u>Rules</u>**

Fed. R. Civ. P. 20 ................................................................................................................. 1

Fed. R. Civ. P. 21 ............................................................................................................... 10

Defendants Litton Loan Servicing LP ("Litton"), Ocwen Financial Corporation ("OFC"), and Ocwen Loan Servicing, LLC ("OLS") respectfully move this Court, pursuant to Fed. R. Civ. P. 20 and 21, to sever Plaintiffs' claims in their Second Amended Complaints ("SACs").[1] Severance is warranted because Plaintiffs have presented a multitude of parties and claims that do not "respect" or "arise out of" the same transactions or occurrences or series of transactions or occurrences. Fed. R. Civ. P. 20. Litton, OFC, and OLS therefore respectfully request that this Court sever Plaintiffs' claims in *Lyons* and *Clarizia* based on Plaintiffs' individual servicer and insurer program. Given the multitude of distinct parties, facts, and claims, severing based on servicer/insurer program is the *minimum* necessary response to the misjoinder that has occurred here.

Plaintiffs have pled claims against twelve separate defendants, but each Plaintiff does not have claims against every Defendant; instead, each Plaintiff has claims against his or her loan servicer and the insurance company through whom the servicer, acting on behalf of the borrower's Lender, obtained Lender Placed Insurance ("LPI"). Plaintiffs' SACs thus involve claims related to individual placements of insurance, at different times, on individual properties located in seven states, secured by different mortgages, owned by different Lenders, serviced by different servicers, and involving several insurance companies offering distinct LPI programs.

For example, Plaintiffs Engelhardt and Coulthurst have no claims against Litton (or six other defendants) in this case because Litton never serviced their loans. The purported basis for naming Defendants American Modern Insurance Group, Inc. and American Modern Home Insurance Company ("American Modern") is that Litton contracted with them to provide LPI. Likewise, Defendants Goldman Sachs Group, Inc. ("Goldman") and Arrow Corporate Member

---

[1] Although the SACs fail to plead personal jurisdiction over OFC, solely to avoid delay and expense associated with litigating that issue, OFC has elected not to move to dismiss on that basis.

Holdings LLC ("Arrow") are named in the Lyons SAC only because of their purported corporate affiliation with Litton prior to September 1, 2011. Because Engelhardt and Coulthurst had no relationship at all with Litton, they therefore have none with any of these other defendants.

Litton did service the loans of Plaintiffs Jimmy and Jacqueline Lyons, Anthony Papapietro, and Sheila Heard. But it is *impossible* as a matter of logic to say that these Plaintiffs' claims are transactionally related to the claims of Engelhardt and Coulthurst. Engelhardt and Coulthurst simply *never* had a "transaction" with Litton, American Modern, Goldman, or Arrow. Similarly, it is logically *impossible* for the claims of Plaintiffs Frances and Johnnie Erving to be transactionally related to those against Litton because Litton *never* serviced the Ervings' loan.

Defendant Saxon Mortgage Services, Inc. ("Saxon") serviced the Ervings' loan between November 2007 and April 2012. The SACs recognize that Litton and Saxon were independent loan servicers, operating under separate ownership, prior to September 2011 (Litton) and March 2012 (Saxon). Saxon contracted with Defendant American Security Insurance Company ("ASIC"), a subsidiary of Defendant Assurant, Inc., to provide LPI pursuant to *Saxon's program with ASIC* on the Ervings' property. Assurant and its subsidiaries, ASIC and Standard Guaranty Insurance Company, on the one hand, and American Modern, on the other, are competitors in the market for the provision of LPI and provide different insurance programs to their insureds.

OLS is the third servicer named in the SACs. OLS competed with both Litton and Saxon prior to September 2011 and March 2012, respectively. In September 2011, OLS's indirect parent corporation, OFC, acquired Litton and the servicing of Litton's loans was transferred to OLS. In March 2012, OLS acquired certain servicing rights belonging to Saxon and the servicing of the affected Saxon loans transferred to OLS. OLS, like Litton and Saxon, placed insurance on borrowers' properties. ASIC provided LPI for properties securing loans serviced by OLS.

The corporate transactions between OFC/OLS and Litton in September 2011 and OFC/OLS and Saxon in March 2012 do little to join Litton, Saxon, OFC, and/or OLS under the same umbrella. In fact, the complexity of each corporate transaction further supports severance.

To join in one set of lawsuits three distinct mortgage servicers, three distinct LPI programs, and allegations relating to two distinct corporate transactions, Plaintiffs rely on industry-relatedness, rather than transactional relatedness, contrary to Rule 20. The SACs rely on the fact that Plaintiffs all had mortgages and all had LPI placed on their property by a loan servicer. But such industry-relatedness is not relatedness at all under Rule 20. It is not much different than saying that the automobile product defect claim of someone who bought a Ford in Spring, Texas is transactionally related to the claim of someone who purchased a Chevrolet in Hallandale, Florida, or a Jeep in East St. Louis, Illinois, because each purchased a car.

For precisely these reasons, the Judicial Panel on Multidistrict Litigation ("JPMDL") has repeatedly rejected industry-relatedness as a basis for pre-trial joinder in LPI litigation:

> LPI actions "involve not only different defendants with different lender agreements with insurers, different alleged abuses, and different mortgage loan documents. Thus, the misconduct is not sufficiently uniform to justify industry-wide centralization."

*In re Mortg. Lender Force-Placed Ins. Litig.*, 895 F. Supp. 2d 1352, 1353-54 (J.P.M.L. 2012) ("2012 MDL Order").[2] It is not just the JPMDL's opinion; it is also the opinion of Plaintiffs' lawyers. Before the JPMDL, Plaintiffs' lawyers here opposed a motion for industry-wide pre-trial consolidation filed by a different set of Plaintiffs' lawyers. In opposition, they said:

---

[2] The JPMDL decisions typically focus on the different *lenders*, whereas this Memorandum (and the underlying lawsuits) reference *servicers*. A "Lender" is the loan originator, or its assign, as set forth in the Mortgage. A servicer acts on behalf of the Lender pursuant to a separate agreement between the Lender and the servicer. The JPMDL decisions refer to "Lenders" because the lead defendant there (Wells Fargo) served as both the originating lender *and* a servicer of the loans. Litton, Saxon, and OLS only serviced, but did not originate, the loans at issue here. Although there are important and meaningful distinctions between Lender and servicer, for purposes of this severance motion, the rationale of the JPMDL decisions respecting Lenders applies equally to servicers here.

> Rather than involving a substantially identical industry-wide scheme, these cases involve *lender-specific* force-placed insurance practices that are separate and distinct from one another.

*In re Mortg. Lender Force-Placed Ins. Litig.*, MDL No. 2388, Case No. 11-cv-000915, Dkt. No. 173 pp. 6-7 ("MDL Opp.") (emphasis added). To be sure, Plaintiffs do not seek to join in one lawsuit claims against *all* servicers and *all* lender placed insurers throughout the U.S. But their theory of joinder is still industry, not transactional, relatedness. As demonstrated below, and as Plaintiffs' counsel have themselves admitted, each of these cases involves "lender-specific force-placed insurance practices" that are "separate and distinct from one another." Thus, there is no just reason to join these transactionally unrelated claims in one set of lawsuits.[3]

## BACKGROUND

### I.    Procedural History

This action is one of many complaints that Plaintiffs' counsel has filed involving LPI. The original *Erving* Complaint was filed in this Court in December 2012 by a consortium of lawyers led by Kessler Topaz Meltzer & Check, LLP. As filed, there was one set of borrowers, the Ervings, and five defendants. *Erving v. Saxon Mortg. Svcs., Inc.*, Case No. 1:12-cv-08992. In January 2013, a separate consortium of lawyers, led by Berger & Montague, P.C., filed *Lyons*. As filed, *Lyons* had one set of borrowers, the Lyonses, and a cast of defendants different from *Erving*. *Lyons* Dkt. No. 1. Three months later, on April 30, 2013, the Berger & Montague

---

[3] Litton, OFC, and OLS file the instant motion pursuant to the Court's order, dated October 29, 2013 (the "October 29 Order"), directing Defendants to file (1) motions to sever and (2) motions to dismiss for lack of subject matter jurisdiction by today, January 21, 2014. Pursuant to the October 29 Order, motions to dismiss for failure to state a claim under Rule 12(b)(6) are expressly reserved until a future date to be set by the Court. At that time, Litton, OFC, and OLS will file a motion to dismiss on grounds, among others, that the filed-rate doctrine operates to bar Plaintiffs' claims. *See Curtis v. Cenlar FSB*, 2013 WL 5995582, at *2 (S.D.N.Y. Nov. 12, 2013) (holding that the filed-rate doctrine may properly be invoked on a motion to dismiss for failure to state a claim under Rule 12(b)(6)). Defendants also respectfully reserve their right to challenge Plaintiffs' Article III standing to assert certain of their state law claims until after a determination of the issue of class certification, assuming, *arguendo*, that the SACs survive Defendants' motions to sever and to dismiss pursuant to Rule 12(b)(6). *See In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F.Supp.2d 198, 213-14 (S.D.N.Y. 2012) (holding under similar circumstances that "class certification is logically antecedent to the issue of standing"); *Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Assoc.*, 2013 WL 6508843, at *6 n.3 (S.D.N.Y. Dec. 12, 2013) (compiling decisions).

consortium filed another complaint on behalf of four additional plaintiffs (Engelhardt, Dominguez, Coulthurst and Clarizia); this new case involved yet a third cast of defendants. *Engelhardt* (now *Clarizia*) Dkt. No. 1. At this point, there were three cases in which borrowers sued their specific loan servicers and the insurers who wrote LPI on their properties.

The two consortia of lawyers involved in *Erving, Lyons*, and *Engelhardt* then joined forces and, in July 2013, filed amendments to *Lyons* and *Engelhardt* that realigned the parties, claims, and proposed classes. As amended, the scope of *Lyons* expanded to include all but one of the original plaintiffs and all of the servicers and insurers named in the three original cases. Plaintiffs also amended *Engelhardt*, renaming it *Clarizia*. Plaintiffs then split the Ervings' claims, adding them as Plaintiffs in *both Lyons* and *Clarizia*. Thus, the original Erving Plaintiffs became Plaintiffs in *both* remaining cases. The Ervings, having split their claims, voluntarily dismissed their original action in August 2013. Finally, on November 19, 2013, Plaintiffs filed SACs in both *Lyons* and *Clarizia*. In their *Second Amended Class Action Complaint* ("Lyons SAC"), the Lyons Plaintiffs added a new Plaintiff (Heard) (Lyons SAC ¶¶ 69-71, 186-98), added new allegations and counts based on the Racketeer Influenced and Corrupt Practices Act ("RICO") and RICO conspiracy (Lyons SAC ¶¶ 342-50), and allegations regarding mail and wire fraud (Lyons SAC ¶¶ 199-212). Similarly, the Clarizia Plaintiffs added to their *Second Amended Class Action Complaint* ("Clarizia SAC") RICO and RICO conspiracy claims (Clarizia SAC ¶¶ 134-42). As it currently stands, the SACs contain claims by <u>eight</u> sets of borrowers, against <u>three</u> servicers, and two groups of insurers, although each Plaintiff presents his or her own unique set of factual allegations regarding how they were harmed, and each Plaintiff has claims only against their respective servicer and insurer – never against all Defendants.

## II.      SAC Allegations

### A.      The SACs Tacitly Acknowledge That Plaintiffs' Claims *Should* Be Organized Transactionally.

If Plaintiffs have stated any claims at all, their claims must be transactionally related; that is, they must arise out of a common transactional relationship with their loan servicer and the insurance company that wrote LPI on their property. Plaintiffs' SACs tacitly concede this point in several ways. *First*, they create groups of defendants organized by servicer and the relevant insurance provider. *See* Lyons SAC ¶¶ 1-2, Clarizia SAC p. 1 (defining the Litton, Saxon, Ocwen, Assurant, and American Modern Defendants). *Second*, they define the supposed RICO Enterprises by servicer and relevant insurance provider. *See* Lyons SAC ¶¶ 225-27, Clarizia SAC ¶¶ 121-22 (defining the purported "Litton Force-Placed Insurance," "Saxon Force-Placed Insurance," and "Ocwen Force-Placed Insurance" Enterprises based on the servicer and the insurer that the servicer contracted with). **Third,** they define putative classes along servicer and insurer lines. *See* Lyons SAC ¶¶ 247, 249, 252, Clarizia SAC ¶ 156 (defining the Litton, Saxon, and Ocwen National Hazard Classes based on the servicer and the relevant insurance provider).

### B.      The SACs Evidence That Plaintiffs' Claims Are Not Transactionally Related.

The SACs also establish that Plaintiffs have not pled their claims, and thus do not intend to prove their claims, transactionally. Rather, the SACs employ a shotgun approach, leveling broad and vague allegations against the entire LPI industry. *See* Lyons SAC ¶¶ 91-129, 213-23; Clarizia SAC ¶¶ 59-67, 72-76, 94-103. The SACs thus collapse the distinct servicers named into a composite, the "Loan Servicing Defendants," accusing each of everything without identifying what actual practices each engaged in. Lyons SAC ¶ 40 (identifying twelve purported practices that the "Loan Servicing Defendants" purportedly engaged in without specifying what Litton, Saxon and OLS specifically did); *see also* Lyons SAC ¶ 42 (identifying five purported practices

of the "Insurer Defendants"). The SACs thus evidence the very harm that the transactional limitation of Rule 20 is designed to avoid – the blurring together of disparate claims. *See Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 171 (S.D.N.Y. 2009) (warning that joint trials involving separate witnesses, evidence, theories, and defenses risk confusing the jury and lead to guilt-by-association, thus justifying severance). In contrast, as Plaintiffs concede, "these cases involve *lender-specific* force-placed insurance practices that are separate and distinct from one another." MDL Opp., at pp. 6-7. Examination of the SACs' descriptions of Plaintiffs' individual grievances reveals that they are not transactionally related to each other.

### 1. Plaintiffs' Claims Against Litton and American Modern are not Transactionally Related to Claims Against Saxon or OLS and Their Insurers.

Plaintiffs Jimmy and Jacqueline Lyons, Sheila Heard, and Anthony Papapietro assert claims against Litton. These claims, however, do not arise from a common transaction or occurrence with each other, much less with the remaining Plaintiffs joined in these two lawsuits.

#### a) Jimmy and Jacqueline Lyons

The Lyonses are residents of Palm Bay, Florida. Lyons SAC ¶ 55. As pled, their claims against Litton arise out of a misunderstanding after their voluntary insurance lapsed on December 3, 2009. A week later, Plaintiffs allege that they received a letter from Litton advising that their voluntary insurance had lapsed and that Litton would purchase insurance at their expense in the absence of proof of acceptable insurance. *Id.* ¶ 133 & n.2, Ex. 27. In January 2010 – approximately one month after their voluntary insurance had expired – Litton and the Lyonses entered into a loan modification agreement. *Id.* ¶ 131. As pled, the Lyonses "believed" that the establishment of an escrow account pursuant to the modification agreement meant that Litton would reinstate their lapsed private policy and pay the 2010 premiums for that policy. They claim that Litton representatives confirmed this understanding in multiple telephone calls. *Id.*

¶¶ 133, 136. Nevertheless, they claim that Litton charged their escrow account in January 2011 for 2010 LPI premiums. *Id.* ¶ 140. The SAC does not identify the insurance provider or attach the policy, but alleges, on information and belief, that the insurance was "backdated."

Putting aside whether Plaintiff can prove the facts alleged, the events alleged in the Lyons SAC describe a unique transaction and occurrence. Proof of Plaintiff's allegations will involve consideration of the specific disclosures made to the Lyonses about their insurance, the terms of the loan modification alleged, evidence of the content of the telephone calls supposedly held with Litton representatives, the circumstances surrounding issuance of the insurance policy by the unidentified insurance carrier, the terms of the insurance, and accounting records relevant to the Lyonses' loans. As the Lyons SAC itself demonstrates, these unique circumstances are not transactionally related to claims made by other Plaintiffs.

### b)   Sheila Heard

Plaintiff Sheila Heard appears to complain against Litton about LPI underwritten by two different insurers. First, she complains of insurance underwritten by Lloyd's of London for coverage effective between 2005 and 2008. *Id.* ¶¶ 187-89. Lloyd's is not a defendant and no other Plaintiff raises claims regarding Lloyd's insurance. Ms. Heard's claims arising from the Lloyd's insurance are thus unrelated to the claims of all other Plaintiffs in these lawsuits. Ms. Heard's claims will require consideration of the specifics of the Lloyd's insurance program and the circumstances under which insurance was placed. This evidence is unique to her claims.

Second, with respect to the claim against Litton and American Modern, Ms. Heard complains of the disclosures made to her by Litton, alleging that they were "false and misleading." *Id.* ¶ 192. However, as the Lyons SAC illustrates, the disclosures relating to LPI varied from servicer to servicer, and disclosures made by even a single servicer varied over time.

*See id.* Ex. 68 (Litton notification dated July 13, 2006);[4] *compare id.* Ex. 71 (Litton notification dated August 25, 2011);[5] *compare id.* Ex. 72 (OLS notification dated September 2011);[6] *compare id.* Ex. 73 (OLS notification dated October 15, 2011).[7] Moreover, each placement of insurance involves multiple servicer- and insurer-specific notifications over several months in a "letter cycle" process. *Id.* Ex 10, pp. 5-6. As the JPMDL found in other LPI cases, joinder of disparate LPI cases is not appropriate because "the pending actions involve . . . differing disclosures to borrowers at the time of the force placed insurance policies were placed." *In re Wells Fargo Bank, N.A. Mortgage Corporation Force-Placed Hazard Insurance Litigation*, 2013 WL 4041553, at *2 (MDL August 7, 2013) ("2013 MDL Order").

### c)   Anthony Papapietro

It is not altogether clear what claims Mr. Papapietro is asserting or why they are joined here. Almost three months <u>before</u> Papapietro joined as a *Lyons* plaintiff in this Court, Mr. Papapietro filed *Papapietro v. Popular Mortgage Servicing Co., et al.*, 13-cv-02433 (E.D.N.Y. April 23, 2013) (the "EDNY Action"). The ongoing EDNY Action also names Litton and OLS as defendants and complains of "unauthorized force-placed insurance." *Id.*, ¶ 168(e). He specifically complains of the same Litton insurance placements as alleged here. *Id.* ¶¶ 76, 116; *compare* Lyons SAC ¶¶ 181, 183. In the EDNY Action, Mr. Papapietro seeks $10,000,000 in damages personally and not as a class representative. EDNY Action, ¶ 191. The gist of

---

[4] "The cost of this insurance may be higher than the cost of insurance purchased through your own agent."

[5] "If you have already purchased insurance, please provide us with a copy of the policy or evidence of coverage as soon as possible. If you have not already purchased insurance, you may be able to purchase it at significant savings through your own agent. *** The company from which we buy insurance may reinsure a portion of that risk with an affiliate of ours and pay premiums to that affiliate for providing such reinsurance. * * * If you acquire your own insurance . . . we will cancel our policy once we receive proof . . . ."

[6] "The cost of the insurance we purchase is likely to be much higher than the cost of the insurance you could obtain on your own. . . . Obtaining your own insurance is in your best interest. . . . [P]lease contact your agent or carrier and purchase coverage."

[7] Stating, among other things, "We strongly recommend that you obtain your own insurance coverage."

Mr. Papapietro's grievance against Litton appears to be that the LPI premium was not refunded once proof of insurance was provided. *Id.*, ¶ 116. Thus, his claims are transactionally unrelated to the other claims made in the Lyons SAC because the "alleged abuse" is distinct from that alleged against Litton by either the Lyonses or Heard. *See* 2012 MDL Order at 1354-54. Papapietro's claim against Litton is also dependent on individualized proofs related to whether Papapietro provided proof of insurance and whether Litton and American Modern reacted appropriately to the proof received. As such, these claims cannot be said to be transactionally related to claims made by other Plaintiffs against Saxon, OLS, or the Assurant insurance defendants.

In any event, Mr. Papapietro cannot pursue the same claims at the same time in different federal judicial districts. Even if Mr. Papapietro's claims satisfied the conditions for permissive joinder here (they do not), the Court should drop them from this suit in the interest of justice. *See* Fed. R. Civ. P. 21; *see also Castillo v. Taco Bell of America, LLC*, 2013 WL 1120829, at *2 (E.D.N.Y. March 18, 2013) ("[A] district court has broad discretion to dismiss a lawsuit that is duplicative of a prior action. … The lawsuits need not be identical, but the claims and rights raised in the two actions must not differ substantially") (internal quotations omitted).

### 2. Claims Against Saxon Are not Transactionally Related to the Claims Against Litton or OLS and Their Insurers.

Plaintiffs Frances and Johnnie Erving assert the only claims against Saxon.

#### a) Hazard Insurance (Lyons SAC)

The Ervings focus on the disclosures made at the time of placement of their hazard insurance; these differ from the Litton and OLS disclosures and reflect the individualized insurance program provided by Saxon and Assurant. Lyons SAC Ex. 38 (Saxon notification

dated July 16, 2010);[8] *compare id.* Ex. 71 (Litton notification dated August 25, 2011); *compare id.* Ex. 72 (OLS notification dated September 2011); *compare id.* Ex. 73 (OLS notification dated October 15, 2011). These differing disclosures demonstrate that the Ervings' claims against Saxon and Assurant are misjoined with the claims in these SACs. *See* 2013 MDL Order at *2 (rejecting consolidation when the claims involved differing disclosures made to plaintiffs).

### b) Flood Insurance (Clarizia SAC)

The Ervings' primary complaint against Saxon regarding its placement of flood insurance appears to focus on an allegation that Saxon's lender-placed flood insurance coverage was greater than that allowed by federal law. Clarizia SAC ¶¶ 82-83, p. 31. This is a unique allegation raised by no other Plaintiff. The only other Clarizia Plaintiff, John Clarizia, does not allege that his coverage was excessive; rather, he alleges that OLS (not Saxon) placed flood insurance on his property despite it not being in a flood zone. *Id.* ¶¶ 85-88, pp. 31-32.

### 3. Claims Against OLS Are Not Transactionally Related to the Claims Against Litton or Saxon and Their Insurers.

Plaintiffs Enrique Dominguez, Lisa Chamberlin Engelhardt, and Gerald Coulthurst assert claims only against OLS; Sheila Heard, the Ervings, and John Clarizia assert claims against OLS in addition to those raised against their prior servicers, Litton or Saxon. None of these claims, however, are transactionally related to each other, much less the claims asserted against Litton or Saxon and their respective insurers.

### a) Enrique Dominguez

The Dominguez allegations primarily implicate OLS and Assurant; he does not raise allegations concerning LPI against Litton, Saxon, or American Modern. Mr. Dominguez focuses

---

[8] "[T]he coverage provided in this renewal may or may not be as comprehensive as a voluntary policy secured by you, and may be more expensive than your former coverage. … [W]e urge you to contact your insurance agent to discuss this coverage."

on disclosures made by OLS at the time of LPI placement. Lyons SAC ¶¶ 161-63. As discussed previously, OLS's disclosures differ from Saxon's and Litton's, and thus claims based on disclosures are not transactionally related. *See id.* Ex. 33 (OLS notification dated March 24, 2012),[9] *compare id.* Ex. 38 (Saxon notification dated July 16, 2010); *compare id.* Ex. 71 (Litton notification dated August 25, 2011). *See* 2013 MDL Order at *2 (rejecting consolidation when the claims involved differing disclosures made to plaintiffs).

### b)    Lisa Chamberlin Engelhardt

Ms. Engelhardt makes allegations against OLS and Assurant; she raises no allegations against Litton, Saxon, or American Modern. She claims that her insurer provided OLS proof of insurance in October 2012, but that OLS ignored this proof and placed an LPI policy in November, and that – despite her request – OLS failed to pay her voluntary insurance out of her escrow account. Lyons SAC ¶¶ 143-47. Both of these allegations present individualized claims that will involve fact-intensive investigation. For example, the Court will need to determine exactly what proof of insurance was provided to OLS, what proof OLS required, and how OLS responded to the proof. Ms. Engelhardt's allegations concern individualized incidents with her servicer that did not involve any other Plaintiff or any Defendant other than OLS and Assurant. These claims are transactionally unique and justify severance.

### c)    Gerald Coulthurst

Mr. Coulthurst's allegations are directed at OLS and Assurant (not Litton, Saxon, or American Modern), and like many other Plaintiffs, appear to focus on the disclosures made by

---

[9] "If you do not have a current policy covering your property, please contact your agent or carrier and purchase coverage. *** [T]he cost may be much higher than the amount you would normally pay. … The amount of insurance on the policy is based on the last known coverage amount on your lapsed policy, or the unpaid principal balance on your loan. … We have incurred expenses in placing this insurance policy. Such expenses are recoverable by us as stated in your loan documents. Part of the policy premium charged to your escrow account may be used by the insurance carrier to reimburse us for these expenses."

OLS in the placement of LPI. *Id.* ¶¶ 148-55. As previously discussed, each servicer's disclosures to borrowers regarding LPI are different. Joinder of disparate lender placed cases is not appropriate because "the pending actions involve . . . differing disclosures to borrowers at the time the force placed insurance policies were placed." 2013 MDL Order at *2.

### d) Sheila Heard

Although the Lyons SAC is sparse with allegations of wrongdoing by OLS as to Ms. Heard, Ms. Heard's allegations involve the disclosures OLS made at the time it placed insurance on her property through Assurant. Lyons SAC ¶¶ 195-96. As discussed *supra*, these disclosures are different across each insurance program (and are even different within such programs, based on the time the disclosures were made).

### e) Frances and Johnnie Erving

#### (1) Hazard Insurance (Lyons SAC)

The Ervings' complaint against the OLS/Assurant hazard insurance placement focuses on correspondence from OLS that allegedly contains "half-truths, misinformation, and omissions," specifically alleging that OLS and Assurant used the LPI process to generate "unjust profits" at the expense of the borrowers. *Id.* ¶¶ 177-78. The differing disclosures implicated by the Ervings are again sufficient evidence to demonstrate that their claims are transactionally unrelated to hazard LPI claims made by other Plaintiffs against Litton or Saxon.

#### (2) Flood Insurance (Clarizia SAC)

The Ervings also raise claims against OLS in the Clarizia SAC relating to OLS's placement of flood insurance (through Assurant) on their property. The Clarizia SAC is vague in the allegations against OLS for this type of insurance. Clarizia SAC ¶¶ 89-92, pp. 32-33. The only clear allegation is that OLS has neglected to provide the Ervings with a copy of their flood LPI policy, a unique allegation to OLS that would require its own factual analysis.

### f)        John Clarizia (Flood Insurance, Clarizia SAC)

The allegations made by Clarizia involve OLS and its flood insurance program with Assurant. The Clarizia SAC alleges that OLS placed flood insurance through ASIC on the Clarizia property, despite the determination that the property was not in a flood zone. However, the SAC acknowledges that this determination was made on November 1, 2012, after the placement of flood insurance, and that OLS refunded the policy premiums after the determination was made. *Id.* ¶¶ 85-88, p. 29. The allegation that OLS placed flood insurance on the property despite it not being within a flood zone is unique to Clarizia, demonstrating the lack of transactional or factual relatedness between Clarizia's claims and those of his fellow Plaintiffs.

### C.        The SACs Present Two Independent and Complex Corporate Transactions

Plaintiffs attempt to tie all servicer defendants together by alleging successor liability to OFC and/or OLS due to corporate transactions in September 2011 (Litton) and March 2012 (Saxon). Plaintiffs fail to note the complexity of these transactions and that they are distinct from one another. The September 2011 transaction involved OFC purchasing Litton. This transaction involved certain indemnification and loss-sharing provisions between Goldman and OFC regarding third-party claims in connection with Litton's pre-closing servicing operations. Lyons SAC Ex. 23. On the other hand, the Saxon transaction took place in March 2012 and involved OLS purchasing assets from Saxon – certain servicing rights; OFC was a party only to limited sections of the agreement, including an indemnification provision. *Id.* ¶ 78.

Although Plaintiffs attempt to gloss over the transactions and present them both as placing successor liability on OFC and/or OLS for both Litton and Saxon, the Lyons SAC makes it clear that these were two distinct transactions. To gloss over these differences through

misjoinder, would risk confusion and unfair prejudice as seemingly similar, but very different, transactions blur together.

## LEGAL STANDARD

Fed R. Civ. P. 20 permits joinder of multiple plaintiffs and defendants if any right to relief is asserted "jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences," and if "any question of law or fact common to all" plaintiffs or defendants will arise in the action. If any party seeking joinder fails to satisfy both the transactional relatedness *and* commonality requirements, misjoinder has occurred and the Court may add or drop parties or sever claims against a party. Fed R. Civ. P. 21; *Kalie v. Bank of America Corp.*, 2013 WL 4044951, at *3 (S.D.N.Y. Aug. 9, 2013). When deciding a severance motion, Courts in this District consider the following factors:

> (1) whether the claims arise out of the same transaction or occurrence;
> (2) whether the claims present some common questions of law or fact;
> (3) whether settlement of the claims or judicial economy would be facilitated;
> (4) whether prejudice would be avoided if severance were granted; and
> (5) whether different witnesses and documentary proof are required for the separate claims.

*Crown Cork & Seal Co., Inc. Master Ret. Trust v. Credit Suisse First Boston Corp.*, 288 F.R.D. 331, 333 (S.D.N.Y. 2013). The presence of just one these conditions justifies severance. *Lewis v. Triborough Bridge & Tunnel Authority*, 2000 WL 423517, at *2 (S.D.N.Y. April 19, 2000).

## ARGUMENT

Misjoinder is clear. The SACs involve eight groups of borrowers with eight different mortgages, and allege improper placement of LPI on behalf of multiple lenders by at least three different servicers and insurers. As in *Kalie*, these differences are dispositive. *See Kalie*, 2013 WL 4044951 at *4 ("A … barrier to joinder is presented by the presence of multiple lenders. 'It is well established that separate loan transactions by different lenders do not constitute a single

transaction or occurrence and claims by plaintiffs who engaged in those separate transactions generally cannot be joined in a single action.'") (*quoting Abraham v. Am. Home Mortg. Servicing, Inc.*, 2013 WL 2285205, at *4 (E.D.N.Y. May 23, 2013)).

Even though only one is necessary, all five factors warrant severance in this matter. *First*, Plaintiffs' claims do not arise out of the same transaction or occurrence, but instead arise out of distinctly different transactions involving the servicing of Plaintiffs' loans and the placement of LPI. *Second*, Plaintiffs' claims share no common questions of law or fact, as they are based on transactions that occurred in multiple states, relate to different insurance programs, and each has its own insurance agreements, disclosures, and individualized grievances. *Third*, severance will facilitate judicial economy by preventing the Court and the jury from parsing individualized evidence that only applies to a subset of Defendants, and would allow this Court to avoid managing discovery among defendants in direct competition with each other. *Fourth*, severance would reduce the risk of unfair prejudice by reducing the opportunity for Plaintiffs to paint all defendants with one broad brush and impute to all the alleged actions of one. *Fifth*, each Plaintiff's claim presents individualized grievances that are subject to their own documentary proof and witnesses.[10]

## I.   Plaintiffs' Claims Fail to Satisfy the Transactional Relatedness Test for Joinder.

To determine whether claims arise out of the same transaction or occurrence, courts "look to the logical relationship between the claims and determine whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Kalie*, 2013 WL 4044951 at *3 (internal quotations omitted).

---

[10] The Court may, at a later date, determine that further severance is required to provide for the just and efficient resolution of all of Plaintiffs' claims.  Litton, OLS, and OFC reserve the right to raise such arguments at the appropriate time.

16

Plaintiffs' claims plainly fail the transactional relatedness test. Each Plaintiff's claim is related to a separate loan transaction, a separate placement of insurance, one of three servicers, and one of two sets of insurers. These claims are unique and do not have any logical connection (other than generally relating to LPI) such that the claims could all be resolved efficiently in one lawsuit. Further, each Plaintiff's claim contains its own unique set of facts related to *how* insurance was lender-placed on their properties; even the method and underlying circumstances of the LPI varies from claim to claim, as the Plaintiffs' "interactions with Defendants were not uniform." *Visendi v. Bank of America, N.A.*, 733 F.3d 863, 870 (9th Cir. 2013).

In *Kalie*, plaintiffs attempted to join multiple claims based on separate loan transactions. In holding that the claims failed to meet the transactional relatedness test, the Court stated, "It is well established that separate loan transactions by different lenders do not constitute a single transaction or occurrence and claims by plaintiffs who engaged in those separate transactions generally cannot be joined in a single action." *Kalie*, 2013 WL 4044951 at *4; *see also Traina v. HSBC Mortg. Svcs., Inc.*, 2013 WL 6576856, at *6 (E.D.N.Y. Dec. 12, 2013) (holding that claims involving multiple loans located in multiple states fails the transactional relatedness test).

Moreover, allegations of industry-relatedness do not satisfy the transactional relatedness test. *Peterson v. Regina*, 2013 WL 1294594, at *6 (S.D.N.Y. Mar. 28, 2013) ("It is settled that joinder is improper where the plaintiff does no more than assert that the defendants merely committed the same type of violation in the same way." (internal quotations omitted)). Plaintiffs merely attempt to tie Defendants together with an "amorphous pattern of activity" by showing that all Defendants are involved in LPI programs, which neglects to allege a single scheme among all Defendants. *Kalie*, 2013 WL 4044951 at *5. Plaintiffs' factual allegations both

17

implicitly and explicitly support this conclusion by setting forth individualized claims against each servicer and insurer (*see* Background Section II, *supra*).

The JPMDL has repeatedly considered whether consolidation of LPI cases should be permitted for pre-trial purposes. Each time it has considered requests to consolidate such cases, the Panel has denied the request. Not only did the JPMDL deny requests for consolidation, but Plaintiffs' counsel opposed consolidation before the Panel. *See* MDL Opp. at p. 7 (the consolidation request "improperly seeks to consolidate numerous different lenders and servicers . . . [and the] cases involve lender-specific force-placed insurance practices that are distinct from one another."). The JPMDL's (and Plaintiffs' counsel's) reasoning should be persuasive to this Court because the question presented there was essentially the same as is now presented to this Court – whether actions that are unrelated transactionally should be tried together or separately. Proponents of consolidation on an industry-wide basis advanced the same kind of arguments advanced in the SACs – that all Plaintiffs have been the victim of an industry-wide pattern of abusive practices. Nevertheless, the JPMDL denied consolidation, noting that LPI actions "involve not only different defendants with different lender agreements with insurers, different alleged abuses, and different mortgage loan documents. Thus, the misconduct is not sufficiently uniform to justify industry-wide centralization." 2012 MDL Order at 1353-54.

After the JPMDL denied consolidation, counsel in the actions before the Panel then filed a complaint in the Southern District of Florida, packaging in one case claims against multiple lenders. The court dismissed the actions for misjoinder with leave to re-file the cases as separate actions. *Hall v. Bank of Am., N.A.*, No. 1:12-cv-22700-FAM (S.D. Fla. Mar. 14, 2013). Additionally, in 2013 the JPMDL was asked to reconsider the 2012 MDL Order on the grounds that the LPI actions at issue in the motion then before it involved only one lender and one type of

insurance product – hazard insurance. The JPMDL again refused, noting, among other things, that "the pending actions involve different originating lenders and differing disclosures to borrowers at the time the force placed insurance policies were placed. Thus, individualized discovery and legal issues still will be substantial." 2013 MDL Order at *2.

The SACs present many of the concerns that led the JPMDL to conclude that LPI cases should not be consolidated even for pre-trial purposes. As already noted, the SACs involve eight mortgages with multiple servicers and at least three distinct insurance programs. And Plaintiffs propose consolidation not only for pre-trial purposes but for *all* purposes including trial. The SACs establish that the transactions primarily at issue – the placement of LPI – present individual transactions, involving different combinations of servicers and insurers. As the JPMDL recognized, the LPI programs at issue are "lender-specific." 2012 MDL Order at 1353. Not only is there a variety of servicers and insurers across Plaintiffs' claims, but the LPI programs at issue involve different disclosures. Each program contains different disclosures in the letters to borrowers for the placement of LPI, and even an individual servicer's disclosures to borrowers varied over time. To the extent there is any relatedness among the transactions at issue (and there is little if any), it does not exist across all Plaintiffs and all claims.

Plaintiffs' recent addition of RICO-related claims to the SAC does nothing to change the fact that their allegations fail the transactional relatedness test. In fact, the "enterprises" described in the SAC *bolster* the fact that the claims at issue are improperly joined. *See* Lyons SAC ¶¶ 225-27 (setting forth three separate supposed enterprises based on loan servicers and their contracted insurers). The Northern District of California recently addressed this issue in a case with comparable facts. In *Bias v. Wells Fargo & Co.*, the court addressed a motion to sever in a case involving three distinct lenders, each alleged to have charged unnecessary fees to

borrowers on defaulted mortgages. 2012 WL 2906664 (N.D. Cal. July 13, 2012). Plaintiffs there attempted to bring joined claims against all three lenders, making allegations as to three plaintiff sub-classes related to the three lender groups, and alleging three RICO enterprises, again based on the three lender groups. The *Bias* court held severance was proper because the allegations did not establish transactional relatedness and "there is no inter-relationship alleged between the Defendant groups." *Id.* at *3. The court acknowledged that "the alleged unlawful actions and schemes are based upon the same basic scenario and same legal theories." Further, the court held that the plaintiffs had not alleged any "conspiracy, concerted action, or RICO action *as between the Defendants groups*, only three separate RICO enterprises within those groups." *Id.* at *2-3 (emphasis added). Thus, the court held there was no transactional relatedness among the claims at issue, and further determined that "there are plainly no common factual questions based on the allegations in the [complaint]." *Id.* at *3. Here, as in *Bias*, severance is warranted.

Finally, Plaintiffs claim that there is a logical relationship among all claims because each Plaintiff allegedly asserts claims against OLS. For one, this allegation is factually incorrect, as at least one set of Plaintiffs (the Lyonses) do not raise claims against OLS at all. To the extent Plaintiffs attempt to tie OLS or OFC to all claims based on successor liability, such an argument fails due to the significant factual and legal differences between the two distinct corporate transactions involving Litton (September 2011), and Saxon (March 2012). *See* Background Section II.C., *supra*. In any event, a common defendant is insufficient to satisfy the "logical relationship" test the Plaintiffs cite to. *See Smith v. Am. Sec. Ins. Co.*, 2013 WL 6628358, at *4 (E.D.N.Y. Dec. 16, 2013) ("[T]he mere presence of a common defendant and common questions of law or fact does not satisfy the same transaction or occurrence requirement."). Here, though the claims Plaintiffs make against each servicer are superficially similar, the experience of each

borrower is different, regardless of whether the borrowers have potential claims against OLS. As the SACs themselves show, each borrower has individualized grievances against his or her servicer and insurer, and these claims are sufficiently different that they should not be joined into one case, even with the purported common "thread" of OLS. Here, as in *Smith*, the mere presence of a common defendant does not justify joinder of disparate claims.

## II.   Plaintiffs' Claims Fail to Satisfy the Commonality Test for Joinder.

Legal and factual differences in the individual claims made by Plaintiffs fail the commonality test and justify severance. As the Ninth Circuit recently held:

> Plaintiffs own separate and unrelated properties across the country, they entered into separate loan transactions, and their dealings with Defendants were necessarily varied. Nothing unites all of these Plaintiffs but the superficial similarity of their allegations and their common choice of counsel. … Plaintiffs merely allege that Defendants violated the same laws in comparable ways. Rule 20(a) requires more.

*Visendi*, 733 F.3d at 870. Here, Plaintiffs have joined in two actions claims arising under the laws of seven states (New York, Florida, Virginia, Texas, Illinois, Massachusetts, and Pennsylvania). Even if, as Plaintiffs allege, some of the underlying documents are similar (Lyons SAC ¶¶ 266), the facts underlying each placement differ from Plaintiff to Plaintiff (and servicer to servicer). Further, the SACs involve "differing disclosures to borrowers at the time the force-placed insurance policies were placed." 2013 MDL Order at *2.

Plaintiffs also raise state law-related claims that explicitly (in the case of claims based on state unfair and deceptive practice laws) or implicitly (breach of contract, conversion, unjust enrichment, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty) require application of state-specific law that would vary based on Plaintiffs' location. Simply attempting to tie all Defendants together because they participated in the same general type of activity (placing insurance when Plaintiffs failed to maintain their own), is insufficient to justify joinder

of the sprawling claims that Plaintiffs propose. Because Plaintiffs have not presented a common nucleus of fact *or* law to tie all of their claims together, this factor weighs in favor of severance.

**III.      Judicial Economy Dictates that Plaintiffs' Claims Should be Severed.**

Severance is appropriate when judicial economy would benefit from treating claims separately. *See Deajess Med. Imaging, P.C. v. Allstate Ins. Co.*, 2004 WL 1920803 (S.D.N.Y. Aug. 27, 2004) (severing individual claims against an insurance company in part because "[a] jury evaluating all of the claims in this case would have to parse evidence regarding several different car accidents, the injuries sustained by forty-five different individuals, the medical treatment each individual received, and the reasonableness of those medical services."); *see also Deskovic*, 673 F. Supp. 2d at 171 (supporting severance when there is no "substantial overlap in discovery and depositions" and "little to no shared testimony and documentary evidence").

Plaintiffs propose to certify five national classes and/or twelve statewide sub-classes. This manner of pleading itself is a telltale that Plaintiffs have packaged too many distinct cases together and validates the JPMDL's concern that consolidation of such cases is simply unworkable. As the JPMDL has repeatedly found, joinder in one action of the multiple claims presented by Plaintiffs would *not* serve "the convenience of the parties and witnesses or … the just and efficient conduct of this litigation." 2013 MDL Order at *2. Plaintiffs are attempting to consolidate unrelated cases involving a multitude of servicers, insurers, and unrelated individual grievances. *See Kalie*, 2013 WL 4044951 at *6 (when each claim by plaintiffs involves "distinct loans, locations, dates and personnel, there is no meaningful economy of scale gained by trying these cases together."). The JPMDL also recognized that placing direct competitors in the same action "would complicate case management." 2012 MDL Order at 1354. Here, for example, Assurant and American Modern are direct competitors in the insurance business. They have an interest in keeping their agreements, fees, and other arrangements with each servicer confidential

from their competitors as trade secrets, and forcing those entities into discovery together would require extensive case management efforts to prevent such disclosure.  Further, the structure that Plaintiffs currently propose would require a jury to parse a multitude of evidence, a large part of which only applies to one of a few individual claims (or insurance programs). This judicial inefficiency can be avoided by severance

## IV.   Prejudice Will be Avoided if Severance is Granted.

Severance is warranted to avoid unfair prejudice to one or more defendants. *See Deskovic*, 673 F. Supp. 2d at 171 (warning that joint trials involving separate witnesses, evidence, theories, and defenses risk confusing the jury and lead to guilt-by-association). Grouping together multiple, unrelated servicers and insurance providers presents a risk of tarnishing all Defendants with any flaw that might be found only with respect to one. And unlike in *Simpkins v. Wells Fargo Bank, N.A.*, 2013 WL 4559711, at *4 (S.D. Ill. Aug. 28, 2013),[11] where the court rejected a similar argument for lack of evidence to support the claim, Plaintiffs' own SACs provide this evidence, as it is particularly telling that a large portion of each SAC focuses on criticism of the LPI industry as a whole, and not on the specific actions of any Defendant. *See, e.g.*, Lyons SAC ¶¶ 91-129, 213-23. It thus tars all Defendants with the supposed sins not only of each other, but all others in the same industry.

Additionally, as detailed in Background Section II.C. *supra*, litigating in the same lawsuits issues related to the corporate transactions involving Litton (September 2011) and Saxon (March 2012) would run a risk of further confusing a jury. Each transaction presents its own underlying agreement and clauses, which are similar superficially, but in fact are very different. The Lyons SAC acknowledges these differences by alleging different methods by

---

[11] The *Simpkins* court held that joinder was proper because there were common issues of law and fact. This case is easily distinguishable on that point, as the *Simpkins* case only involved one servicer/lender, Wells Fargo.

which OLS and/or OFC were involved in each transaction. *See* Lyons SAC ¶¶ 75, 78. Thus, severance is further justified due to the risk of jurors confusing the two transactions.

## V.   **Different Witnesses and Documentary Proof are Required for Plaintiffs' Claims.**

Severance is also appropriate when Plaintiffs' claims involve different witnesses and documentary proof. *See Deajess Med. Imaging, P.C. ex rel. Barry v. Geico Gen. Ins. Co.*, 2005 WL 823884 (S.D.N.Y. Apr. 7, 2005) (holding that this factor favors severance when there is "distinct documentary evidence" for each claim, and unique defenses that would be supported by differing evidence). Plaintiffs' individual claims will require individualized witnesses and documentary evidence. Each claim will involve its own documents, disclosures, and other communications to the Plaintiff, underlying agreements between servicer and insurer, and witnesses to address the underlying facts of each claim. Grouping the claims at issue into servicer/insurer groups will reduce the inefficiency. Plaintiffs propose lumping together two competing insurance providers, who have their own individual agreements with loan servicers. Forcing insurers (or servicers, for that matter) who are in direct competition to conduct discovery together would require protective orders and discovery management efforts to prevent confidential documents from being disclosed to direct competitors. In short, Plaintiffs' claims involve separate and individualized witness and documentary proof; this factor weighs in favor of severance.

//

//

//

//

//

//

## CONCLUSION

Severance is necessary to prevent a multitude of problems created by Plaintiffs' current SACs. Severance according to Plaintiffs' respective loan servicer and insurer would better balance the Court's interests in the efficient administration of justice with prevention of juror confusion and unfair prejudice.

Dated: January 21, 2014           **BUCKLEYSANDLER LLP**

By:   /s/ Fredrick S. Levin
       Richard E. Gottlieb
       Fredrick S. Levin
       100 Wilshire Boulevard, Suite 1000
       Santa Monica, CA 90401
       Phone: (310) 424-3900
       Fax: (310) 424-3960

*Attorneys for Defendants Litton Loan Servicing LP, Ocwen Financial Corporation, and Ocwen Loan Servicing, LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 21, 2014, I electronically filed the foregoing with the Clerk of the United States District Court for the Southern District of New York through the CM/ECF system, thereby automatically serving all registered parties.

/s/ Fredrick S. Levin
Fredrick S. Levin

1504215.3

25