UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JIMMY LYONS, *et al.*, | |
| Plaintiffs, | Civil Action No. 1:13-cv-00513-ALC-HBP |
| v. | |
| LITTON LOAN SERVICING LP, *et al.*, | |
| Defendants. | |

**COMBINED REPLY IN SUPPORT OF MOTIONS TO SEVER BY DEFENDANTS AMERICAN MODERN INSURANCE GROUP, INC., AMERICAN MODERN HOME INSURANCE COMPANY, ASSURANT, INC., AMERICAN SECURITY INSURANCE COMPANY, STANDARD GUARANTY INSURANCE COMPANY, GOLDMAN SACHS GROUP, INC. AND ARROW CORPORATE MEMBER HOLDINGS LLC**

**I.    INTRODUCTION**

Plaintiffs bring claims against three separate groups of defendants bound together by three separate and mutually exclusive contractual arrangements. Plaintiffs gloss over these independent relationships and transactions and urge the Court view them as one unified arrangement. But a closer inspection of their Second Amended Complaint and Opposition reveals that plaintiffs have always recognized and continue to recognize that their claims arise from three separate and distinct transactions. Consider:

- The Complaint brings claims against three separate groups of "Loan Servicing Defendants," the Ocwen Defendants, the Litton Defendants, and the Saxon Defendants.[1] The Complaint alleges that each set of Insurer Defendants had an "exclusive contract" to place coverage for one or more of the Loan Servicing Defendants (SAC ¶ 8.) Each LPI placement in this case is the result of one, but only one, of these three arrangements, meaning that at no time did the Assurant

---

[1] In strategically-chosen locations, the Opposition abandons the umbrella "Loan Servicing Defendants" label and instead conflates all Loan Servicing Defendants with the Ocwen Defendants. *See*, *e.g.*, Plfs' mem. at 7 ("The Ocwen Defendants' wrongful conduct (committed either directly or as successor-in-interest) could not have occurred but for the assistance of the Insurer Defendants, and vice versa."). That tactic, however, is transparent. If plaintiffs truly viewed all Loan Servicing Defendants as one and the same, the Second Amended Complaint and its allegations would have so reflected.

        Defendants and American Modern issue coverage on behalf of the same group of Loan Servicing Defendants.

- The Complaint organizes its class definitions by each of the three groups of Loan Servicing Defendants, with each subclass also naming the one group of Insurer Defendants with which each group of Loan Servicing Defendants had an "exclusive contract."

- The Complaint alleges three separate RICO conspiracies took place, predictably organized by each of the three groups of Loan Servicing Defendants and their exclusive contracts with the Insurer Defendants. Thus, plaintiffs' own formulation of their claims recognizes that they will have to prove three separate conspiracies, each involving a unique combination of Defendants.

Thus, while plaintiffs oppose severance, their filings with this Court reflect that this litigation is really an amalgamation of three separate, unrelated suits.

Despite these differences, plaintiffs argue that joinder of disparate claims against unrelated defendants is somehow justified because after the alleged conduct occurred, one of the defendants, Ocwen Financial Corporation, acquired two other defendants, Litton Loan Servicing LP and Saxon Mortgage Services, Inc. The successor liability of Ocwen, however, does not justify wedging all defendants into a single proceeding, and forcing those defendants to bear the costs of such a proceeding. Plaintiffs cite no case in support of such a result.

For these reasons, plaintiffs have failed to meet the joinder standard under Rule 20.

## II. LAW AND ARGUMENT

### A. Plaintiffs' Claims Are Not Properly Joined Under Rule 20.

Joinder under Rule 20 requires that each plaintiff's claims arise from the same transaction or occurrence and that there are question of law or fact common to all plaintiffs. FED. R. CIV. P. 20(a). "[P]laintiff[s] bear[] the burden of demonstrating that joinder is proper under Rule 20," but their brief falls short of meeting that burden. *Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 159 (S.D.N.Y. 2009). Plaintiffs concede that in the analogous cases of *Kalie v. Bank of*

*America Corp.*, No. 12-cv-9192, 2013 WL 4044951 at *4 (S.D.N.Y. 2013) and *Abraham v. Am. Home Mortg. Serving, Inc.*, 947 F. Supp. 2d 222 (E.D.N.Y. 2013), the courts found joinder was improper "where separate loan transactions by different lenders did not constitute a series of transaction or occurrences," but attempt to avoid the result of that case law based entirely on the notion that the eventual ownership by Ocwen of Litton and Saxon "unites all of the force-placed hazard insurance transactions under the same loan servicing umbrella." But successor liability does not serve as a common thread to unite otherwise distinct claims. It remains that Litton had nothing to do with loans secured by Saxon, and vice versa; that neither Litton nor Saxon had anything to do with loans secured by Ocwen, and that American Modern had nothing to do with the LPI coverage issued by the Assurant Defendants, and vice versa.[2] The Goldman Sachs Group is charged as the ultimate parent of Litton, but that is no reason for embroiling it in protracted, expensive litigation with Morgan Stanley, Saxon, or the Assurant Defendants, who are not alleged to have had any role in the LPI issued in connection with Litton's secured loans. Nor is it any reason for joining the latter group of defendants with Goldman, Litton, American Modern, or Arrow.

        **1.**        **Plaintiffs' claims do not arise out of the same transaction or occurrence.**

Each unique combination of Loan Servicing Defendants and Insurer Defendants issued coverage to particular plaintiffs pursuant to unique and exclusive program agreements. These exclusive program agreements mean there is not a single instance where the same Loan Servicing Defendant purchased coverage from the same Insurer Defendant on behalf of the same plaintiff. Despite the Opposition's effort to tie together the different plaintiffs and their claims,

---

[2] For ease of reference, American Security Insurance Company, Standard Guaranty Insurance Company and Assurant, Inc. are referred to herein as "the Assurant Defendants," without prejudice to Assurant, Inc.'s argument that plaintiffs lack Article III standing to assert claims against it.

each asserts claims *only* against the loan servicer that serviced his or her mortgage and the insurance company from whom that loan servicer obtained LPI for that plaintiff's property. Indeed, plaintiffs do not dispute that their alleged classes and RICO claims are already divided among three separate groups in the same fashion that defendants propose severance: the "Litton Force-Placed Insurance Enterprise," the "Saxon Force-Placed Insurance Enterprise," and the "Ocwen Force-Placed Enterprise." (SAC ¶¶ 225-27.)

Plaintiffs' suggestion that alleged Litton, Saxon, and Ocwen "subclasses" do not reflect differing transactions accordingly misstates their allegations. (Plfs' mem. at 9 n. 7.) The Second Amended Complaint does not allege one omnibus class with subclasses defined by loan servicer. Rather, plaintiffs allege *three* separate classes organized by each loan servicer, in the same manner in which defendants propose that claims be severed: the "Litton National Hazard Class," the "Saxon National Hazard Class," and the "Ocwen National Hazard Class."[3] (SAC ¶¶ 247, 249, 251.)

Plaintiffs also assert that "ownership by Ocwen of all the Loan Servicing Defendants unites all of the force-placed hazard insurance transactions" and establishes the logical relationship necessary for joinder. (Plfs' mem. at 8.) But Plaintiffs do not address their counsel's failed attempt to consolidate similar claims against only one loan servicer and one insurer, where the MDL Panel found that "individualized discovery and legal issues still will be substantial," and denied the request to consolidate. *In re HSBC LPI Hazard Litig.*, MDL 2464, dkt. no. 35 p. 2. Here, where *multiple* servicer/insurer relationships are alleged, the individual issues grow exponentially, making consolidation even less practical and warranting severance.

---

[3] Subclasses with "divergent claims" based on different facts may not be certified, contrary to plaintiffs' contention. (Plfs' mem. at 9 n. 7.) Subclasses must independently meet all requirements for certification, including the existence of common questions that will "generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); Rule 23(c)(5).

Plaintiffs argue that Ocwen either directly placed LPI on a plaintiff's property or has successor liability for Litton and Saxon having done so.  But Ocwen's alleged successor liability for acquiring Litton and Saxon does not transform their pre-acquisition conduct into Ocwen's, or provide the necessary lynchpin to force disparate broader defendant groups together.  Indeed, a common defendant is insufficient to satisfy the "logical relationship" test.  *See Smith v. Am. Sec. Ins. Co.*, 2013 WL 6628358, at *4 (E.D.N.Y. Dec. 16, 2013) ("[T]he mere presence of a common defendant and common questions of law or fact does not satisfy the same transaction or occurrence requirement.").  Loans serviced by Litton before September 2011 have no relation to those serviced by Ocwen or Saxon – they involved different servicers, loan programs, and insurers.  The Lyons' loan, for example, was serviced by Litton, not Ocwen, and LPI was purchased on their property through American Modern, not the Assurant Defendants.  Those transactions preceded Ocwen's acquisition of Litton, and occurred pursuant to Litton's loan program with American Modern.  Plaintiffs do not allege that American Modern ever had a contractual relationship with Ocwen or Saxon relating to LPI, or that Litton ever had a contractual relationship with the Assurant Defendants relating to LPI.  And five plaintiffs offer no allegations of any relationship with Goldman Sachs or Arrow whatsoever.

Furthermore, the claims of Lyons, Papapietro, Heard, and the Ervings against Ocwen for successor liability will rise and fall on the merits of their underlying claims against Litton or Saxon; if Litton or Saxon is not liable to plaintiffs, there is no liability for which Ocwen can be liable as a successor.  Those underlying claims will turn on the individual facts surrounding those transactions, including Litton's or Saxon's purchase of LPI based on individual program agreements with American Modern and the Assurant Defendants.  And the direct claims against Ocwen of Engelhardt, Coulthurst, Dominguez, Ervings, Papapietro, and Heard, for Ocwen's

5

direct placement of LPI purchased from the Assurant Defendants, are unrelated to claims against Litton and Saxon.

Moreover, Litton and American Modern had *nothing* to do with the direct claims of Papapietro and Heard arising from Ocwen's placement of LPI through the Assurant Defendants, which are governed by the program agreement between Ocwen and the Assurant Defendants. With respect to the successor liability claims, Ocwen and the Assurant Defendants had nothing to do with Litton's purchase of LPI from American Modern on the properties of Papapietro and Heard. Accordingly, while both claims involve LPI placed on properties of Papapietro and Heard may be "substantially similar," (Plfs' mem. at 10), they took place at different times, are attributable to different servicers, and were performed pursuant to different (and mutually exclusive) program agreements, making them separate and unique.[4] In fact, "[i]t is well established that separate loan transactions by *different lenders* do not constitute a single transaction or occurrence and claims by plaintiffs who engaged in those separate transactions generally cannot be joined in a single action." *Kalie v. Bank of America Corp.*, 2013 WL 4044951 at *4 (S.D.N.Y. 2013) (emphasis in original).

Plaintiffs' thin reed of successor liability to connect their disparate claims snaps when examining how they must prove successor liability claims. While Ocwen's derivative liability depends in the first instance on Litton's and Saxon's liability, proof of successor liability depends on facts involving the acquisition of Litton and Saxon by Ocwen, acquisitions that have nothing to do with any of plaintiffs' transactions or the other defendants. (Plfs' mem. at 6-7, n. 5, dkt. no. 117). And, Ocwen's acquisition of Litton in September 2011 and of certain assets of

---

[4] The same logic applies to the Ervings' direct claims against Saxon, Ocwen, and the Assurant Defendants. In fact, the Ervings are the only plaintiffs who allege *any* relationship with Saxon or Morgan Stanley. Consequently, the Ervings' claims, like those of each plaintiff, arise out of insurance and mortgage-related transactions that are distinct from the transactions on which the other plaintiffs' claims are based.

6

Saxon in March 2012 themselves raise differing fact issues. (Ocwen mem. at 14, dkt. no. 112). Plaintiffs' omnibus and incorrect labeling of all of their varied claims "under the same loan servicing umbrella" (Plfs' mem. at 8) reveals the prejudice to defendants from being painted with such a broad brush.

That plaintiffs' claims were originally brought as three separate actions – with each plaintiff asserting claims against the loan servicer that serviced his or her mortgage, the insurer from whom LPI was purchased, and Ocwen as successor – further demonstrates that plaintiffs' claims do not arise out of the same transaction or occurrence. If Ocwen's involvement provides the only lynchpin and logic needed to join these previously separately filed claims, plaintiffs fail to explain why they were initially filed separately. Plaintiffs also decline to explain how the Ervings' voluntary splitting of their claims in two separate actions, here and in *Clarizia*, is any different from the severing into three groups of claims by loan servicer that defendants propose.

2. **Plaintiffs' claims do not present common questions of law or fact.**

Plaintiffs' opposition rests on the sweeping assertion that "[t]he factual and legal issues are substantially similar across all of Plaintiffs' claims." Nowhere, however, do plaintiffs address the reality that their claims require application of five different states' laws. (AMIG mem. at 12, dkt. 96). Moreover, plaintiffs' ignore that their claims rest on dissimilar facts of three different insurance programs involving two separate insurers, and the procedures and requirements of three different loan servicers under servicer-specific agreements, as well as under a variety of loan documents.

Plaintiffs contend that their claims "are united not only by. . .Ocwen's continuing course of conduct and its successor-liability, but also by their common allegations that the Loan Servicing and Insurer Defendants engaged in an unlawful force-placed insurance scheme."

(Plfs' mem. at 10). But there are no allegations that Litton, Saxon, and Ocwen, along with American Modern and the Assurant Defendants, *together* engaged in any transaction with any plaintiff. For example, there are no liability-related facts "uniting" the claims of Papapietro and Heard against Litton and American Modern with those of other plaintiffs against Ocwen and the Assurant Defendants; LPI was placed on their properties by American Modern under an insurance program specific to Litton, using procedures and methods of communication unique to Litton and American Modern. Further, plaintiffs allege that the Litton/American Modern program was reinsured through Goldman Sachs/Arrow, but there are no reinsurance allegations concerning the Saxon/Assurant and Ocwen/Assurant programs. Indeed, "[n]othing unites all of these Plaintiffs but the superficial similarity of their allegations and their common choice of counsel. … Plaintiffs merely allege that Defendants violated the same laws in comparable ways. Rule 20(a) requires more." *Visendi v. Bank of America*, 733 F.3d 863, 870 (9th Cir.). Were broad allegations such as these sufficient to join LPI claims, the MDL Panel would not have rejected the previous attempt to consolidate cases involving a single lender and insurer, let alone the quagmire of defendants here.

Plaintiffs argue that only a single common issue is necessary for them to carry their burden, analogizing Rule 20 to Rule 23, but in the process misstate the requirements under both rules. The Supreme Court has rejected the generalized commonality test that plaintiffs espouse:

> The crux of this case is commonality--the rule requiring a plaintiff to show that 'there are questions of law or fact common to the class.' That language is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'' For example: Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification…Title VII, for example, can be violated in many ways--by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of

8

> the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (internal citations omitted). What "matters . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id*. Merely alleging that all plaintiffs were injured in the same manner does not create a common fact that drives liability questions sufficient to permit joinder.

Plaintiffs leave unanswered these questions going to the heart of whether there are common questions of law and fact sufficient to permit joinder, but opt for generalizations to try to convince this Court to do what the MDL Panel would not – consolidate disparate LPI claims based on nothing more than that they are LPI claims.

### B. This Case Should Be Severed Under FED. R. CIV. P. 21.

#### 1. Joinder will not facilitate judicial economy.

Relying heavily on *Kehr v. Yamaha Motor Corp.*, 596 F. Supp. 2d 821 (S.D.N.Y. 2008), a product liability case in which both plaintiffs were injured by all-terrain vehicles manufactured by the same manufacturer, plaintiffs argue that joinder promotes judicial economy. But in ruling on severance issues, the *Kalie* court, dealing specifically with mortgage transactions, expressly distinguished *Kehr*, holding "plaintiffs' reliance on two products liability cases to support their claim that this joint action may proceed is misplaced." *Kalie*, 2013 WL 4044951, at *4. None of the other cases cited by plaintiffs support their novel theory.

Plaintiffs incorrectly decry that severance would result in three rounds of fact and expert discovery. (Plfs' mem. at 12). It is true that different representatives of Litton, Saxon, Ocwen, American Modern, and the Assurant Defendants may need to be deposed, but that would occur

9

irrespective of severance, whether there remains one or three cases. Fact witnesses need not be deposed twice, let alone three times; in the unlikely event that an Ocwen representative is able to testify also about Litton's and/or Saxon's loan program practices before Ocwen's acquisitions, the parties could work cooperatively to combine that deposition. Defendants acknowledge that plaintiffs may need discovery separately from Ocwen, but it is not the dire situation plaintiffs' paint. For those whose claims against Ocwen are limited to successor liability, discovery will be limited solely to the purchase of Litton and Saxon. And because Ocwen's acquisition of Litton differed from its acquisition of Saxon (see infra, at p. 5), each plaintiff's discovery on successor liability can be properly tailored. Further, Plaintiffs' rash assumption that defendants would all use the same expert witness overlooks the differing fact patterns among all three loan servicers and two insurers, as well as their different interests.[5]

    Litigating at least three different cases as one does not facilitate judicial economy. According to plaintiffs, because their claims implicate identical questions and theories, litigating them together will preclude the need for the parties to brief separately, and the Court to rule separately. Yet plaintiffs continue to ignore the five separate state law claims asserted in their Second Amended Complaint and the varying insurance programs and transactions that will be examined under these different laws. Separate briefing on class certification and dispositive motions is a foregone conclusion, whether the case is severed or not. Rule 23 requires a fact-driven inquiry, and how plaintiffs propose to prove their claims against each loan servicer and insurer must of necessity depend on servicer-specific and insurer-specific practices. With severance, briefing will be directed only to the insurance program and transactions applicable to the particular plaintiffs in each of the severed cases, making it far easier for the parties and the

---

[5] Deposition of any expert who opines in more than one case could also be combined by agreement across the three severed cases, if appropriate.

Court to focus on the individual evidence needed for each plaintiff to prove his or her claim under the relevant state law and the requirements for class certification.

Moreover, although severance will require three cases, counsel can surely coordinate discovery when appropriate so as to lessen any burden on the parties and the Court.  Indeed, plaintiffs' counsel have recognized this as a cure to their protestations, having argued to the MDL Panel that consolidation should not occur because "other methods of coordination exist and are already being employed by cooperating counsel."  *In re HSBC LPI Hazard Litigation*, MDL 2464, Member Case No. PAE/2:11-cv-04074, dkt. no. 1-1 p. 2.

### 2. Joinder will result in prejudice.

Plaintiffs chide defendants for "paint[ing] a doomsday picture of the prejudice they will face if severance is denied." (Plfs' mem. at 14).  But when multiple plaintiffs assert claims against different lenders arising from different transactions, as they do here, any "'interest in economy is affirmatively disserved'" and a "'joint trial could lead to confusion of the jury and thereby prejudice [the] defendant.'"  *Green v. CitiMortgage, Inc.*, No. 13 CV 2341 (SFJ), 2013 U.S. Dist. LEXIS 177791, *35 (E.D.N.Y. Dec. 18, 2013).  Plaintiffs' sophistry that the potential for spillover prejudice by improper joinder becomes an exception that "would swallow the rule" ignores the fundamental principle underlying proper joinder.  (Plfs' mem. at 15).  Not every case with multiple defendants must be severed; rather, where the claims are based on different transactions by different plaintiffs with different defendants acting under different practices, avoiding unfair prejudice is a purpose of the rule – not an exception.   Especially here, where plaintiffs incorrectly group multiple transactions with different loan servicers and insurers under one "umbrella," a real risk exists that alleged noncompliant practices by one defendant could be unfairly attributed to others.

Moreover, under circumstances such as these involving multiple unrelated transactions and defendants, joinder would force "the Litton Defendants," "the Saxon Defendants," and "the Ocwen Defendants" - to use plaintiffs' grouping of the various defendants - to incur the significant expense of participating in a single proceeding encompassing Litton facts, Saxon facts, and Ocwen facts.  The same is true on the insurance side for American Modern and the Assurant Defendants.

Plaintiffs cite Rule 20(b) to address the prejudice resulting from the haphazard joinder of their claims.  But Rule 20(b) only applies when claims have been properly joined under Rule 20(a) in the first instance.  *Adams v. Alliant Techsystems, Inc.*, 2002 WL 220934, *3 (W.D. Va.) ("Rule 20(b) gives the court discretion to sever claims 'that technically may be joined in one action under liberalized joinder rules but that could be determined more conveniently and expeditiously in separate trials.'") (citing WRIGHT, MILLER & KANE, FED. PRAC. & PROC. §§ 1660, 1663 (3d. ed. 2001)); *see also Wynes v. Kaiser Permanente Hospitals*, 2011 WL 4954196, *4 fn. 2 (E.D. Calif.) ("Rule 21 permits the Court discretion to refuse to sever an action even when parties are misjoined. Because the Court has already determined joinder is proper under Rule 20(a), the Court declines to proceed under Rule 21 here. The Court will nonetheless discuss whether severance is warranted under Rule 20(b).")   Further, curative jury instructions are not the panacea for the demonstrable prejudice from improper joinder that plaintiffs posit.  *Disparte v. Corp. Exec. Bd.*, 223 F.R.D. 7, 15 (D.D.C. 2004) (certain claims must be severed regardless of carefully worded jury instructions where divergent facts create "a high probability that the defendant would encounter prejudice due to jury confusion.")

Defendants do not argue that competitors can never be joined in the same action.  Rather, where claims against competitors, as here, arise from different transactions and practices,

shoehorning claims against both into the same case "would be an undertaking of nightmarish proportion." *In re Mortg. Lender Force-Placed Ins. Litig.*, MDL No. 2388, Member Case. No. CAC/8:11-cv-00915, dkt. no. 173 p. 6. Plaintiffs never address how a complex, multi-tiered protective order could address the "nightmarish" spectacle of removing counsel for American Modern and the Assurant Defendants from depositions concerning confidential practices of the other's client, let alone the due process deprivations of precluding a party from being represented in a deposition in the same case in which it is also a party.

As demonstrated above and in defendants' motions to sever, joinder under Rule 20(a) here is improper. Consequently, because Rule 20(b) is inapplicable, the Court cannot, as plaintiffs posit, alleviate the "spillover prejudice" cited in defendants' memoranda through use of Rule 20(b), nor can it eliminate the significant confidentiality concerns. The Court can accomplish both, however, through severance.

### 3. Different witnesses and documentary proof are required for plaintiffs' separate claims.

Plaintiffs resort to their mantra that, "because all Plaintiffs allege that Ocwen, or a servicer subsequently acquired by Ocwen, abused its limited right to force-place insurance…it is anticipated that there will be significant overlap between Plaintiffs' discovery." (Plfs' mem. at 18). No doubt plaintiffs will seek their mortgage documents (which arise from five separate lenders), the notices they received on behalf of the loan servicer (Litton, Saxon, Ocwen), the insurance program documents between the loan servicers and the insurers, reinsurance agreements, and communications. Relevant documents will vary, and dramatically so, based on the insurance program at issue.

Furthermore, because each plaintiff asserts claims against fewer than all defendants, there will necessarily be different witnesses. For example, witnesses relevant to claims against Litton

and American Modern will differ markedly from witnesses relating to the Saxon, Ocwen, and the Assurant Defendants, against whom certain plaintiffs have no claims. If one plaintiff is successful in proving a claim against the loan servicer that serviced his or her mortgage, that will only bear, if at all, on the other plaintiffs also serviced by the same loan servicer and on whose property the same insurer issued LPI. It will have no bearing, however, on plaintiffs whose loans were serviced by one of the other two loan servicers or on whose property LPI was issued by a different insurer.

Finally, severing plaintiffs' claims has no bearing on their desire to "designate the same experts for deposition, and proffer the same expert reports." (Plfs' mem. at 18.) Regardless of whether the case remains joined or severed into three separate cases, any competent expert will need to review each plaintiff's claims through the prism of evidence relating to each plaintiff. That will require a separate analysis of the insurance program relevant to each plaintiff's claim; whether under one cover or three, the expert analysis required remains the same. To the extent plaintiffs argue the need to present a homogenized case theory based on industry practices, rather than practices by each loan servicer and insurer, the resulting prejudice is palpable (and underscores both the impropriety of litigating claims based on multiple LPI programs in one action and the weakness of plaintiffs' individualized claims). That prejudice can be ameliorated only by severing plaintiffs' claims.

## III.   CONCLUSION

For these reasons and those stated in their memoranda in support, Defendants respectfully request that the Court sever plaintiffs' claims into three separate cases grouped by each loan servicer defendant with whom each plaintiff's loan was serviced and the insurer defendant that issued LPI relating to that loan.

Respectfully submitted,

| | |
|---|---|
| /s/W. Glenn Merten | /s/Mark A. Johnson |
| Andrew T. Solomon | Mark A. Johnson (*pro hac vice*) |
| Karen E. Abravanel | mjohnson@bakerlaw.com |
| SULLIVAN & WORCESTER LLP | Rodger L. Eckelberry (*pro hac vice*) |
| 1633 Broadway, 32nd Floor | reckelberry@bakerlaw.com |
| New York, New York 10019 | Joseph E. Ezzie (*pro hac vice*) |
| Telephone: (212) 660-3000 | jezzie@bakerlaw.com |
| Facsimile: (212) 660-3001 | BAKER HOSTETLER LLP |
| asolomon@sandw.com | 65 East State Street, Suite 2100 |
| kabravanel@sandw.com | Columbus, Ohio 43215-4260 |
| | T 614.228.1541 |
| Franklin G. Burt (pro hac vice) | F 614.462.2616 |
| W. Glenn Merten (pro hac vice) | |
| CARLTON FIELDS JORDEN BURT | Lauren J. Resnick |
| 1025 Thomas Jefferson Street, | lresnick@bakerlaw.com |
| NW Suite 400 East | BAKER HOSTETLER LLP |
| Washington, DC 20007 | 45 Rockefeller Plaza |
| Telephone: (202) 965-8100 | New York, New York 10111 |
| Facsimile: (202) 965-8104 | T (212) 589-4200 |
| fburt@cfjblaw.com | F (212) 589-4201 |
| gmerten@cfjblaw.com | *Attorneys for American Modern Insurance* |
| *Attorneys for Assurant, Inc., American* | *Group and American Modern Home* |
| *Security Insurance Company, and Standard* | *Insurance Company* |
| *Guaranty Insurance Company* | |

/s/Melvin A. Brosterman
Lisa M. Simonetti (*pro hac vice*)
lsimonetti@stroock.com
STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1600
Los Angeles, California  90067-3086
Telephone: (310) 556-5800
Facsimile:  (310) 556-5959

Melvin A. Brosterman
mbrosterman@stroock.com
Quinlan D. Murphy
qmurphy@stroock.com
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY  10038-4982
Telephone: (212) 806-5400
Facsimile:  (212) 806-6006
*Attorneys for Goldman Sachs Group, Inc. and Arrow Corporate Member Holdings LLC*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on March 7, 2014, I electronically filed the foregoing with the Clerk of the United States District Court for the Southern District of New York through the CM/ECF system, thereby automatically serving all registered parties.

/s/Mark A. Johnson
Mark A. Johnson