**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JIMMY LYONS, *et al.,*<br>                              Plaintiffs,<br><br>            v.<br><br>LITTON LOAN SERVICING LP, *et al.,*<br>                              Defendants. | Case No.: 1:13-cv-00513-ALC-HBP |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS**
**FILED PURSUANT TO THIS COURT'S ORDER TO SHOW CAUSE**

Plaintiffs Frances and Johnny Erving and Sheila Heard (collectively, "Plaintiffs"), by their undersigned attorneys, respectfully submit this Memorandum of Law in Opposition to the Motion to Dismiss filed by Defendants Litton Loan Servicing, LP ("Litton"), The Goldman Sachs Group, Inc. ("Goldman Sachs"), and Arrow Corporate Member Holdings, LLC ("Arrow") (collectively "Litton Defendants") and Saxon Mortgage Services, Inc. ("Saxon") and Morgan Stanley (together, the "Saxon Defendants"), and Assurant, Inc., American Security Insurance Company and Standard Guaranty Insurance Company (collectively, the "Assurant Defendants") (the Litton Defendants, with the Saxon Defendants and Assurant Defendants, "Defendants"), and pursuant to this Court's Order to Show Cause ("MTD").[1]

Defendants do not seek to dismiss the claims asserted by plaintiffs Jimmy and Jacqueline Lyons ("Lyons") concerning LPI that the Litton Defendants purchased from the American

---

[1] The Litton Defendants and Saxon Defendants are collectively referred to as the "Mortgage Servicing Defendants." The Assurant Defendants, along with American Modern Insurance Group and American Modern Home Insurance Company (collectively, "American Modern Defendants") are collectively referred to as the "Insurer Defendants." As detailed in the Second Amended Complaint ("SAC"), the Assurant Defendants sold LPI coverage to the Saxon Defendants and the American Modern Defendants sold LPI coverage to the Litton Defendants. The Lyons and Heard's mortgages were serviced by the Litton Defendants, and the Ervings' mortgage was serviced by the Saxon Defendants.

Modern Defendants.  Accordingly, the Lyons do not join this Opposition at this time.[2]

## INTRODUCTION

Defendants' kickback scheme involving illusory "reinsurance" arrangements, sham commission agreements and fake expense reimbursements all designed to disguise the cash payments funneled back to the mortgage servicers for purchasing higher-priced lender placed insurance ("LPI") from the insurers, and then misrepresenting the nature of those payments and charges to borrowers, goes far beyond the reach of the filed rate doctrine.

As the Second Circuit explained in *Rothstein v. Balboa Insurance Company,* 794 F.3d 256, 261 (2d Cir. 2015), the filed rate doctrine is grounded on two principles:  nonjusticiability and nondiscrimination.  The nonjusticiability principle recognizes that "courts are 'simply ill-suited' to decide whether a rate is appropriate."  *Id.* at 262 (quoting *Wegoland Ltd. v. NYNEX Corp.*, 27 F. 3d 17, 21 (2d Cir. 1994)).  The nondiscrimination principle bars challenges to filed rates if "allowing individual ratepayers to attack the filed rate would undermine the . . .  scheme of uniform rate regulation" and give some ratepayers preference over others.  *Id.* (quoting *Wegoland*, 27 F. 3d at 19)).  A careful review of the facts alleged here demonstrates that neither the nonjusticiability nor nondiscrimination principle is implicated by any of Plaintiffs' claims.

First, the charges that the Mortgage Servicing Defendants are permitted to assess borrowers is governed by the borrowers' mortgage agreement, not the filed rate.  That is distinct from the amount that the insurers are permitted to charge the Litton Defendants and Saxon Defendants for LPI, which is a commercial product subject to regulation by the insurers' filed

---

[2] Defendants explain that they do not seek dismissal of the Lyons' claims, whose LPI was purchased by the Litton Defendants from the American Modern Defendants, because "[t]he parties most knowledgeable about whether the LPI rates charged to [the Lyons] were approved by a rate-making authority are the [American Modern Defendants]," and the American Modern Defendants have reached a settlement in principle with the Lyons.  *See* MTD, at 2, fn. 2.  Lyons' claims against the remaining Defendants will persist.

rate.  In *Rothstein*, <u>because the plaintiffs settled their claims against the mortgage servicer prior to the appeal</u>, such claims were not at issue on appeal, and therefore, at most, the Second Circuit's *Rothstein* decision bears only upon claims brought by borrowers directly against insurers—not against mortgage servicers such as the Litton and Saxon Defendants.

Second, contrary to Defendants' assertion, the form of the kickback is critical to any analysis.  In *Rothstein,* the plaintiffs alleged only that the LPI provider provided the mortgage servicer with free loan tracking services.  *Id.* at 262.  The Second Circuit found that whether such tracking services were appropriately included in the LPI rates was a regulatory decision, and that a judicial determination that such services should not have been included in the LPI rates would violate the nonjusticiability principle.  *Id.* at 262.  Here, however, Plaintiffs are not arguing as to whether charges for reinsurance, commissions and/or expense reimbursements can appropriately be included in LPI premiums charged by insurers to mortgage servicers.  Instead, Plaintiffs allege that Defendants schemed to disguise cash payments as reinsurance, commission, and expense reimbursements in order to make such payments appear to be authorized under borrowers' mortgage agreements, and that the Mortgage Servicing Defendants breached the borrowers' mortgage agreements by assessing to borrowers more than just the cost to protect the lenders' interest in the borrowers' properties.  The carefully crafted cash kickback schemes at issue in this case are quite different than the mere provision of tracking services at issue in *Rothstein*.  In fact, as Judge Lynch noted from the bench to the plaintiff's counsel during oral argument in *Rothstein*:  "I would be inclined to agree with you, I think, if there was a straightforward cash kickback."  *See* Exhibit A to the Declaration of Tyler S. Graden ("Graden Decl."), containing a true and correct transcription of pertinent portions of the May 1, 2015 Oral Argument Hearing in *Rothstein v. Balboa Insurance Co*., No. 14-cv-2250 (2d Cir.).

Third, in *Rothstein*, the plaintiffs did not challenge the conduct of the defendants, as Plaintiffs do here.  As Plaintiffs previously noted, in the vast majority of LPI cases where courts have declined to apply the filed rate doctrine, they have noted that the doctrine does not apply where there is a challenge to conduct, as opposed to a challenge to the rate.  *See* ECF No. 118, at 8-11.  As the Third Circuit declared in *Alston v. Countrywide Financial Corporation*, 585 F.3d 753, 765 (3d Cir. 2009), "[i]t is absolutely clear that the filed rate doctrine simply does not apply" where the plaintiff challenges the defendants' "allegedly wrongful conduct, not the reasonableness or propriety of the rate that triggered that conduct."  *Id.*

Fourth, in *Rothstein*, the Court did not examine the factual scenario presented here, where the LPI is "commercial lines" insurance sold to and covering commercial enterprises, as opposed to "personal lines" insurance sold to and covering individual consumers.  Whether commercial lines insurance appropriately includes costs associated with certain mortgage servicing functions, or other business costs, is obviously a regulatory decision.  However, the charges that the mortgage servicer may assess borrowers is governed by their contractual/business relationship – not by an insurance regulator setting a commercial rate.  As such, the LPI here is not the "A-to-B-to-C transaction that implements a two-party-transaction between the insurer and the borrower" examined in *Rothstein*.  *See Rothstein,* 794 F.3d at 265.

## BACKGROUND

Plaintiffs filed the original Complaint in this action nearly three years ago, on January 23, 2013, subsequently amending the Complaint to include additional plaintiffs and claims against additional defendants.  On November 19, 2013, Plaintiffs filed the Second Amended Complaint ("SAC").  *See* ECF No. 93.  In the SAC, the Lyons, Johnnie and Frances Erving, Enrique Dominguez, Gerald Coulthurst, Lisa Chamberlin Englehardt, Anthony Papapietro, and Sheila Heard alleged that Defendants colluded to cause borrowers whose residential mortgages were

4

serviced by the Litton Defendants, Saxon Defendants, and/or Ocwen into paying amounts disguised as "commissions," "reinsurance," and other compensation which, in reality, were nothing more than bribes and kickbacks paid to induce the respective mortgage servicers into purchasing the Assurant Defendants and/or Litton Defendants' higher-priced commercial insurance.[3]   However, even though LPI is a commercial insurance product, with the mortgage servicer named as the "Primary Insured," *see, e.g.*, SAC, Ex. 39, the Mortgage Servicing Defendants colluded with the Insurer Defendants to charge borrowers the cost of these kickbacks in abuse of servicers' discretion under the mortgage agreements.[4]   Plaintiffs assert various claims against Defendants, including claims for breach of contract against the Litton Defendants and Saxon Defendants, and RICO claims against all Defendants.

Specifically, with respect to the Litton Defendants, plaintiff Heard alleges that Goldman Sachs set up an illusory reinsurance scheme whereby Litton, a Goldman Sachs subsidiary, would agree to purchase LPI from the American Modern Defendants and, in return, the American Modern Defendants were compelled to pay another Goldman Sachs subsidiary, Arrow, a portion of the amount collected for LPI.   However, because the borrowers' mortgage agreements did not

---

[3] Plaintiff Anthony Papapietro voluntarily dismissed his claims without prejudice on April 16, 2014. ECF No. 130.  The Ervings, and plaintiff John Clarizia, also filed a separate action against the Saxon Defendants and the Assurant Defendants regarding a similar LPI kickback scheme involving lender placed flood insurance, which is also currently before this Court.  *See Clarizia v. Ocwen Financial Corp.*, No. 13-cv-2907 (S.D.N.Y.).  The Ervings and plaintiff John Clarizia's lender placed flood insurance claims against Ocwen, and against the Assurant Defendants with respect to lender-placed flood insurance purchased by Ocwen, were settled as part of the *Lee* Settlement in the Southern District of Florida.  The Ervings, however, were also separately charged for lender-placed flood insurance purchased by the Saxon Defendants from the Assurant Defendants, the claims concerning which were not released in the *Lee* Settlement.

[4] Residential borrowers are identified as "Additional Insured" on the "Additional Insured Endorsements" to the LPI polices purchased by the mortgage servicers; however, these endorsements explicitly state that the "Named Insured Mortgagee is authorized to act for such Additional Insureds in ***all matters pertaining*** to this insurance including the receipt of Notice of Cancellation, and return of premium, if any."  *Id.* (emphasis added).

allow for such payments, the Litton Defendants and American Modern Defendants agreed to disguise these payments as "reinsurance." *See* SAC ¶¶ 99-101, 103, 108, 205, 282. Litton then sent plaintiff Heard and other borrowers cycle letters that *affirmatively misrepresented* that Litton had "incurred expenses" in placing the LPI, and that part of the policy premium may be used to "reimburse" Litton for those expenses. *Id.* ¶ 192. However, these statements were false and misleading because the money paid to Litton was not "reimbursement" for any expenses incurred in placing insurance on the borrower's property; rather, these amounts were in fact paid to allow the Litton Defendants to unlawfully and unjustly profit from LPI.

The Ervings also allege that the Saxon Defendants entered into a similar LPI scheme with the Assurant Defendants. Specifically, the Ervings alleged that the Assurant Defendants agreed to funnel a portion of the LPI charges back to the Saxon Defendants through cash payments disguised as "expense reimbursements," "commissions," "reinsurance," and/or other forms of consideration. *See, e.g.*, SAC ¶¶ 99-102, 108, 203(d), 204, 205, 282. To effectuate this scheme, Saxon represented to borrowers through billing statements and "cycle letters" that they were being charged for insurance when, in fact, they were also charged for these cash payments. The cycle letters sent to the Ervings and other borrowers not only misleadingly identified the nature of the charges as "insurance," but also affirmatively misrepresented the reason for the high price, stating that the insurance: "[w]ill have significantly higher premiums than standard insurance premiums *because our carrier has issued the policy without the benefit of normal underwriting* guidelines." SAC, Ex. 40 (emphasis added). This statement is false and misleading; in fact, the charges were higher because of the kickbacks.

On January 21, 2014, Defendants moved to sever Plaintiffs' claims, arguing that Plaintiffs had improperly joined claims against three separate mortgage servicers. Plaintiffs opposed on the grounds that Litton and Saxon were properly joined with Ocwen as defendants

because Ocwen purchased Litton and Saxon's mortgage servicing portfolios. *See* ECF No. 117. On September 29, 2014, the Court denied Defendants' motions to sever without prejudice, finding judicial efficiencies in keeping the cases together, but observing that Defendants had "correctly noted issues that may merit severance later in the action-before trial and possibly before discovery." *Lyons v. Litton Loan Servicing LP*, No. 13-cv-513, 2014 WL 5039458, at *6 (S.D.N.Y. Sept. 29, 2014).

On January 21, 2014, the Assurant Defendants also simultaneously moved for dismissal under Rule 12(b)(1), arguing that the filed rate doctrine bars Plaintiffs' LPI kickback claims. *See* ECF No. 98. Plaintiffs opposed the Assurant Defendants' motion to dismiss, arguing that the filed rate doctrine is inapplicable because Plaintiffs do not challenge the LPI rate, but instead "challenge the Loan Servicing Defendants' decision to purchase higher-priced hazard insurance from the Assurant Defendants because the Assurant Defendants returned large kickbacks." *See* ECF No. 118, at 8-11. In the alternative, Plaintiffs also argued that Judge Nathan's decision in *Rothstein v. GMAC Mortgage, LLC,* No. 12-cv-3412, 2013 WL 5437648 (S.D.N.Y. Sept. 30, 2013) further supported denial of the Assurant Defendants' motion because the insurers first sold the LPI to the mortgage servicer. *Id.* at *12-13. On September 30, 2014, this Court sided with Plaintiffs and held that the filed rate doctrine does not bar Plaintiffs' claims. *See* ECF No. 139.

On December 18, 2014, plaintiffs Coulthurst, Engelhardt, Dominguez, the Ervings, Clarizia and Heard, whose loans were also serviced by Ocwen, entered into a nationwide class action settlement agreement in an overlapping class action pending in the Southern District of Florida captioned *Lee v. Ocwen Loan Servicing LLC*, No. 14-cv-60649 (S.D. Fla.) ("*Lee* Settlement"). The *Lee* Settlement, which received final approval on September 14, 2015, resolves plaintiffs Coulthurst, Engelhardt, Dominguez, the Ervings, Clarizia and Heard's claims asserted in this action and the related *Clarizia* action concerning lender placed flood and hazard

insurance purchased by Ocwen from the Assurant Defendants.  *See Lee v. Ocwen Loan Servicing, LLC*, No. 14-cv-60649, 2015 WL 5449813 (S.D. Fla. Sept. 14, 2015).

After the Court denied Defendants' motions to sever and dismiss on jurisdictional grounds, Magistrate Judge Pitman held a Pretrial Conference on January 20, 2015.  At the conference, Defendants indicated that they would be filing motions to dismiss under Rule 12(b)(6) and the Court set a briefing schedule.  Plaintiffs also requested that the Court permit limited discovery; however, the Court denied Plaintiffs' request and stayed discovery until the resolution of Defendants' anticipated 12(b)(6) motions.  *See* ECF No. 146.

As the parties briefed, and the Court considered, Defendants' 12(b)(6) motions, discovery proceeded before Judge Nathan in *Rothstein*.  In April 2014, Judge Nathan allowed the defendants to request an interlocutory appeal of the court's September 2013 decision denying the defendants' motion to dismiss on filed rate grounds, which Plaintiffs here previously cited in connection with their alternative argument as to why the Court should deny the Assurant Defendants' motion to dismiss.  The Second Circuit accepted the interlocutory appeal on June 25, 2014.  However, prior to taking their appeal, the *Rothstein* plaintiffs settled all claims against all defendants except for claims against their LPI provider Balboa Insurance Company, and its affiliate MeritPlan Insurance Company (together, "Balboa").  *See Rothstein,* 794 F.3d at 259.

On July 22, 2015, the Second Circuit held that the filed rate doctrine applies "whether or not the rate is passed through an intermediary" if the claim "would undermine the regulator's rate-setting authority or operate to give the suing ratepayer a preferential rate."  *Id.* at 259.  On September 29, 2015, this Court issued an Order to Show Cause why this action should not be dismissed on the ground that the filed rate doctrine precludes Plaintiffs' claims against both the Insurer and Loan Servicing Defendants.  *See* ECF No. 182.

## ARGUMENT

I.  ***Rothstein* Did Not Hold That LPI Claims Against Mortgage Servicers, Such as the Litton Defendants and Saxon Defendants, Are Barred by the Filed Rate Doctrine**

Indisputably, *Rothstein* does not hold that claims asserted against the lenders/mortgage servicers and their affiliates are barred. As noted above, prior to the appeal, the *Rothstein* plaintiffs reached a settlement with their mortgage servicer in exchange for a $13 million unsecured claim in bankruptcy. *See Rothstein*, 794 F.3d at 261. Thus, as the Court recognized, although the plaintiffs argued that it could be possible for the lender to "decouple its purchase of LPI from its demand of reimbursement, for example, by charging the borrower twice (or half) the filed rate," the plaintiffs failed to "explain how any such action by the *lender* could result in liability for the *insurer*." *Id.* at 265 (emphasis in original).

The simple fact is that insurance regulators do not oversee the amounts that mortgage servicers can lawfully charge borrowers under the terms of their mortgage agreements. Defendants have cited no authority, nor can they, holding that the filed rate doctrine bars mortgage servicers from charging borrowers only a portion of the premium paid by the servicer for the LPI coverage. At most, Defendants cite isolated decisions such as *Trevathan v. Select Portfolio Servicing, Inc.*, No. 15-cv-61175, 2015 WL 6913144 (S.D. Fla. Nov. 6, 2015) and D*ecambaliza v. QBE Holdings, Inc.,* No. 13-cv-286, 2013 WL 5777294 (W.D. Wis. Oct. 25, 2013), where courts refused to find mortgage servicers liable for charging borrowers the full amount of the LPI premium. While the courts in those outlier cases found that the filed rate doctrine protected mortgage services from claims that the amounts charged were too high, the decisions in no way suggested that the filed rate doctrine's nonjusticiablity and nondiscrimination principles would preclude a mortgage servicer from charging less than the full amount of the LPI premium.

Multiple courts have relied on the fact that it is the mortgage servicers' responsibility to determine amounts charged to borrowers – not insurance regulators – in holding that the filed rate doctrine does not bar LPI claims against mortgage servicers.  For example, in *Abels v. JPMorgan Chase Bank*, 678 F. Supp. 2d 1273, 1277 (S.D. Fla. 2009), the Southern District of Florida found that the filed rate doctrine did not bar a borrower's LPI kickback claims against their mortgage servicer "because the bank is not subject to the extensive administrative oversight that insurance companies" are subjected to, and thus applying the filed rate would not serve either the principles of nondiscrimination or nonjusticiablity.  More recently, in *Persaud v. Bank of America., N.A.*, No. 14-cv-21819, 2014 WL 4260853, at *6 (S.D. Fla. Aug. 28, 2014), the Southern District of Florida echoed the reasoning in *Abels* and refused to bar LPI kickback claims against the plaintiffs' bank and mortgage servicer "because the Florida [Office of Insurance Regulation] does not regulate financial institutions."

In *Cannon v. Wells Fargo Bank N.A.*, No. 12-cv-1376, 2014 WL 324556 (N.D. Cal. Jan. 29, 2014), the Northern District of California also found that, despite the well accepted nonjusticiablity and nondiscrimination principles embraced by the Second Circuit in *Wegoland*, the filed rate doctrine does not bar LPI kickback claims challenging the amount mortgage servicers charge borrowers for LPI.  In reaching its holding, the *Cannon* court examined a regulatory decision by the California Insurance Commissioner regarding the Assurant Defendants' LPI practices.  *Id.* at *5.  Although the Commissioner found that "commissions and tracking expenses are appropriate components of an insurance rate," the Commissioner "expressly noted that he ***lacked jurisdiction*** to consider whether it was proper for [the mortgage servicer] to pass the commissions and tracking expenses ***onto the borrower***."  *Id.* (emphasis added).  The following year, the Central District of California in *Valdez v. Saxon Mortgage Services., Inc.*, No. 14-cv-03595, 2014 WL 7968109, at *10 (C.D. Cal. Sept. 29, 2014) examined

the same decision by the California Insurance Commissioner and similarly found that the Commissioner's approval of the LPI rates does not support the "contention that these are approved components of ASIC's insurance rate, *vis-à-vis the borrower*." (quoting *Cannon*, 2014 WL 324556, at *5).

Within the Second Circuit, the Northern District of New York in *Hoover v. HSBC Mortgage Corporation* (*USA*), 9 F. Supp. 3d 223, 239 (N.D.N.Y. 2014) reached the same conclusion, holding that the filed rate doctrine does not extend to mortgage servicers "**because they are not insurers subject to the relevant regulatory regime**." (emphasis added). After reviewing the relevant case law, the *Hoover* court first found, as discussed *infra*, that "[t]here is a substantial body of case law" where courts have refused to apply the filed rate doctrine in LPI kickback actions where the plaintiffs "do not challenge the rates charged by Defendants (as opposed to challenges to allegedly improper conduct underlying the rates, such as kickbacks)." *Id.*, at 237-39. The court then further held that, notwithstanding the distinction between challenged rates and challenged conduct, the filed rate doctrine does not bar claims against the mortgage servicer because mortgage servicers are "not subject to the extensive administrative oversight that insurance companies are" subjected to. *Id.* (quoting *Abels*, 678 F. Supp. 2d at 1277). Although *Hoover* settled before the Second Circuit decided *Rothstein*, the *Hoover* court's holding as to the claims against the mortgage servicer is not abrogated by the holding in *Rothstein* that certain claims cannot be asserted against insurers.

Thus, because the charges mortgage servicers are authorized to assess borrowers for protecting the lenders' interest in their properties is derived from the mortgage agreements, the filed rate doctrine cannot shield mortgage servicers from liability when they enrich themselves at the expense of borrowers by charging more than the amount authorized under those mortgage agreements.

**II.**      ***Rothstein* Relied on an Overlapping, But Distinct, Set of Facts**

Moreover, although certain facts in this case overlap with *Rothstein*, there are critical distinctions.   Significantly, in *Rothstein,* the plaintiffs only alleged that Balboa provided kickbacks in the form of free tracking services.   *See Rothstein,* 794 F.3d at 260.   By contrast, as described above, Plaintiffs here allege that the Litton Defendants and Saxon Defendants created unlawful reinsurance, commission, and expense reimbursement schemes in order to disguise the true nature of the ***cash payments*** made to the mortgage servicers and their affiliates in exchange for their business.   This is an entirely different factual scenario from that explored by the Second Circuit in *Rothstein*.   Indeed, as Judge Lynch stated to the plaintiffs' counsel from the bench during oral argument in *Rothstein*:   "I would be inclined to agree with you, I think, if there was a straightforward cash kickback."   *See* Graden Decl., Exhibit A.

In *Rothstein*, the plaintiffs simply could not explain how the insurers' provision of free loan tracking services could result in liability for the ***insurer*** when state insurance regulators determine that such amounts are properly included in LPI rates.   *Rothstein*, 794 F.3d at 265.   As the Second Circuit recognized, it is "hardly uncommon for insurers to render policyholders free services, such as inspections, appraisals and so forth."   *Id.* at 262, n.4.

By contrast, Plaintiffs here allege that Defendants intentionally devised elaborate schemes in order to disguise cash payments to the mortgage servicer (and its affiliates) as "reinsurance," "commissions," and/or "expense reimbursements" so that the payments appeared legitimate under the mortgage agreements.   The Litton Defendants structured a wholly fictitious "reinsurance" arrangement where no actual risk was transferred, and then misrepresented to borrowers that the reinsurance payments they received were simply a legitimate reimbursement. The Saxon Defendants engaged in similar misrepresentations, colluding with the Assurant Defendants – who drafted and sent cycle letters on Saxon letterhead – to misrepresent the nature

of these cash payment to borrowers.

Thus, where the plaintiffs in *Rothstein* only alleged that Balboa provided free tracking services, which the Second Circuit found to be a common practice, Plaintiffs here specifically allege that the Defendants went a step further – creating unlawful, fictitious payment mechanisms in order to disguise cash payments to the mortgage servicers not authorized under the mortgage agreements.

### III.   Plaintiffs Do Not Claim That the Rates Approved By Regulators Were Too High

Moreover, unlike here, the *Rothstein* plaintiffs directly challenged the rate.  As the Second Circuit observed, the *Rothstein* plaintiffs' claims "rest on the premise that the rates approved by regulators were too high."  *Rothstein,* 794 F.3d at 263.  By contrast, as Plaintiffs argued before this Court nearly a year ago, plaintiffs here challenge Defendants' unlawful conduct, the payment and acceptance of kickbacks in exchange for purchasing a particular type of insurance, as opposed to challenging the rates of the insurance.[5]  *See* ECF No. 118, at 8-11. While the mortgage servicer is not obligated "to obtain the cheapest or most cost-effective insurance available," mortgage servicers cannot abuse their "discretion to obtain secret kickbacks."  *Gallo v. PHH Mortg. Corp.*, 916 F. Supp. 2d 537, 552-53 (D.N.J. 2012) (quoting *Montanez v. HSBC Mortg. Corp. (USA),* 876 F. Supp. 2d 504, 513 (E.D. Pa. 2012)).

As the Third Circuit explained in *Alston v. Countrywide Financial Corporation*, 585 F.3d 753 (3d Cir. 2009), this distinction is critical.  In *Alston*, the plaintiffs challenged Countrywide Financial Corporation's mortgage insurance practices, alleging that Countrywide entered into

---

[5] *See, e.g.*, SAC ¶ 44 ("Plaintiffs do not challenge the rates of their force-placed insurance as excessive nor Defendants' right to force-place insurance.  Rather, Plaintiffs challenge, among other things and as set forth herein, the Defendants' *decision to purchase* force-placed hazard insurance from insurers that provide improper financial benefit to Defendants and/or their affiliates.").

illicit arrangements with private mortgage insurance companies to generate kickbacks in the form of ceded reinsurance premiums. *Id.* at 756-57. Like here, the defendants moved to dismiss on filed rate grounds. However, while the *Alston* Court recognized that, under the Second Circuit's decision in *Wegoland,* "a rate filed with and approved by a governing regulatory agency is unassailable in judicial proceedings," the *Alston* Court distinguished between challenges to rates and challenges to conduct, finding the filed rate doctrine inapplicable with respect to the latter. *Id.* at 764-65 (citing *Wegoland*, 27 F.3d at 18). The court held, in no uncertain terms: "It is absolutely clear that the filed rate doctrine simply does not apply" where the plaintiff challenges the defendants' "allegedly ***wrongful conduct, not the reasonableness or propriety of the rate*** that triggered that conduct." *Id.* at 765 (emphasis added).

This distinction between challenges to conduct, and challenges to rates, is not a novel theory, but has a long history with wide acceptance. In fact, by the early 2000's courts had recognized the importance of the subtle, but critical, distinction between challenges to conduct and challenges to rates. For example, in *Stevens v. Union Planters Corp*., No. 00-cv-1695, 2000 WL 33128256, at *3 (E.D. Pa. Aug. 22, 2000), the court dismissed LPI claims on filed rate grounds finding that the plaintiffs were challenging the LPI rate as excessive. However, approximately four months later, the same district judged decided *Stevens v. Citigroup, Inc*., No. 00-cv-3815, 2000 WL 1848593 (E.D. Pa. Dec. 15, 2000), which involved a claim by the same plaintiff from *Union Planters* regarding the same mortgage and lender-placed hazard insurance that was challenged as excessive in *Union Planters*. This time, however, the court found that the defendants had inaccurately characterized plaintiffs' claims as a rate challenge and denied defendants' motion to dismiss. *Id.* at *3. Instead, as the court explained more recently in *Gallo*, in also rejecting the filed rate doctrine defense in connection with LPI kickback claims:

14

> The [Stevens'] court, after reviewing the facts alleged in the plaintiff's complaint, determined that "plaintiff d[id] not challenge the mortgagee purchased, hazard insurance as excessive. Rather, plaintiff allege[d] that [Citigroup's] decision to purchase mortgagee purchased hazard insurance at a rate that far exceeded the mortgagor purchased hazard insurance without notice to the plaintiff was a breach of the mortgage contract, and was an action taken in violation of defendants' obligation to proceed with good faith and fair dealing." Concluding that the plaintiff in *Citigroup* did not challenge the excessiveness of any one rate of insurance, but instead challenged that ***manner in which Citigroup chose the insurance at issue***, the court allowed plaintiff's claims to proceed past the motion to dismiss stage.

*Gallo*, 916 F. Supp. at 544-45 (distinguishing *Union Planters* and quoting *Citigroup*, 2000 WL 1848593, at *3) (emphasis added).[6]

Courts not just within the Third Circuit, but across the country, have drawn the same distinction between challenged conduct and challenged rates in denying motions to dismiss LPI claims on filed rate grounds.  For example, in *Ellsworth v. U.S. Bank*, 908 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012), the court refused to apply the filed rate doctrine, finding that "[j]ust because the damages are based on increased costs incurred as a result of the alleged kickback scheme does not transform a ***challenge to conduct and practices*** into a challenge to the premiums." (emphasis added).  The Court in *Leghorn v. Wells Fargo Bank*, 950 F. Supp. 2d 1093, 1115 (N.D. Cal. 2013) similarly refused to apply the filed rate doctrine "[b]ecause Plaintiffs are not challenging [the insurer's] rate in making their claim."  The court explained that the "kickback claims boil down to an attack on [the servicer's] ***decision to purchase insurance*** from QBE as opposed to any other insurer from which it could have obtained a more favorable

---

[6]  *See also Lauren v. PNC Bank, N.A.*, No. 13-cv-762, 2013 WL 5565511, at *5 (W.D. Pa. Oct. 8, 2013) ("**Put simply, the 'filed rate doctrine' does not apply because Plaintiff is not challenging the rate of the ASIC policy**.") (emphasis added); *Laffan v. Santander Bank, N.A.*, No. 13-cv-4040, 2014 WL 2693158, at *4 (E.D. Pa. June 12, 2014) ("**Here, as in a number of cases decided throughout the country, the filed rate doctrine does not apply because Plaintiff is not challenging the rate of the force-placed policy in question**.") (emphasis added).

rate" and thus "[t]he challenge is not to the lawfulness of QBE's rate—but to [the servicer's] decision to choose QBE in order to obtain a kickback." *Id.* (emphasis added). The court in *Cannon v. Wells Fargo Bank*, 917 F. Supp. 2d 1025, 1038 (N.D. Cal. 2013) similarly found, that "if insurance were available from a number of carriers at different rates—all subject to filed-rates—the filed-rate doctrine would not protect a loan servicer who chooses a carrier and a policy with a rate higher than others simply to receive a kickback not available from other carriers." Indeed, as the Northern District of New York recognized in *Hoover*, "[t]here is a **substantial body** of case law" where courts have refused to apply the filed rate doctrine in LPI kickback actions with respect to lenders and insurers where the plaintiffs "do not challenge the rates charged by Defendants (as opposed to challenges to allegedly improper conduct underlying the rates, such as kickbacks)." *Hoover,* 9 F. Supp. 3d at 238 (listing cases) (emphasis added).

The Second Circuit in *Rothstein* did not examine this type of challenge to conduct. Rather, the Second Circuit reviewed only the district court's finding that the filed rate doctrine does not apply where the rate was "secondarily billed by the lenders to borrowers," s*ee Rothstein*, 2013 WL 5437648, at *9, and held that the filed rate doctrine applies "whether or not the rate is passed through an intermediary. [7] *Rothstein,* 794 F.3d at 259. The Second Circuit in *Rothstein* was thus confronted with a rate challenge and refused to find a "secondary billing" exception.

Without dispute, the Second Circuit has consistently recognized that certain conduct cannot be challenged under the filed rate doctrine; however, the conduct that cannot be challenged is *fraud on the regulator*, which is not what Plaintiffs here allege. An example of a claim of fraud on the regulator is found in *Wegoland*, which the *Rothstein* Court discussed. As noted by the Second Circuit, in *Wegoland*, the plaintiffs "alleged that the rate filers bought

---

[7] Notably, the court in *Hoover* cited the district court's decision in *Rothstein* as "*cf.*"

certain products and services from their own insurance subsidiaries at artificially inflated prices, and then relied on the inflated prices to obtain regulatory approval of higher rates to consumers." *See Rothstein*, 794 F.3d at 262-63 (citing *Wegoland*, 27 F. 3d at 18-21).  Confronted with a filed rate defense, the *Wegoland* plaintiffs argued that "there should be an exception to the filed rate doctrine when there are allegations of fraud upon the regulatory agency."  *Wegoland*, 27 F.3d at 20.  The Second Circuit disagreed, finding that "[i]f courts were licensed to enter this process under the guise of ferreting out fraud in the rate-making process, they would unduly subvert the regulating agencies' authority and thereby undermine the stability of the system."  *Id.* at 21.

Here, in contrast, as in *Alston* and the multiple cases across the country that have distinguished between challenges to conduct and challenges to rates, ***Plaintiffs do not allege fraud on the regulator***.   Rather, Plaintiffs allege that the Saxon Defendants and Litton Defendants could have purchased, and charged borrowers, for cheaper LPI – but chose not to because the Assurant Defendants and American Modern Defendants paid bribes and kickbacks in return for purchasing their higher-priced LPI products.   Defendants then misrepresented the nature of the charges they were assessing borrowers.   As such, Plaintiffs are not asking the court to reexamine whether the LPI rate for the type of insurance charged was proper (in contravention of the filed rate doctrine's nonjusticiability principle) nor are Plaintiffs asking that the Assurant Defendants or American Modern Defendants refund amounts to Litton and Saxon and thereby give them a preferential rate over other mortgage servicers.   Accordingly, the filed rate doctrine is not implicated.

**IV.   The Mortgage Servicing Defendants Did Not Purchase Homeowners Insurance, and Pass Through Charges to Borrowers, But Instead Purchased Commercial Policies**

Moreover, in *Rothstein,* the Second Circuit found the filed rate doctrine applies even though "Plaintiffs were not direct customers of the rate filer, Balboa." *Rothstein,* 794 F.3d at 261.  In the factual scenario examined in *Rothstein*:

> There are three participants in the transaction (insurer, lender, borrower), but the lender is a go-between that connects the insurer (the party selling the insurance) to the borrower (the party actually paying for it).  Thus LPI is an A-to-B-to-C transaction that implements a two-party-transaction between the insurer and the borrower.

*Id.* at 265.  This is a different factual scenario than what is at issue here.

Here, as discovery will confirm, the LPI at issue is "*commercial lines*" insurance sold to and covering *businesses*, as opposed to "*personal lines*" insurance sold to and covering individual *consumers*.  As previously noted, on the "Additional Insured Endorsement" mailed to homeowners, the mortgage servicer is identified as the "primary insured."  *See* SAC, Ex. 39. While the borrower is only identified as an "Additional Insured," LPI policies provide that the borrowers' rights are entirely subservient to discretion of the mortgage servicer, explicitly stating that the "Named Insured Mortgagee is authorized to act for such Additional Insureds *in all matters pertaining to this insurance* including the receipt of Notice of Cancellation, and return of premium, if any." *Id*. (emphasis added).

Consistent with *Rothstein*, commercial insurance premiums may be able to include costs associated with a mortgage servicer's routine loan servicing functions.  Indeed, as the courts recognized in *Cannon* and *Valdez,* the California Commissioner of Insurance made this very determination, finding that "commissions and tracking expenses are appropriate components of an insurance rate."  *Cannon*, 2014 WL 324556 at *5; *Valdez*, 2014 WL 7968109, at *10. However, as both of those courts also found, the Commissioner's approval of those commercial

18

LPI rates does not support the "contention that these are approved components of [the] insurance rate, vis-à-vis the borrower." *Valdez*, 2014 WL 7968109, at *10 (quoting *Cannon*, 2014 WL 324556, at *5).

Accordingly, the Litton Defendants and Saxon Defendants were not simply acting as intermediaries, as the *Rothstein* court found was the situation in connection with Balboa's insurance. The Litton Defendants and Saxon Defendants did not simply pass along charges for personal lines insurance that regulators determined were appropriate to charge to residential borrowers. Instead, the Saxon Defendants and Litton Defendants purchased commercial lines insurance, which protected the mortgage servicer's commercial interest in the properties. Thus, to the extent any rate is approved for the commercial LPI product, it is the rate that the Insurer Defendants are permitted to charge to the Mortgage Servicing Defendants. This is separate and apart from the charges assessed to borrowers under their mortgage agreements.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an Order denying Defendants' Motion to Dismiss Filed Pursuant to this Court's Order to Show Cause, and allow Plaintiffs to proceed with discovery.

Dated:  December 21, 2015                                Respectfully submitted,

                                                                                **KESSLER TOPAZ**
                                                                                 **MELTZER & CHECK, LLP**


                                                            By:  /s/ *Peter A. Muhic*
                                                                                Peter A. Muhic (*pro hac vice*)
                                                                                Tyler S. Graden (*pro hac vice*)
                                                                                280 King of Prussia Road
                                                                                Radnor, PA 19087
                                                                                Telephone: (610) 667-7706
                                                                                Facsimile: (610) 667-7056

**LOWEY DANNENBERG
COHEN & HART, P.C**.
Barbara J. Hart (BH-3231)
David Harrison (DH-3834)
One North Broadway, Suite 509
White Plains, NY 10601-2301
Telephone: (914) 997-0500
Facsimile: (914) 997-0035

**BERGER & MONTAGUE, P.C**.
Shanon J. Carson (*pro hac vice*)
Patrick Madden (*pro hac vice*)
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-4656
Fax: (215) 875-4604
Email: scarson@bm.net
        pmadden@bm.net

*Counsel for Plaintiffs and The
Proposed Classes*

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of December, 2015, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.


*/s/ Peter A. Muhic*
Peter A. Muhic