UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/2/16

| | |
|---|---|
| JIMMY LYONS, JACQUELINE LYONS, LISA CHAMBERLIN ENGELHARDT, GERALD COULTHURST, ENRIQUE DOMINQUEZ FRANCES ERVING, JOHNNIE ERVING ANTHONY PAPAPIETRO, and SHEILA D. HEARD individually and on behalf of all others similarly situated, | : : : : : : : : : : : |
| Plaintiffs, | : : |
| -against- | : : : |
| LITTON LOAN SERVICING LP, GOLDMAN SACHS GROUP, INC., ARROW CORPORATE MEMBER HOLDINGS LLC, SAXON MORTGAGE SERVICES, INC., MORGAN STANLEY, OCWEN FINANCIAL CORPORATION, OCWEN LOAN SERVICING, LLC, ASSURANT, INC. (d/b/a Assurant Specialty Property), AMERICAN SECURITY INSURANCE COMPANY, STANDARD GUARANTY INSURANCE COMPANY, AMERICAN MODERN INSURANCE GROUP, and AMERICAN MODERN HOME INSURANCE COMPANY, Defendants. | : : : : : : : : : : : : : : : : : : : |

1:13-cv-513 (ALC) (GWG)

**OPINION AND ORDER**

------------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiffs bring this purported class action suit against loan servicers and insurers.

Plaintiffs are borrowers who were required to pay their loan servicers for lender-placed insurance

in connection with their residential mortgage loans.[1] Plaintiffs allege that the loan servicers purchased lender-placed insurance policies from the insurers under exclusive and illegal arrangements that included kickbacks from the insurers. These kickbacks, Plaintiffs allege, inflated the price of the policies and as a result inflated the price they then had to pay their servicers as reimbursement for the insurance.

On September 29, 2015, this Court issued an Order to Show Cause as to why Plaintiffs' claims should not be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). (ECF No. 121.) This Order was occasioned by a recent Second Circuit decision, Rothstein v. Balboa Ins. Co., 794 F.3d 256 (2d Cir. 2015) ("Rothstein"), which dealt with claims related to lender-placed insurance similar to those raised here and which ultimately dismissed those claims under the filed rate doctrine. Per this Court's Order, Plaintiffs were ordered to show cause as to why their case should not be dismissed against all Defendants on the grounds that the filed rate doctrine precluded their claims against both the insurer defendants and the loan servicing defendants. The Court also granted leave to one group of defendants, the Assurant Defendants, to file a motion to reconsider its previously denied motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), as those Defendants had also raised filed rate doctrine arguments there.

With this Opinion and Order, the Court gives a fuller explanation of its original denial of the Assurant Defendants' motion to dismiss pursuant to Rule 12(b)(1) and DENIES the Assurant Defendants' motion to reconsider. Further, the Court GRANTS Defendants' motion to dismiss pursuant to this Court's Order to Show Cause.[2]

---

[1] In the instant case, Plaintiffs bring claims related to lender-placed hazard insurance. In a related case, Engelhardt v. Ocwen, No. 13 Civ. 2907 (ALC), Plaintiffs bring claims related to lender-placed flood insurance. All parties acknowledge that the type of policy is the only material difference between the cases. (See Engelhardt, No. 13 Civ. 2907, Mem Law Supp. Def.'s Mot. Dismiss, ECF No. 125, 1; Mem. Law Supp. Pl.'s Opp. Mot. Dismiss, ECF No. 128, 1.)

[2] As explained infra, this Order is directed only at the claims raised by Francis and Johnnie Erving against the Saxon and Assurant Defendants and the claims raised by Heard against the Litton Defendants.

# BACKGROUND

## I.    Factual Background

Plaintiffs Jimmy and Jacqueline Lyons, Johnnie and Frances Erving, Enrique

Dominquez, Gerald Coulthurst, Lisa Engelhardt, Anthony Papapietro, and Sheila Heard brought

this suit on behalf of themselves and all other borrowers who were required to pay for lender-

placed insurance ("LPI"), also called force-placed insurance, in connection with a residential

mortgage serviced by one or more of three sets of loan servicers (the "Loan Servicing

Defendants"):

> (1) the "Litton Defendants" (Defendants Litton Loan Servicing LP ("Litton"), Goldman
> Sachs Group, Inc. ("Goldman Sachs"), and Arrow Corporate Member Holdings LLC
> ("Arrow"));
>
> (2) the "Ocwen Defendants" (Ocwen Loan Servicing, LLC ("OLS") and Ocwen
> Financial Corporation ("OFC")); and
>
> (3) the "Saxon Defendants" (Saxon Mortgage Services, Inc. ("Saxon") and Morgan
> Stanley). (Plaintiffs' Second Amended Complaint ("SAC") ¶ 1, ECF No. 93).

Plaintiffs also brought suit against the insurance companies that provided the lender-placed

insurance (the "Insurer Defendants"):

> (1) the "Assurant Defendants" (Assurant, Inc. (d/b/a Assurant Specialty Property)
> ("Assurant, Inc."), and its subsidiaries American Security Insurance Company and
> Standard Guaranty Insurance Company); and
>
> (2) the "American Modern Defendants" (American Modern Insurance Group and its
> subsidiary American Modern Home Insurance Company). (SAC ¶ 2.)

Plaintiffs are all borrowers of loans secured by property mortgages. (SAC ¶ 1.)  The

mortgage loan agreements required Plaintiffs to purchase and keep hazard or flood insurance on

their mortgaged properties to protect the lenders' interests. (SAC ¶ 6.) When borrowers fail to

maintain the required insurance policies, lenders—acting on their own behalf or through loan

servicers—may purchase lender-placed insurance policies on their behalf, in order to protect the value of the property and the lenders' interest in the property. (SAC ¶¶ 4, 7.)

Plaintiffs contend that each of the Loan Servicing Defendants entered into an exclusive agreement with an Insurer Defendant. (SAC ¶ 98.) Under these exclusive agreements, Plaintiffs allege, the Loan Servicing Defendants and the Insurer Defendants together exploited the Loan Servicing Defendants' ability to force-place insurance in order to reap additional profits in the form of fees, commissions, rebates, reinsurance, and other forms of consideration at the expense of borrowers whose insurance was force-placed. (SAC ¶¶ 4-5, 13, 15, 19, 106, 230.) The agreements resulted in "inflated" or "excessive" LPI premiums, and these inflated prices were then passed on to the borrowers when the Loan Servicing Defendants demanded reimbursement for the LPI. (SAC ¶¶ 4-5.)[3]

## II.   Procedural History

### a.  Parties

Plaintiffs filed the original complaint in this action on January 23, 2013. (ECF No. 1.) They amended it twice to include additional plaintiffs and claims against additional defendants, and the second amended complaint was filed November 19, 2013. (ECF No. 93.) Since then, the number of parties involved has been greatly reduced. First, Plaintiff Papapietro voluntarily dismissed his claims. (ECF No. 130.) Second, Plaintiffs Johnnie and Frances Erving, Dominquez, Coulthurst, Engelhardt, and Sheila Heard entered into a nationwide class action settlement in an overlapping class action pending in the Southern District of Florida. See Lee v. Ocwen Loan Servicing, LLC, 14-cv-60649, 2015 WL 5449813 (S.D. Fla., Sept. 14, 2015). That

---

[3] While Plaintiffs initially alleged that the Defendants engaged in practices of backdating policies and overinsuring properties, in addition to the "kickback" scheme described above, Plaintiffs later withdrew those claims. (ECF No. 166, 2 n.4))

settlement resolved those Plaintiffs' claims concerning lender-placed insurance purchased by Ocwen from the Assurant Defendants. Id. Finally, the American Modern Defendants submitted a proposed class action settlement, settling their claims with Plaintiffs Jimmy and Jacqueline Lyons and Sheila Heard. (ECF No. 197.) The Court entered an Order granting the motion for preliminary approval of the class action settlement and staying all proceedings in the action as to the American Modern Defendants, except as necessary to effectuate the terms of the settlement. (ECF No. 207.)

As a result, three sets of claims remain to be addressed in this Opinion and Order: (1) claims asserted by Johnnie and Frances Erving against the Saxon Defendants and the Assurant Defendants; (2) claims asserted by Heard against the Litton Defendants; and (3) claims asserted by Jimmy and Jacqueline Lyons against the Litton Defendants. However, the Litton Defendants, the Saxon Defendants, and the Assurant Defendants decline to address the claims of Jimmy and Jacqueline Lyons in the instant motions, as they assert that the American Modern Defendants— who declined to join in the briefing, in light of their proposed settlement—were most knowledgeable about whether the LPI rates charged to the Lyons were approved by a rate-making authority. (Mem. Law Supp. Def.'s Mot. Dismiss, ECF No. 191 ("Def. Mot."), 2 n.2.) This Opinion and Order therefore addresses: (1) claims asserted by Johnnie and Frances Erving against the Saxon Defendants and the Assurant Defendants; and (2) claims asserted by Heard against the Litton Defendants.

**b. Proceedings**

Following the filing of the Amended Complaint, Defendants moved on January 21, 2014, to sever Plaintiffs' claims, arguing that Plaintiffs had improperly joined claims against three separate mortgage servicers. (ECF No. 98.) Plaintiffs opposed, and on September 29, 2014, the

Court denied the motion to sever without prejudice but observed that Defendants had "correctly noted issues that may merit severance later in the action—before trial and possibly before discovery." (ECF No. 138, 12-13.)

Also on January 21, 2014, the Assurant Defendants moved for dismissal under Rule 12(b)(1), on the grounds that Plaintiffs lacked standing—based on the filed rate doctrine and three other grounds—to pursue at least some of their claims. (ECF No. 98). Plaintiffs opposed the Assurant Defendants' motion to dismiss. (ECF No. 118.) On September 30, 2014, the Court issued a summary order denying the Rule 12(b)(1) motion to dismiss, with a fuller order to be forthcoming. (ECF No. 139).

Finally, on February 20, 2015, all Defendants moved for dismissal under Rule 12(b)(6). (ECF Nos. 147-63.) Some Defendants argued that the filed rate doctrine precluded all of the remaining claims and others preserved the argument pending a decision in Rothstein, then pending before the Second Circuit. (Id.) Plaintiffs opposed all Defendants' motions. (ECF No. 167.) On July 22, 2015, while the Court was considering Defendants' motions, the Second Circuit issued its decision in Rothstein v. Balboa Ins. Co., 794 F.3d 256 (2d Cir. 2015). Both sides submitted letters regarding the effect of Rothstein (ECF Nos. 178-81.) Following the receipt of those letters, the Court entered an Order to Show Cause requiring plaintiffs to demonstrate why this action should not be dismissed against all Defendants on the grounds that the filed rate doctrine precludes the remaining plaintiffs' claims. (ECF No. 182.) The Order denied without prejudice Defendants' pending motions and set a briefing schedule under which the parties were to submit arguments regarding the effect of Rothstein. (Id.) The Order also granted leave to the Assurant Defendants to request reconsideration of the Order denying their Rule 12(b)(1) motion to dismiss in light of Rothstein. All remaining Defendants filed a motion to

6

dismiss pursuant to this Court's order to show cause, which Plaintiffs opposed. (ECF Nos. 190, 194). The Assurant Defendants also filed a motion for reconsideration of their Rule 12(b)(1) motion to dismiss, which Plaintiffs opposed. (ECF Nos. 193, 196). The Court here addresses Defendants' motion to dismiss pursuant to the Order to Show Cause and the Assurant Defendants' motion for reconsideration of their Rule 12(b)(1) motion, and gives a fuller explanation for its September 29, 2014, denial of that motion.

## STANDARD OF REVIEW

### I.    Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). Both a lack of standing and a failure to exhaust administrative remedies constitute jurisdictional defects and may be addressed through a Rule 12(b)(1) motion. See Tasini v. New York Times Co., 184 F. Supp. 2d 350, 355 (S.D.N.Y. 2002) ("An objection to standing is properly made on a Rule 12(b)(1) motion"); Johnson v. Benheim, 2001 WL 799569 at *4 (S.D.N.Y. July 13, 2001) ("Failure to exhaust administrative remedies permits a court to dismiss the action because no subject matter jurisdiction exists."). In resolving a Rule 12(b)(1) motion, the Court may consider evidence outside of the pleading to determine whether a plaintiff has established subject matter jurisdiction by a preponderance of the evidence. Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008).

### II.    Rule 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,

570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows

the Court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." Id. (citing Twombly, 550 U.S. at 556). The plaintiff must allege sufficient facts to

show "more than a sheer possibility that a defendant has acted unlawfully." Id.

For the purposes of a motion to dismiss, the court must accept all factual allegations in

the complaint as true and draw all reasonable inferences in the plaintiff's favor. See Famous

Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010). However, the court need not

credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action."

Iqbal, 556 U.S. at 678, 681 (citing Twombly, 550 U.S. at 555). The complaint must provide

factual allegations sufficient "to give the defendant fair notice of what the claim is and the

grounds upon which it rests." Port Dock & iStone Corp. v. Oldcastle Northeast, Inc., 507 F.3d

117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). To decide the motion, the court "may

consider facts as asserted within the four corners of the complaint together with the documents

attached to the complaint as exhibits, and any documents incorporated in the complaint by

reference." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 64 (2d Cir.

2010) (internal quotation marks and citation omitted).

**III.   Motion to Reconsider**

"A motion for reconsideration is an extraordinary remedy to be employed sparingly in the

interests of finality and conservation of scarce judicial resources." Drapkin v. Mafco Consol.

Group, Inc., 818 F. Supp. 2d 678, 695 (S.D.N.Y. 2011) (internal quotation marks and citations

omitted). "A motion for reconsideration should be granted only when the defendant identifies an

intervening change of controlling law, the availability of new evidence, or the need to correct a

clear error or prevent manifest injustice." Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL

Irrevocable Trust, 729 F.3d 99, 104 (2d Cir. 2013) (quoting Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)) (internal quotation marks omitted). "Parties should not regard such a motion as an opportunity to take a second bite at the apple." Pascazi v. Rivera, No. 13 Civ. 9029 (NSR), 2015 WL 5783944, at *1 (S.D.N.Y. Oct. 1, 2015) (quoting Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012) (internal quotation marks and alteration marks omitted).

## DISCUSSION

### I.    Rule 12(b)(1)

The Assurant Defendants allege that Plaintiffs do not have standing to bring at least some of their claims. "The irreducible constitutional minimum of standing contains three requirements: (1) an injury in fact; (2) traceability, *i.e.*, a causal connection between the injury and the actions complained of; and (3) redressability, *i.e.*, a likelihood that the requested relief will redress the alleged injury." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103 (1998) (internal quotation marks omitted).

The Assurant Defendants raised four separate grounds for dismissal under Rule 12(b)(1). First, they allege that all Plaintiffs, except for Dominquez, lacked standing because their claims are barred by the filed rate doctrine. Second, they alleged that Plaintiffs did not have standing to assert unjust enrichment or aiding and abetting claims on behalf of borrowers allegedly injured in states other than where those plaintiffs reside or were injured. Third, they alleged that Plaintiffs did not have standing against Assurant, Inc. because Assurant, Inc. did not cause Plaintiff's injuries. Last, they alleged that Plaintiffs Frances and Johnnie Erving (the "Ervings") failed to exhaust administrative remedies.

9

The Court denied the Assurant Defendants' Rule 12(b)(1) motion on September 29, 2014, in a summary order, but *sua sponte* granted leave to file a motion to reconsider in light of Rothstein on September 29, 2015. (ECF Nos. 138, 182). In their motion to reconsider, the Assurant Defendants address only the filed rate ground. With this Order, the Court further explains its reasoning for denying the initial Rule 12(b)(1) motion and denies the Assurant Defendants' motion to consider.

### a.  Filed Rate Doctrine

The Court must first address whether Assurant Defendants' filed rate doctrine arguments are properly brought on a Rule 12(b)(1) motion to dismiss. They are not. As discussed at length below, the filed rate doctrine "bars suits against regulated utilities grounded on the allegation that the rates charged by the utility are unreasonable." Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 18 (2d Cir. 1994). The Assurant Defendants argue that the filed rate doctrine applies here to the claims of all Plaintiffs, other than Dominquez, and contend that if the doctrine applies, Plaintiffs have no standing to sue and the Court subsequently lacks subject matter jurisdiction.

As discussed below, the Court does find that the filed rate doctrine limits the claims here. But such arguments are not appropriate for a Rule 12(b)(1) motion. "While standing and merits questions frequently overlap, standing is fundamentally about the propriety of the individual litigating a claim irrespective of its legal merits, while a Rule 12(b)(6) inquiry is concerned with the legal merits of the claim itself." Hoover v. HSBC Mortgage Corp. (USA), 9 F. Supp. 3d 223, 237 (N.D.N.Y. 2014) (internal citations omitted). Here, the Assurant Defendants "are not contending that [Plaintiffs are] the wrong individual[s] to bring these legal claims; they are arguing that the claims are simply not legally cognizable." Curtis v. Cenlar FSB, 13 Civ. 3007 DLC, 2013 WL 5995582, at *2 (S.D.N.Y. Nov. 12, 2013) (finding that the defendants'

arguments were "not properly understood as standing arguments" and deciding the filed rate

doctrine issue under Rule 12(b)(6).

This Court recognizes that disagreement exists in other circuits regarding whether the

filed rate doctrine is an issue of standing or merit. See Hoover, 9 F. Supp. at 237 (discussing

various decisions by courts regarding whether the filed rate doctrine is a jurisdictional or merits

issue). However, courts within the Second Circuit have found that filed rate doctrine challenges

should not be brought under Rule 12(b)(1). See Miller v. Wells Fargo Bank, N.A., 994 F. Supp.

2d 542, 550 (S.D.N.Y. 2014) (denying motion to dismiss for lack of subject matter jurisdiction

because the filed rate doctrine claims brought were "merits arguments in the guise of standing

arguments"); Curtis, 2013 WL 5995582, at *2 (finding that filed rate doctrine "arguments are not

properly characterized as standing arguments" and instead granting the motion to dismiss

pursuant to Rule 12(b)(6)); Hoover, 9 F. Supp. 3d at 237  (stating that "[t]his Court agrees with

the court in Curtis and others that have determined that a filed rate argument is a defense on the

merits, rather than a challenge to subject matter jurisdiction"); NOCO Inc. v. Rochester Gas &

Elec. Corp., No. 13-cv-6487L, 2015 WL 1097406, at *10 (W.D.N.Y. Mar. 11, 2015) (finding

"the filed rate doctrine is not a subject matter jurisdiction issue, but is rather a defense on the

merits") (quoting Perryman v. Litton Loan Servicing, LP, No. 14-cv-2261, 2014 WL 4954674, at

*6 n. 4 (N.D.Cal. Oct.1, 2014)).  As did the Miller and Curtis courts, this Court will analyze

Assurant Defendant's filed rate doctrine claims under Rule 12(b)(6).  See Miller, 994 F. Supp. 2d

at 550 (evaluating Assurant Defendants' filed rate doctrine 12(b)(1) standing arguments as

12(b)(6) merits arguments) (citing Curtis, 2013 WL 5995582, at *2).

The Court further denies the Assurant Defendants' motion to reconsider, as Rothstein

does not constitute an "intervening change of controlling law." YLL Irrevocable Trust, 729 F.3d

11

at 104 (2d Cir. 2013). The filed rate issue reached the Second Circuit in <u>Rothstein</u> on a Rule

12(b)(6) motion, <u>Rothstein</u>, 794 F.3d at 261, and the Second Circuit nowhere indicated that this

was the improper vehicle or that Rule 12(b)(1) would have been more appropriate. This Court

acknowledges that its summary order did not make clear whether the Court denied the Rule

12(b)(1) motion because the filed rate doctrine is a merits defense, rather than a jurisdictional

issue, or because of the state of substantive law at the time—i.e. that the filed rate doctrine is a

jurisdictional issue but that under pre-<u>Rothstein</u> law, it did not apply to the claims against the

Assurant Defendants in this case. As the Court makes clear above, its denial was due to its

determination that the filed rate doctrine is a merits defense. <u>Rothstein</u> did nothing to change that

conclusion. Therefore, the motion to reconsider is denied.

### b.  Standing to Assert Nationwide Claims

The Assurant Defendants next argue that Plaintiffs only having standing to assert unjust

enrichment and aiding and abetting claims on behalf of borrowers in their home states (those in

which Plaintiffs reside or were specifically injured). The Assurant Defendants argue that because

"plaintiffs' purported 'nationwide' classes include persons who allegedly were injured in states

other than those of plaintiffs," and "plaintiffs do not allege injury under those states' laws,"

plaintiffs must "lack standing to assert claims for unjust enrichment or aiding and abetting on

behalf of borrowers allegedly injured outside of plaintiffs' states." (Def.'s Mem. Law Supp. Mot.

Dismiss Under Fed. R. Civ. P. 12(b)(1), ECF 98 ("Def.'s R. 12(b)(1) Mot."), 13.)

A plaintiff "must demonstrate standing for each claim he seeks to press."

<u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332, 352 (2006). "This is no less true with respect to

class actions than with respect to other suits." <u>Lewis v. Casey</u>, 518 U.S. 343, 357 (1996) (internal

quotation marks omitted). However, as the Supreme Court has explained, it is appropriate to

defer standing objections until after class certification where certification issues are "logically antecedent to Article III concerns." Ortiz v. Fibreboard Corp., 527 U.S. 815, 831 (1999) (quoting Amchem Products, Inc. v. Windsor, 521 U.S. 591, 612 (1997)) (internal quotation marks omitted). Thus, courts may "treat class certification as logically antecedent to standing where class certification is the source of the potential standing problems." In re Grand Theft Auto Video Game Consumer Litig. (No. II), 2006 WL 3039993, at *2 (S.D.N.Y. Oct. 25, 2006); see also Oklahoma Police Pension & Ret. Sys. v. U.S. Bank Nat. Ass'n, 986 F. Supp. 2d 412, 419, n. 3 (S.D.N.Y. 2013) (collecting cases).

This order of proceedings makes sense: in situations where a named plaintiff has established individual standing to bring specific claims against a defendant in her own right, and also asserts parallel common law claims arising under different states' law on behalf of a putative class, "the issue is not whether the named plaintiff has standing to sue the defendant, but whether his or her injuries are sufficiently similar to those of the purported class to justify the prosecution of a nationwide class action, which is properly determined at the class certification stage, when th[e] [c]ourt may consider commonality and typicality issues with respect to the named plaintiffs and other putative class members." In re DDAVP Indirect Purchaser Antitrust Litigation, 903 F.Supp.2d 198, 214 (S.D.N.Y. 2012) (quotation marks omitted). But the Second Circuit has cautioned that "logical antecedence is only a narrow exception to the rule that Article III standing is a prerequisite to class certification," and has explained "the exception applies in cases in which the Article III concerns would arise only if the Court affirmed class certification." Oklahoma Police Pension, 986 F. Supp. 2d at 419 n. 3 (quoting Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 65 (2d Cir. 2012) (internal quotation marks and citation omitted).

This case is the kind of exception to which the Second Circuit referred. Plaintiffs propose a nationwide class, including both claimants in the same states as the named plaintiffs and claimants outside those states, and the Article III objections concern only those out-of-state claimants. But this latter group would not even be in the case if there was no class certification. Therefore, the narrow "logical antecedence" exception applies, as the Article III concerns would arise only if the Court affirmed class certification. See Mahon, 683 F.3d at 65. Given that, it is not necessary for the Court to address potential standing issues regarding claimants outside the home states of the named plaintiffs prior to addressing class certification.

### c.   Causation of Plaintiff's Injuries

The Assurant Defendants also claim that Plaintiffs lack standing against Assurant, Inc. specifically, as they fail to establish the causation prong of standing. While the Complaint alleges that the Loan Servicing Defendants entered into agreements with Assurant, Inc. and that Assurant, Inc. is a provider of insurance products, including LPI, the Assurant Defendants deny that Assurant, Inc. is an insurance company, that it contracts with mortgage servicers, and that it had any contractual relationship with the Loan Servicing Defendants. (See SAC ¶¶ 6, 8, 81; Def.'s R. 12(b)(1) Mot., 14.) Instead, the Assurant Defendants attributes these actions to Assurant's underwriting subsidiaries and argue that Plaintiffs' allegations concern only the independent actions of Assurant's co-defendants, including its indirectly owned subsidiaries.

Courts have split on whether plaintiffs in similar suits have standing to bring claims against Assurant, Inc. Compare Roberts v. Wells Fargo Bank, N.A., No. 4:12-cv-200, 2013 WL 1233268, at *6–7 (S.D. Ga. Mar. 27, 2013) (analyzing similar argument and dismissing, with prejudice, Assurant as a party), with Simpkins v. Wells Fargo Bank, N.A., No. 12-cv-00768, 2013 WL 4510166, at *11–12 (S.D. Ill. Aug. 26, 2013) (rejecting Assurant's argument and

denying motion to dismiss Assurant as a party). The only court to consider the question in this

Circuit found that plaintiffs did, in fact, have standing against Assurant, Inc.:

> "Relying on affidavits submitted in support of its motion to dismiss, Assurant states that
> it is a publicly-traded holding company and not an insurance company, and that it did not
> have a contract with the . . . Defendants. Thus, Assurant argues, no causal connection
> exists between Assurant and Plaintiffs' injury and, therefore, Plaintiffs lack standing to
> sue Assurant. . . .

> [P]laintiffs claim the injury is traceable to Assurant. Plaintiffs allege that Assurant, acting
> with [the lender], provided grossly overpriced homeowners insurance policies as force-
> placed insurance to [the lender's] borrowers, and then paid commissions to [the lender]
> for the referral of business. Plaintiffs contend this arrangement establishes that their
> injury is directly traceable to Assurant's conduct, and that Assurant was a substantial part
> of the 'scheme' to defraud plaintiffs. . . . As plaintiffs have adequately alleged the
> requirements of Article III case-or-controversy standing, the Court denies Assurant's
> motion to dismiss based on lack of standing."

Hoover v. HSBC Mortgage Corp. (USA), 9 F. Supp. 3d 223, 240 (N.D.N.Y. 2014) (quoting

Simpkins, 2013 WL 4510166, at *11)). The Court here adopts this reasoning and finds that

Plaintiffs sufficiently allege standing with respect to causation against Assurant, Inc.

### d.  Failure to Exhaust Administrative Remedies

Finally, the Assurant Defendants allege that the Ervings, whose mortgaged property was

located in Florida, failed to exhaust their administrative remedies. Florida law provides an

administrative complaint procedure for "[a]ny person aggrieved by any rate charged, rating plan,

rating system, or underwriting rule followed or adopted by an insurer" and allows such persons

to "make written request of the insurer or rating system to review the manner in which the rate,

plan, system, or rule has been applied with respect to insurance afforded her or him." Fla. Stat. §

627.371. The statute provides the exclusive means for challenging insurance rates and premiums

in Florida. Int'l Patrol & Detective Agency, Co., Inc. v. Aetna Cas. & Surety Co., 419 So. 2d

323, 324 (Fla. 1982).

Plaintiffs argue that they were not required to exhaust under the statute, because they were not challenging the rates and were instead challenging conduct. At the time the Court issued its summary order, Plaintiffs had ample support for that position. A line of cases found, "Plaintiffs are not complaining of an excessive insurance rate, they are complaining that the defendant bank acted unlawfully when it chose this particular insurance company and this particular rate. For these reasons, the doctrine of primary agency jurisdiction does not bar this action." Abels v. JPMorgan Chase Bank, N.A., 678 F. Supp. 2d 1273, 1278 (S.D. Fla. 2009); see also Cannon v. Wells Fargo Bank, N.A., 917 F. Supp. 2d 1025, 1039-1040 (N.D. Cal. 2013) (same); Montoya v. PNC Bank, N.A., No. 14-20474-CIV, 2014 WL 4248208, at *6 (S.D. Fla. Aug. 27, 2014) (same).

The Second Circuit's decision in Rothstein would seem to weaken that rationale. However, the Assurant Defendants did not move for reconsideration on this ground. Further, courts have since articulated a second, independent reason why the Florida statute does not require Plaintiffs to exhaust their administrative remedies: "the plain text of the statute makes clear that the remedy provided by § 672.321 is available to plaintiffs claiming violations of Florida's insurance code." Wilson v. EverBank, N.A., 77 F. Supp. 3d 1202, 1235 (S.D. Fla. 2015) (quoting Montoya v. PNC Bank, N.A., No. 14-20474-CIV, 2014 WL 4248208, at *6 (S.D. Fla. Aug. 27, 2014)); c.f. Cont'l Cas. Co. v. First Fin. Employee Leasing, Inc., 716 F. Supp. 2d 1176, 1186 (M.D. Fla. 2010) ("If the [administrative] complaint states a violation of *Chapter 627's provisions* governing rates and ratemaking, [the Office of Insurance Regulation] may order corrective action (including a premium adjustment) . . .") (emphasis added). Where, as here, Plaintiffs do not allege a violation of Florida's Insurance Code but instead allege a violation of the Florida Deceptive and Unfair Trade Practices Act, § 627.321 is not implicated. Therefore,

16

even if the Assurant Defendants had raised <u>Rothstein</u> as an intervening change of law in this context, their argument would have been unavailing, as that change of law would not have controlled the outcome on the administrative exhaustion question. For the foregoing reasons, the Assurant Defendants' motion to dismiss pursuant to Rule 12(b)(1) is DENIED, as is their motion to reconsider.

## II.      Rule 12(b)(6)

All Defendants move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing that the filed rate doctrine bars all of Plaintiffs' claims against all Defendants. Under the filed rate doctrine, "any filed rate—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers." <u>Rothstein v. Balboa Ins. Co.</u>, 794 F.3d 256, 261 (2d Cir. 2015) (quoting <u>Wegoland Ltd. v. NYNEX Corp.</u>, 27 F.3d 17, 18 (2d Cir. 1994)) (internal quotation marks omitted). The doctrine is grounded in two related principles: first, the principle of nonjusticiability, i.e. "that courts should not undermine agency rate-making authority by upsetting approved rates"; and second, the principle of nondiscrimination, i.e. "that litigation should not become a means for certain ratepayers to obtain preferential rates." <u>Id.</u> (citing <u>Marcus v. AT&T Corp.</u>, 138 F.3d 46, 58 (2d Cir. 1998)) (internal quotation marks and alteration marks omitted).

The filed rate doctrine has a wide reach. Indeed, "[w]hen the filed rate doctrine applies, it is rigid and unforgiving." <u>Simon v. KeySpan Corp.</u>, 694 F.3d 196, 205 (2d Cir. 2012). It bars both federal and state causes of action and protects rates approved by either federal or state regulators. <u>Wegoland</u>, 27 F.3d at 20. "It does not depend on the culpability of the defendant's conduct or the possibility of inequitable results, nor is it affected by the nature of the cause of

action the plaintiff seeks to bring." Simon, 694 F.3d at 205 (quoting Marcus, 138 F.3d at 58)

(internal quotation marks omitted)

Until recently, however, it was unclear whether the doctrine barred claims where

Plaintiffs were not the direct customers of the rate filer. This question arose in cases, like this

one, where plaintiffs' lenders or mortgage servicers purchased lender-placed (or force-placed)

insurance policies and passed the cost onto plaintiffs, and plaintiffs sued their lenders and

mortgage servicers, the insurance companies, or both. Some courts—including the only court in

this Circuit to consider the question—found the filed rate doctrine inapplicable to such suits,

characterizing the claims "not so much as a challenge to the legal rates charged, but rather as a

challenge to the manner in which the defendants select the insurers, the manipulation of the

force-place insurance policy process, and the impermissible kickbacks included in the

premiums." Rothstein v. GMAC Mortgage, LLC, No. 12 Civ. 3412 AJN, 2013 WL 5437648, at

*6 (S.D.N.Y. Sept. 30, 2013) (quoting Simpkins v. Wells Fargo Bank, N.A, No. 12 Civ. 0768,

2013 WL 4510166 (S.D. Ill. Aug. 26, 2013); see also id. (collecting cases). Other courts,

however, "found the distinction dubious, particularly because calculating damages in cases like

the one before it would require the Court to impermissibly make a judicial determination of the

reasonableness of the rate . . ." Id. (quoting Roberts v. Wells Fargo Bank, N.A., No. 12 Civ. 200,

2013 WL 1233268 (S.D.Ga. Mar. 27, 2013)).

Overturning the District Court's determination, the Second Circuit in Rothstein agreed

with those courts that found the filed rate doctrine applicable. In Rothstein, the plaintiffs alleged

that "they were fraudulently overbilled because the rates they were charged" by their mortgage

servicer as reimbursement for LPI "did not reflect secret rebates and kickbacks that [the servicer]

received from [the insurance company] through [the company's] affiliate." Rothstein, 794 F.3d

at 259. The Second Circuit found that plaintiffs' claims implicated both the nonjusticiability

principle and the nondiscrimination principle. Id. at 263. As to the nonjusticiability principle, the

Court found that "plaintiffs' claims would undermine the rate-making authority of the state

insurance regulators who approved [the insurance company's] LPI rates." Id. This is because

their claim of overbilling "rest[s] on the premise that the rates approved by regulators were too

high," as the insurance company would only be willing to offer a "discount" from the filed rates

(by providing free services to the mortgage servicer) if the rates had been inflated in the first

place. Id. "But whether insurer-provided services should have been reflected in the calculation of

LPI is not for us to say; under the nonjusticiability principle, the question is reserved exclusively

to the regulators." Id. (citing Ark. La. Gas Co. v. Hall, 453 U.S. 571, 578-79 (1981)). The Court

also found that the claims offended the nondiscrimination principle, as "[a]ny damages recovered

by these Plaintiffs would operate like a rebate to give them a preference over other borrowers

who were charged for LPI." Id. (quotation marks and alteration marks omitted). "The problem is

not obviated simply because Plaintiffs have brought their claims on behalf of a putative class."

Id. (citing Sun City Taxpayers' Ass'n v. Citizens Utils. Co., 45 F.3d 58, 62 (2d Cir. 1995)).

Finally, the Second Circuit disagreed with the District Court's holding "that the filed rate

doctrine does not apply at all because the doctrine addresses only a simple A-to-B transaction—

in which A, the insurer, approved a rate and charged it to B, not the A-to-B-to-C arrangement at

issue here, in which the insurer billed the lender and the lender in turn billed the borrower."

Rothstein, 794 F.3d at 264 (quoting Rothstein, 2013 WL 5437648, at *8-9) (internal quotation

marks omitted). Instead, the Second Circuit held, "[T]he filed rate doctrine is not limited to

transactions in which the ratepayer deals directly with the rate filer. The doctrine operates

notwithstanding an intermediary that passes along the rate." Id. Turning specifically to LPI, the Court wrote:

> "The distinction between an 'A–to–B' transaction and an 'A–to–B–to–C' transaction is especially immaterial in the LPI context because LPI travels invariably 'A–to–B–to–C.' . . . There are three participants in the transaction (insurer, lender, borrower), but the lender is a go-between that connects the insurer (the party selling insurance) to the borrower (the party actually paying for it). Thus LPI is an A–to–B–to–C transaction that implements a two-party transaction between the insurer and the borrower."

Id. The Court did note "that the lender need not act as a pass-through, and could theoretically decouple its purchase of LPI from its demand of reimbursement, for example, by charging the borrower twice (or half) the filed rate." Id. However, the Second Circuit was dubious that "any such action by the *lender* could result in liability for the *insurer,* which would (under any such arrangement) still be legally compelled to charge the filed rate." Id. (emphasis in original). But because no such facts were alleged in Rothstein, the Court stopped short of definitively answering that question.

Defendants here argue that Plaintiffs' case is indistinguishable from Rothstein, and Plaintiffs' claims against all Defendants must be dismissed. Plaintiffs, on the other hand, make four arguments as to why their case is distinguishable from Rothstein and why their claims should not be dismissed: first, they argue that Rothstein applies the filed rate doctrine only to claims brought by borrowers against insurers, not claims brought by borrowers against lenders or servicers; second, they claim that the kickbacks they allege are substantively different than those alleged in Rothstein; third, they assert that the Rothstein plaintiffs directly challenged the rate, whereas they challenge only Defendants' unlawful conduct; and fourth, they point out that the policies at issue here are "commercial lines" policies, rather than "personal lines" policies. The Court finds all of these arguments unavailing.

### i.   Applicability to Mortgage Servicers

Plaintiffs first argue that <u>Rothstein</u> bears only upon claims brought by borrowers against insurers and does not hold that claims asserted against lenders or mortgage servicers and their affiliates are barred. (Pl.'s Mem. Law Supp. Opp. Mot. Dismiss, ECF No. 194 ("Pl.'s Opp."), 3, 9.) Thus, Plaintiffs argue, <u>Rothstein</u> has no impact on the claims against the Litton Defendants and the Saxon Defendants.

While it is true that at the time the Second Circuit decided <u>Rothstein</u>, only insurer-defendants remained in the case, 794 F.3d at 259, the logic of the case applies to the claims against Loan Servicing Defendants as well. Plaintiffs argue that the servicers' demands for reimbursement are governed by the terms of their mortgage agreements, and that "insurance regulators do not oversee the amounts that mortgage servicers can lawfully charge borrowers under the terms of their mortgage agreements." (Pl.'s Opp., 9.) They postulate, as the <u>Rothstein</u> plaintiffs did, that a lender or servicer could decouple its purchase of LPI from its demand of reimbursement, and charge borrowers only a portion of the premium paid by the servicer for the LPI coverage. (<u>Id</u>.) That mortgage servicers have a responsibility, independent of insurance regulators, to determine the amount charged to borrowers must mean that the filed rate doctrine does not apply. Plaintiffs find support for this argument in several pre-<u>Rothstein</u> decisions. <u>See Hoover v. HSBC Mortgage Corporation</u>, 9 F. Supp. 3d 223, 239 (N.D.N.Y. 2014); <u>Cannon v. Wells Fargo Bank N.A.</u>, 12-cv-1376, 2014 WL 324556, *5 (N.D. Cal. Jan. 29, 2014); <u>Abels v. JPMorgan Chase Bank</u>, 678 F. Supp. 2d 1273, 1277 (S.D. Fla. 2009).

But regardless of who is ultimately responsible for setting the amount charged to borrowers and what that amount is set at, claims against the Loan Servicing Defendants implicate the nonjusticiability principle of the filed rate doctrine. This is clearest where, as here, the Loan Servicing Defendants pass on to Plaintiffs an amount equal to the premium paid for the

LPI. (Wilson Decl., ECF No. 101 (Ervings); Wilson Decl. ECF No. 102 (Heard)). If the Court were to inquire into the reasonableness of the amount charged by the Loan Servicing Defendants to the Plaintiffs, the Court would necessarily have to inquire into the reasonableness of the filed rates charged by the insurers to the Loan Servicing Defendants. This is not allowed. See Rothstein, 794 F.3d at 263.

While Rothstein was directed at a case with an insurer-defendant, the Second Circuit made clear that the "doctrine operates notwithstanding an intermediary that passes along the rate." Id. at 264. It would make little sense to apply the filed rate doctrine to bar claims by plaintiffs against insurer-defendants challenging rates, but to allow claims by plaintiffs against the intermediary loan servicing defendants challenging the very same rates. In cases like this one, the filed rate doctrine applies equally to claims against the Insurer Defendants and claims against the Loan Servicing Defendants. See Trevathan v. Select Portfolio Servicing, Inc., No. 15-61175-Civ., 2015 WL 6913144, at *3 (S.D. Fla. Nov. 6, 2015) ("The Court extends Rothstein 's reasoning to the servicer, as failing to do so would contravene the purposes of the filed-rate doctrine.").

### ii. Form of Alleged Kickbacks

Next, Plaintiffs assert that the alleged kickbacks in their case are substantively different than those at issue in Rothstein. (Pl.'s Opp., 12.) While the kickbacks alleged in Rothstein took the form of free tracking services, the kickbacks alleged here also include unlawful reinsurance, referral fees, commissions, and services. (SAC ¶¶ 17-19, 40, 99, 101, 107.) The conduct alleged here, Plaintiffs argue, "went a step further – creating unlawful, fictitious payment mechanisms in order to disguise cash payments to the mortgage servicers not authorized under the mortgage agreements." (Pl.'s Opp., 13.)

Regardless of the form of the alleged scheme, however, the same concerns are implicated: the Court cannot examine whether *any* form of benefit or alleged scheme impermissibly inflated the amounts charged to Plaintiffs without also examining the rates set by regulators. Setting aside the form of the scheme, Plaintiffs' "claims . . . rest on the premise that the rates approved by the regulators were too high," Rothstein, 794 F.3d at 263, and that they were inflated by the Assurant Defendants and the Loan Servicing Defendants' conspiracies. "But whether insurer-provided services"—or unlawful reinsurance, commission, or expense reimbursements—"should have been reflected in the calculation of LPI is not for us to say; under the nonjusticiability principle, the question is reserved exclusively to the regulators." Id. This rationale, and thus the applicability of the filed rate doctrine, does not change based on the form of the scheme. Therefore, the filed rate doctrine applies as much to the scheme alleged here as it did to the scheme alleged in Rothstein.[4]

### iii. Characterization of Claims

Third, Plaintiffs claim that the Rothstein plaintiffs directly challenged the rate, whereas they challenge Defendants' unlawful conduct. (Pl.'s Opp., 13.) This, they argue, means that the filed-rate doctrine is not implicated. Their argument, however, flies in the face of the Rothstein decision, which held that "[a] claim may be barred under the filed rate doctrine even if it can be characterized as challenging something other than the rate itself." 794 F.3d at 262.

Plaintiffs here characterize their claims not as a challenge to the rates they were charged but as a challenge to the Defendants' unlawful conduct, the payment and acceptance of

---

[4] Plaintiffs point to a comment Judge Lynch made during the Rothstein oral argument as to the form of the kickback. However, as other courts have noted, "it is the judicial opinion which stands as the sole expression of the court; statements made at oral argument do not determine the scope of an opinion unless explicitly incorporated into the opinion." United States v. Maciel-Alcala, 612 F.3d 1092, 1096 n. 2 (9th Cir. 2010) (quoting United States v. Bd. of Educ. of Chicago, 799 F.2d 281, 285 n. 3 (7th Cir. 1986)) (internal quotation marks omitted).

kickbacks in exchange for purchasing a particular type of insurance. (Pl.'s Opp., 13; SAC ¶ 44).
While Plaintiffs characterize the Rothstein plaintiffs' claims as directly challenging the rates
approved by regulators, the Rothstein plaintiffs in fact raised substantively the same argument.
Like Plaintiffs here, the Rothstein plaintiffs insisted "that the filed rate doctrine did not bar their
claims because they were attacking the fraudulent scheme, not the rates themselves." Rothstein,
794 F.3d at 262.[5] The Second Circuit rejected that argument, explaining that even where the
challenge is framed as a challenge to conduct, the claims "rest on the premise that the rates
approved by regulators were too high. Id. at 263. That is, "the theory behind the claims is that
Plaintiffs were overbilled when they were charged the full LPI rates (which were approved by
regulators), instead of lower rates net of the value of loan tracking services" provided by the
insurer. Id. at 262. For this theory to succeed, however, the Court would have to examine
whether loan tracking services (or any other kickbacks) "should have been treated as part and
parcel of the LPI transaction and *reflected in the LPI rates*." Id. (emphasis in original). This
inquiry would violate the nonjusticiability principle, as "it is squarely for the regulators to say
what should or should not be included in a filed rate." Id. (citing Wegoland, 27 F.3d at 21).

As in Rothstein, Plaintiffs' claims would require the Court to consider the reasonableness
of the rates charged. Plaintiffs allege that the amounts for which the Loan Servicing Defendants
sought reimbursement from Plaintiffs—that is, purported insurance premiums in line with the
filed rates—"do not constitute their actual cost once the 'commissions,' tracking fees and other

---

[5] See also Corrected Brief of Plaintiffs-Appellees, 1,  Rothstein v. Balboa Ins., 794 F.3d 256 (2d Cir. 2015)
("[Defendants] portray this lawsuit as alleging that Defendants defrauded state insurance regulators by filing
'inflated' rates. This depiction is false. The District Court held that [Plaintiffs] adequately alleged that Defendants
violated [RICO], not by defrauding regulators or filing 'inflated' rates, but, instead, by participating with [a loan
servicer] in a fraudulent scheme to overstate [the loan servicer's] insurance costs, and thereby to recoup inflated
reimbursements from Plaintiffs, who were obligated to indemnify those costs under their mortgages.") (internal
citations omitted).

payments between the Insurer Defendants and the Loan Servicing Defendants are taken into account." (Pl.'s Opp., 13; SAC ¶ 44.) To analyze that allegation, the Court would have to determine whether the approved rates had been inflated—that is, whether "insurer-provided services should have been reflected in the calculation of LPI" or, likewise, whether the alleged commissions, reinsurance, or expense reimbursement payments should have been reflected in the calculation of LPI. It is not for the Court to answer these questions; "under the nonjusticiability principle, the question is reserved exclusively to the regulators." Rothstein, 794 F.3d at 263. See also Coll v. First Am. Title Ins. Co., 642 F.3d 876, 888-90 (10th Cir. 2011) (quoting H.J. Inc. v. Nw. Bell Tel. Co., 954 F.2d 485, 489 (8th Cir. 1992)) ("[T]he underlying conduct does not control whether the filed rate doctrine applies. Rather, the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations"); Trevathan v. Select Portfolio Servicing, Inc., No. 15-61175-Civ, 2015 WL 6913144, at *3 (S.D. Fla. Nov. 6, 2015) ("Plaintiff argues that it is not the rate itself, but rather the 'kickback' present in the inflated rate and the Defendants' alleged collusion and self-dealing' that is at issue. Defendants respond that the purported distinction is meaningless. . . . Based on Rothstein, a recent Second Circuit decision, the Court finds that both of Plaintiff's arguments are unavailing.").

Plaintiffs' arguments to the contrary are not persuasive. First, they rely heavily on cases that predate Rothstein for the proposition that the filed rate doctrine does not apply to challenges to allegedly improper conduct underlying the rates. Only one of these cases, Hoover v. HSBC Mortgage Corp. (USA), 9 F. Supp. 3d 223 (N.D.N.Y. 2014), was in this Circuit. In that case, the Northern District of New York agreed with a "substantial body of case law [in] which courts have found claims . . . sufficient to survive a motion to dismiss, to the extent Plaintiffs do not

challenge the rates charged by Defendants (as opposed to challenges to allegedly improper conduct underlying the rates, such as kickbacks)." Hoover, 9 F. Supp. 3d at 238. But that opinion was issued a year prior to Rothstein, and to the extent that the cases are in conflict, Rothstein overruled Hoover. Similarly, the Third Circuit cases on which Plaintiffs rely are unpersuasive in light of Rothstein. The Third Circuit found it "absolutely clear that the filed rate doctrine simply does not apply [where] Plaintiffs challenge [a defendant's] allegedly wrongful conduct, not the reasonableness or propriety of the rate that triggered that conduct." Alston v. Countrywide Fin. Corp., 585 F.3d 753, 765 (3d Cir. 2009); see also Gallo v. PHH Mortgage Corp., 916 F. Supp. 2d 537, 545 (D.N.J. 2012); Stevens v. Citigroup, Inc., No. Civ. A. 00-3815, 2000 WL 1848593 (E.D. Pa. Dec. 15, 2000). However, as another court in the Third Circuit recently noted, "Rothstein . . . is in direct tension with the prevailing precedent in the Third Circuit, Alston." Weiss v. Bank of Am. Corp., No. 15-62, 2015 WL 9304506, at *10 (W.D. Pa. Dec. 22, 2015). In this Circuit, the logic of Rothstein controls.

Plaintiff's second argument is similarly in tension with Rothstein. Plaintiffs argue that in the Second Circuit, the filed rate doctrine only bars claims that are characterized as challenges to fraud on *regulators*. (Pl.'s Opp. 16-17). However, as discussed above, the Rothstein plaintiffs alleged that the insurer and lender engaged in a fraudulent scheme to overstate insurance costs and recoup inflated reimbursements from plaintiffs; they did not allege fraud on the regulators. Faced with the same type of fraud alleged here, rather than limit the applicability of the filed rate doctrine to claims of fraud on regulators, the Second Circuit found the filed rate doctrine applicable. Regardless of how Plaintiffs characterize their claims, they are barred by the filed rate doctrine.

### iv.  Nature of Policies

Finally, Plaintiffs point out that the LPI at issue is "commercial lines" insurance, covering businesses, as opposed to "personal lines" insurance, covering individual consumers. Here, the mortgage servicer was identified as the "primary insured" under the policy and the Plaintiffs were identified as "Additional Insured." (See, e.g. Exh. 39, SAC.) The policies provided that the "Named Insured Mortgagee is authorized to act for such Additional Insured in all matters pertaining to this insurance including the receipt of Notice of Cancellation, and return of premium, if any." (Id.) This, Plaintiffs argue, fundamentally changes the Loan Servicing Defendants' role.

Plaintiffs' contention seems to be that it is because the Loan Servicing Defendants are the primary policy holders that the LPI protects their commercial interest in the properties, and "thus, to the extent any rate is approved for the commercial LPI product, it is the rate that the Insurer Defendants are permitted to charge the Mortgage Servicing Defendants." (Pl.'s Opp., 19). Put this way, the commercial lines argument is merely a recapitulation of their earlier argument that the filed rate doctrine should not bar claims against the Loan Servicing Defendants because the amount they demand from Plaintiffs is not necessarily the filed rate. To the extent that the arguments overlap, the Court reiterates that it cannot examine the amount charged for reimbursement to Plaintiffs without considering the reasonableness of the filed rate—and that exercise would violate the nonjusticiability principle.

To the extent that Plaintiffs are arguing that the purpose of LPI—and thus the Rothstein analysis—is different based on who is listed as primary insured versus additional insured, the Court finds this argument unconvincing. Regardless of who is listed in what role, LPI serves to "mitigate the risk that the mortgaged property will be damaged or destroyed before the loan is repaid," Rothstein, 794 F.3d at 259, and thus to protect the loan servicers' interest in the

property. No matter the listed roles, "LPI travels invariably A-to-B-to-C," and "the lender [or mortgage servicer] is a go-between that connects the insurer (the party selling insurance) to the borrower (the party actually paying for it)." Id. at 265. No matter what, the insurance ultimately protects the lender's interest in the property. Whether Plaintiffs or the Loan Servicing Defendants are the primary insured, the essential quality of the transaction remains unchanged, and so too does the application of the filed rate doctrine to Plaintiffs' claims.

**CONCLUSION**

For the reasons above, the Court DENIES the Assurant Defendants' motion for partial reconsideration of their Rule 12(b)(1) motion to dismiss (ECF No. 192) and GRANTS the Assurant Defendants', Litton Defendants', and Saxon Defendants' motion to dismiss the claims of Plaintiffs Johnnie and Jacqueline Erving and Heard, filed pursuant to this Court's Order to show cause. (ECF No. 190.) The surviving claims are: (1) the claims brought by Plaintiffs Jacqueline and Jimmy Lyons against the Litton Defendants; and (2) the claims brought by Plaintiffs Jacqueline and Jimmy Lyons and Heard against the American Modern Defendants.[6]

**SO ORDERED.**

**Dated:** February 2 , 2016

        **New York, New York**

                                   **ANDREW L. CARTER, JR.**

                                   **United States District Judge**

---

[6] Plaintiffs and the American Modern Defendants have submitted a proposed class action settlement for the Court's approval. (ECF No. 197.) The Court entered an Order on January 13, 2016, granting preliminary approval of a class action settlement of the claims against the American Modern Defendants. (ECF No. 207.) A hearing regarding final approval of the Settlement will be held on April 22, 2016. (Id.)